IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ARLIN M. ADAMS, as Chapter 11<br>Trustee of the Bankruptcy Estates of<br>Coram Healthcare Corp. and Coram, Inc.<br>and not individually,<br><br>Plaintiff,<br><br>v.<br><br>GENESIS INSURANCE COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. _____<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, Arlin M. Adams, as the Chapter 11 Trustee of the bankruptcy estates of

Coram Healthcare Corporation ("CHC") and its wholly-owned subsidiary Coram, Inc. ("CI")

(collectively "Coram"), by way of complaint against Genesis Insurance Company ("Genesis"),

states:

## PARTIES

1.      Coram is the leading provider of alternative-site infusion therapy in the United

States.  Infusion therapy involves the intravenous administration of drug therapies for nutrition,

anti-infection, HIV, blood factor, pain management, chemotherapy and other purposes.

2.      On August 8, 2000, Coram filed a voluntary petition for relief under Chapter 11

of the United States Code §§ 101, *et seq*. (the "Bankruptcy Code") in the United States

Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

3.      At a hearing held on February 12, 2002, the Bankruptcy Court granted two

motions seeking the appointment of a Chapter 11 trustee to assume control over Coram's

property and affairs pursuant to Section 1104 of the Bankruptcy Code.  On March 7, 2002, the

Bankruptcy Court entered an order approving the appointment of Arlin M. Adams, former judge

of the United States Court of Appeals for the Third Circuit, as Chapter 11 Trustee of Coram (the

"Trustee").

4.      At all times relevant hereto, CHC was a Delaware corporation.

5.      CI is a Delaware corporation.

6.      The Trustee lives and works in the Commonwealth of Pennsylvania.

7.      Genesis is a Connecticut corporation with principal places of business in

Connecticut and is authorized to do business in Delaware.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as the

action is between citizens of different states and the matter in controversy exceeds $75,000,

exclusive of interest and costs.

9.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1409.

## FACTUAL ALLEGATIONS

**A.      The Outside Directors' Failure to Investigate
and Address Crowley's Conflict of Interest.**

10.      On December 21, 2000, the Bankruptcy Court denied confirmation of Coram's

first proposed plan of reorganization.  The Bankruptcy Court held that Coram had not proposed

its plan in good faith because its CEO, Daniel D. Crowley ("Crowley"), had an actual conflict of

interest, which he failed to disclose, due to his separate employment contract with one of

Coram's largest creditors, Cerberus Partners, L.P. ("Cerberus"), which required that Crowley

obey the instructions of Cerberus and under which Crowley was being paid almost $1 million per

year.  A true and correct copy of the Bankruptcy Court's decision is attached hereto as Exhibit A.

11.    Following denial of confirmation of the first plan, Coram's Board of Directors formed a Special Committee of independent directors, consisting of Coram's four outside directors: Donald J. Amaral; William J. Casey; L. Peter Smith; and Sandra L. Smoley (the "Outside Directors").  The Special Committee retained Harrison J. Goldin Associates, L.L.C. ("Goldin"), a financial advisory firm, as an independent restructuring advisor.  Coram filed a motion to appoint Goldin on February 1, 2001, which the Bankruptcy Court approved on February 26, 2001.

12.    As approved by the Bankruptcy Court, Goldin's assignment was to advise the Special Committee regarding Crowley's relationship with Cerberus and potential revisions to the plan of reorganization that had been rejected.

13.    Goldin prepared a report of his investigation and Coram incorporated his recommendations into Coram's second proposed plan of reorganization.

14.    On December 21, 2001, the Bankruptcy Court issued a written opinion denying confirmation of the Debtors' second plan.  *In re Coram Healthcare Corp.,* 271 B.R. 228 (Bankr. D. Del. 2001), a true and correct copy of the Bankruptcy Court's opinion is attached as Exhibit B. After hearing testimony concerning events since December 2000, the Bankruptcy Court concluded:

> Nothing, in fact, has changed since the first confirmation hearing. Crowley continues to receive almost $1 million a year from one of the Debtors' largest creditors, while, serving as the Debtors' CEO and President.  Under his agreement with Cerberus, he is required to obey its instructions or risk having the agreement terminated and losing his $1 million.  This is an actual conflict of interest, as we concluded at the first confirmation hearing.

*Id.* at *17-18.

15.    The Bankruptcy Court rejected Coram's argument that Crowley's conflict of interest had caused no harm to Coram.  To that end, the Bankruptcy Court found that:

> there is absolutely no evidence from which the Court can conclude
> that the Debtors have suffered no harm from Crowley's continued
> conflict of interest. Mr. Goldin's assertion that there must be no
> harm since the disclosure of the relationship because no harm was
> caused by Crowley when the relationship was hidden is not logical,
> nor is it borne out by the facts. Crowley did cause harm to the
> Debtors while his relationship with Cerberus was hidden and there
> is no reason to assume he did not cause harm to the Debtors when
> that relationship was disclosed.

*Id.* at * 27.

16.     In its opinion, the Bankruptcy Court noted that one of the Outside Directors
"testified that Goldin was hired to 'sprinkle holy water on the situation' and make everything all
right." *Id.* at *15.

17.     The Bankruptcy Court found that the Special Committee had taken no action in
response to the denial of confirmation of Coram's first plan other than hiring Goldin and
reviewing his report. The Bankruptcy Court explained, "[s]ignificantly, it did not conduct any
investigation of Crowley's conflict of interest, did not require that Crowley cease accepting any
compensation from Cerberus and did not even ask Crowley if the conflict persisted." *Id.*

18.     The Bankruptcy Court stated that Coram "should have required that Crowley
sever all agreements with Cerberus as a condition of continued employment" and concluded that
the "don't ask, don't tell" approach adopted by the Special Committee did not fulfill its fiduciary
duty and that the Special Committee's hiring of Goldin neither cured the conflict nor evidenced
good faith. *Id.* at *29, 33.

19.     In its later opinion confirming the plan of reorganization proposed by the Trustee,
the Bankruptcy Court made it clear that Crowley's conflict was the reason that Coram remained
in bankruptcy:

> As we recognized at the conclusion of the first confirmation
> hearing, Crowley's consultation agreement with Cerberus created
> an actual conflict of interest that tainted the Debtors' restructuring
> of its debt, the Debtors' negotiation of a plan, and the Debtors'

4

> ultimate emergence from bankruptcy. The delay (and the
> additional expenses incurred by the Debtors inherent in that delay)
> is largely attributable to that conflict.

*In re Coram Healthcare Corp.*, 315 B.R. 321, 347-48 (Bankr. D. Del. 2004), a true and correct

copy of which is attached hereto as Exhibit C.

## B.    The Confirmation of the Trustee's Plan.

20.    Shortly after the Bankruptcy Court rejected Coram's second plan of

reorganization, the Trustee was appointed.

21.    On May 1, 2003, the Trustee filed a proposed plan of reorganization that provided

for a breach of fiduciary duty lawsuit against Crowley and the Outside Directors.

22.    In accordance with the Court's order entered as of November 1, 2004, the

Bankruptcy Court confirmed the Trustee's Second Amended Plan of Reorganization (the

"Plan"), which became effective on December 1, 2004 (the "Effective Date").

## C.    The Trustee's D&O Action.

23.    On December 29, 2004, in accordance with the confirmed Plan, the Trustee filed

an action in the United States District Court for the District of Delaware, Civil Action No. 04-

1565 (SLR) (the "D&O Action"), asserting that Crowley and the Outside Directors breached

their fiduciary duties to Coram.  A true and correct copy of the Complaint in the D&O Action is

attached as Exhibit D.

24.    In the complaint commencing the D & O Action, the Trustee alleged that the

Outside Directors breached their fiduciary duties to Coram by, *inter alia*:  (a) making no

inquiries and approving Crowley's employment as CEO without investigating Crowley's

relationship with Cerberus or learning that Crowley was receiving nearly $1 million per year

from Cerberus; (b) failing to take adequate remedial action after the Bankruptcy Court rejected

the Debtors' first plan as a result of Crowley's conflict; (c) failing to inquire as to whether Crowley continued to receive payments from Cerberus after the Bankruptcy Court denied confirmation of the first plan; and (d) hiring Goldin, not to give truly independent advice, but rather to "sprinkle holy water" on the situation.

25.    In the D&O Action, the Trustee seeks to recover more than $100 million in damages, including more than $40 million in reorganization expenses incurred by Coram after the first plan was rejected and the substantial diminution in Coram's value that resulted from the delay in its emerging from bankruptcy.

**D.    The D&O Policy Issued By Genesis.**

26.    Coram purchased from Genesis a Directors' and Officers' Liability Policy (Policy No. YXB001625A) (the "D&O Policy), which, as amended, covered the period from January 8, 1999 through January 27, 2001 (the "Policy Period") and had a discovery period for reporting claims extending until January 27, 2002 (the "Discovery Period"). The D&O Policy has an aggregate limit of liability of $25 million. A true and correct copy of the D&O Policy is attached as Exhibit E.

27.    The Outside Directors notified Genesis of the D&O Action and requested that Genesis defend their interests. Genesis declined.

28.    Under the D&O Policy, Genesis agreed to pay: (a) claims made during the Policy Period based on a "Wrongful Act" of Coram's officers and directors, (b) claims made during the Discovery Period based on a "Wrongful Act" of Coram's officers and directors during the policy period, (c) claims made after the Policy Period that were based on potential claims of which notice was provided during the Policy Period, and (d) claims made after the Policy Period that were based on or arising out of the same acts that were already subject to claims made during the Policy Period.

29.     The definition of a "Wrongful Act" under the D&O Policy includes "any actual or alleged act, omission, misstatement, misleading statement, neglect, error or breach of duty" of Coram's directors or officers in their capacity as directors or officers of Coram. (D&O Policy § II.L.)

30.     The Trustee's claims in the D&O Action that the Outside Directors breached their fiduciary duties by, *inter alia*, failing to properly investigate Crowley's relationship with Cerberus and adopting a "don't ask, don't tell" approach to Crowley's conflict of interest constitute "Wrongful Act[s]" for which Genesis is required to provide coverage pursuant to the D&O Policy.

**E.     Genesis Was Timely Notified of the Claims in the D&O Action.**

31.     The D&O Policy requires that Genesis be given written notice as soon as practicable of any claim first made during the Policy Period or the Discovery Period and in no event later than thirty (30) days after the expiration of the Policy Period or Discovery Period. (D&O Policy § VII.A.)

32.     Genesis was timely notified of the claims in the D&O Action.

33.     The D&O Policy provides that claims based upon or arising out of similar facts or circumstances shall be considered a single claim deemed to be made when the earliest claim is filed or notice of a potential claim is given. The Policy states:

> More than one Claim based upon or arising out of the same Wrongful Act(s), or facts or circumstances or situations, or one or more series of similar, repeated or continuous Wrongful Acts, shall be considered a single Claim, and only one Retention shall be applicable to such single Claim. Such single Claim shall be deemed to be first made on the date when the earliest Claim is first made, or on the date within the Policy Period in which notice of a potential Claim pursuant to Section VII.B.is given.

(D&O Policy § V.C.)

7

34.    On November 8, 2000, Coram shareholders brought a class action suit against Crowley and the Outside Directors (and others) in the United States District Court for the District of New Jersey, alleging securities fraud and breach of fiduciary duty. *See Furst v. Feinberg, et al.*, No. 2:00-cv-5509. Coram notified Genesis of the *Furst* case during the Policy Period and Genesis agreed to defend the action.

35.    On March 21, 2001, the *Furst* plaintiffs filed a Second Amended Complaint to include specific claims against Crowley and the Outside Directors based upon Crowley's conflict. A true and correct copy of the Second Amended Complaint in *Furst* is attached as Exhibit F.

36.    Coram notified Genesis of the Second Amended Complaint during the Discovery Period. Genesis defended Crowley and the Outside Directors in *Furst*.

37.    The factual allegations in the D&O Action are virtually identical to those in the Second Amended Complaint in *Furst*:

| *FURST v. FEINBERG*<br>*Second Amended Complaint:* | *DELAWARE ACTION*<br>*The Trustee's Complaint:* |
|---|---|
| "Cerberus, acting through Feinberg, hired Crowley in August, 1989 [sic], to be a full-time employee of Cerberus with cash compensation of $1 million per year and opportunities for substantial additional bonuses." ¶ 36. | "In July 1999, Crowley and Cerberus entered into an oral agreement pursuant to which Crowley agreed to work exclusively for Cerberus for three years at a salary of $80,000 per month plus expenses and the possibility of substantial bonuses if Cerberus' investments on which Crowley had consulted were profitable." ¶ 13. |
| "As soon as Crowley was hired to work full time for Cerberus, Feinberg recommended that Coram hire Crowley as a 'consultant.'" ¶ 36. | "In August 1999, after Crowley and Cerberus had made their oral agreement, Feinberg recommended to the Board that Coram hire Crowley as a 'consultant' or 'CEO coach' to work with the newly-elevated CEO, Richard Smith." ¶ 14. |

8

| | |
|---|---|
| "Feinberg, a member of the Coram Board of Directors, did not disclose to the board the compensation terms of Crowley's employment agreement with Cerberus nor did he disclose that Crowley had agreed to work full time for Cerberus under the direction of Feinberg and that all of Crowley's benefits could be terminated by Feinberg if Crowley did not follow his instructions." ¶ 38. | "Feinberg disclosed to the Board that Crowley had a relationship with Cerberus, but provided no information about that relationship . . . [Coram's Directors] approved the retention of Crowley as a consultant to CEO Richard Smith without knowing Crowley's obligations to Cerberus, the nature of his work for Cerberus, and the terms of his compensation from Cerberus. ¶ 15. |
| "Crowley was hired by Coram for a three-year term, effective November 30, 1999, as Chairman of the Board, President and Chief Executive Officer." ¶ 40. | "On November 17, 1999, the Board approved a three-year employment agreement with Crowley, which he signed the next day." ¶ 21. |
| "On or about the same day that Crowley agreed to employment terms with Coram, Crowley and Cerberus executed a written employment agreement that reflected the earlier terms . . . and confirmed that Crowley agreed to devote 'his entire business time, attention, skill and energy exclusively' to Cerberus by performing duties to be assigned by Feinberg, in exchange for a base salary of $80,000 a month ($960,000 a year) plus the potential for Crowley to receive sizeable bonuses." ¶ 41. | "The Crowley/Cerberus Employment Agreement provides that Crowley would devote 'his entire business time, attention, skill and energy exclusively to the business of the Employer [Cerberus]' by performing duties to be assigned by Feinberg. Cerberus agreed to pay Crowley a base salary of $960,000 and the potential for bonuses. The Employment Agreement also provided that Cerberus could terminate Crowley for cause if Crowley did not follow Cerberus' reasonable instructions." ¶ 22. |
| "Neither Crowley nor Feinberg disclosed to Coram and its Board of Directors that Crowley was being paid nearly $1 million a year, plus expenses, and potential bonuses, by Cerberus." ¶ 44. | "As was the case with the oral agreement between Crowley and Cerberus, neither Crowley nor Feinberg disclosed the existence or the terms of their written agreement to the Board of Coram, and no member of the Board of Coram made any inquiry about the terms of the Crowley/Cerberus relationship." ¶ 23. |

| | |
|---|---|
| "Feinberg recommended to Coram's Board of Directors . . . that Coram hire Crowley's consulting company, Dynamic Health Care Solutions (Dynamic) to act as a 'consultant' to Coram." ¶ 42. | "Coram retained Crowley's wholly-owned consulting company, Dynamic Health Care Solutions, L.L.C., to act as a 'consultant' to Coram." ¶ 26. |
| [A] renegotiated agreement . . . was finalized in April 2000.  It was signed on behalf of Coram by Feinberg, who was not an officer of Coram." ¶ 60.  Feinberg arranged for Coram to bind itself to pay Crowley huge (potentially $13 million or more) incentive bonuses for one year's work." ¶ 8. | "Even though the other members of the Board had been informed that Crowley had a 'relationship' with Cerberus, they allowed Feinberg to conduct the negotiations with Crowley, made no inquiry concerning that relationship, nor made any independent review of Feinberg's negotiations with Crowley. ¶ 28.  "The Second Amendment provided a new bonus structure that was far greater than the maximum $1.9 million bonus that Crowley received under the employment agreement with Coram he had signed just four months earlier." ¶ 29. |
| "Consistent with these arrangements, Crowley used his position as Chairman and Chief Executive Officer at Coram to run Coram in a manner that benefited Cerberus and injured Coram… [Crowley] had thereby abandoned the fiduciary duties of care, loyalty and good faith which he owed to Coram." ¶ 9. | "Crowley, as an officer and director, owed Coram fiduciary duties of care, loyalty, disclosure, and good faith, including the duty to disclose actual and potential conflicts of interest.  As found by the Bankruptcy Court, Crowley breached those duties." ¶ 49. |

| | |
|---|---|
| "The Officer and Director Defendants had a fiduciary duty to act in the best interests of the Plaintiffs and the Class, in connection with all activities relating to Coram common stock, and in connection with the activities of Coram under their supervision and control." ¶ 87.<br><br>"Defendants breached their fiduciary duties to the Plaintiffs and the Class by working instead to orchestrate the scheme of fraud described herein . . . ." ¶ 90. | "The conduct of the outside directors, individually and as the Special Committee, was an egregious breach of their fiduciary duties and was consciously indifferent to the foreseeable results of the breach." ¶ 66. |

38.     Since the D&O Action and *Furst* are based upon and arise out of the same facts and circumstances, the D&O Action and the Second Amended Complaint in *Furst* constitute a single claim that was deemed to be first made within the Discovery Period based upon conduct occurring during the Policy Period, rendering notice timely under the D&O Policy.

39.     On February 6, 2001, during the Discovery Period, the Official Committee of Equity Security Holders in the Coram bankruptcy (the "Equity Committee") filed a motion seeking leave to file a derivative suit against Crowley and others based upon the Bankruptcy Court's finding that Crowley had a conflict.  Coram provided notice of the motion to Genesis on or about February 20, 2001, during the Discovery Period.

40.     On December 28, 2001, the Equity Committee filed a renewed motion for leave to file a derivative claim against Crowley and the Outside Directors.  Coram notified Genesis of the renewed motion on January 24, 2002, within the Discovery Period.

41.     Since the D&O Action and the Equity Committee's motions are both grounded in Crowley's conflict and the Outside Directors' failure to address that conflict, notice of the Delaware Action is deemed to have been made within the Discovery Period when Genesis received notice of the motions.

11

42.    The D&O Policy contains the following provision regarding notice of potential claims:

> [i]f, prior to the effective date of the expiration of the Policy Period, the Directors, Officers or the Company first become aware of circumstances which may substantially give rise to a Claim, and the Directors, Officers or the Company as soon as practicable during the Policy Period give written notice to the insurer of the circumstances and the reasons for anticipating a Claim, then any Claim subsequently made based upon such circumstances… shall be deemed for the purposes of this Policy to have been first made during the Policy Period.

(D&O Policy § VII.B.)

43.    By letter from Coram's general counsel, David Schwab, to Genesis dated January 24, 2001 (during the Policy Period), Coram reported the Bankruptcy Court's finding that Crowley had an actual conflict and advised Genesis that the Outside Directors faced potential claims for breach of fiduciary duty arising out of Crowley's conflict as a result of the Outside Directors' failure to inquire about or limit that conflict. In section 7 of the letter, Coram informed Genesis that:

> the Equity Committee in the Chapter 11 alleged that the Debtors failed to disclose fully to the creditors in the Disclosure Statement all of [sic] financial relationships that existed between Mr. Crowley and Cerberus Partners. In addition, certain portions of the transcript of the December 21, 2000 hearing in the Bankruptcy Court raise the implication that the officers and directors of the Debtors may have been negligent in failing to obtain such information from Mr. Crowley upon his employment with the organization and later in connection with their consideration of filing of the bankruptcy petitions. With this information, a stockholder or creditor of the Debtors may attempt to assert some sort of securities fraud, breach of fiduciary duty, negligence or other claim directly or derivatively against the Insureds for the failure to disclose this relationship, inquire about it, limit it or otherwise take notice of these facts in the operation of the organization or the filing of the bankruptcy petitions and the formulation and negotiation of the plan of reorganization that was proposed in the bankruptcy proceedings.

A true and correct copy of Mr. Schwab's January 24, 2001 letter is attached as Exhibit G.

44.     The transcript of the Bankruptcy Court's December 21, 2000 decision was attached to Mr. Schwab's letter and Genesis acknowledged receipt of the letter.

45.     Because the Delaware Action is based upon and arises out of the same facts and circumstances as the notice of provided in the January 24, 2001 letter, the Trustee's claim is deemed for the purposes of the D&O Policy to have first been made during the Policy Period.

**F.      The Settlement of the Trustee's Claims Against the Outside Directors in the D&O Action.**

46.     Under the D&O Policy, Genesis agreed to pay on behalf of Coram's directors or officers any "Loss" arising from claims first made during the policy or discovery period based on a "Wrongful Act" of Coram's directors or officers.  (D&O Policy § I.A.)

47.     On or about April 5, 2006, after protracted negotiations, the Trustee and the Outside Directors entered into a written agreement settling the claims against the Outside Directors asserted in the D&O Action, subject to the approval of the Bankruptcy Court (the "Settlement Agreement").  Pursuant to the Settlement Agreement: (a) judgment shall be entered against the Outside Directors in the amount of $9.55 million; and (b) the Outside Directors shall assign all of their rights against Genesis to the Trustee.  A true and correct copy of the Settlement Agreement is attached hereto as Exhibit H.

48.     The settlement amount is reasonable in view of the amount of the damages the Trustee intends to assert in the D&O Action, including hard dollar reorganization costs of in excess of $40 million and expert testimony that Coram's remaining in bankruptcy caused a substantial decline in its value.

49.     On April 24, 2006, after notice to all parties in interest, including Genesis, the Bankruptcy Court approved the Settlement Agreement, finding that the settlement was fair and reasonable.  A true and correct copy of the Order approving the settlement is attached hereto as Exhibit I.

50.    Despite repeated requests by the Outside Directors, Genesis, having abandoned its insureds by refusing to defend them, then refused to engage in meaningful settlement negotiations with the Trustee on their behalf.

## FIRST COUNT
### (Breach of Insurance Contract)

51.    The Trustee repeats the allegations contained in paragraphs 1 through 50 as if set forth at length herein.

52.    Section VI.A. of the D&O Policy provides that Coram's directors and officers may not settle any claim without the prior written consent of Genesis, "which consent shall not be unreasonably withheld."

53.    Genesis unreasonably withheld its consent to the settlement.

54.    By abandoning its insureds, Genesis is not entitled to rely upon the consent to settlement clause of the D&O Policy.

55.    The settlement is a fair and reasonable compromise of the Trustee's claims against the Outside Directors and was the product of extensive negotiations by experienced counsel.

56.    Counsel for the Outside Directors kept Genesis contemporaneously advised of the progress of the negotiations and time and time again invited Genesis to participate, but Genesis rejected his requests out of hand.

57.    The Trustee's claims in the D&O Action that the Outside Directors breached their fiduciary duties constitute "Wrongful Act[s]" for which Genesis is required to provide coverage pursuant to the D&O Policy.

58.    Genesis' refusal to pay the settlement on behalf of the Outside Directors constitutes a breach of its obligations under the D&O Policy.

WHEREFORE, the Trustee demands that judgment be entered against Genesis in the amount of $9,550,000.00, together with interest, attorneys' fees, costs of suit and that he be granted such other and further relief as the Court deems just and equitable.

Dated: May 31, 2006

SCHNADER HARRISON SEGAL
& LEWIS LLP

By: _____
Richard A. Barkasy (#4683)
Michael J. Barrie (#4684)
824 Market Street Mall, Suite 1001
Wilmington, DE  19801
(302) 888-4554 (telephone)
(302) 888-1696 (telecopier)

Barry E. Bressler, Esq.
Wilbur L. Kipnes, Esq.
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA  19103-7286
(215) 751-2000 (telephone)
(215) 751-2205 (telecopier)

Of Counsel.

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                          )
                                )
CORAM RESOURCES NETWORK, INC.,)
and CORAM INDEPENDENT PRACTICE) Case No. 99-2889
ASSOCIATION, INC.,              )        (MFW)
                                )
              Debtors.          )

                         Bankruptcy Courtroom
                         No. 1, Sixth Floor
                         Marine Midland Plaza
                         824 Market Street
                         Wilmington, Delaware

                         Thursday, December 21, 2000
                         1:35 p.m.

BEFORE:  THE HONORABLE MARY F. WALRATH,
             United States Bankruptcy Judge

-- Transcript of Proceedings --

WILCOX & FETZER
1330 King Street - Wilmington Delaware  19801

(302) 655-0477

37

1   point with another plan or sale or some other vehicle

2   that I think there is no basis to conclude will result in

3   anything other than creditors getting less and the

4   equityholders still getting nothing.

5           So, Your Honor, if the issue is that

6   somebody did something wrong, and I'm not suggesting

7   that, and I'm certainly not endorsing that view, but if

8   that's the point, there is redress in the courts, but I

9   don't think that the answer is to put this company out of

10  business.

11          Thank you.

12          THE COURT:  Well, I'm in a difficult

13  situation.  I would like to sidestep my duties, but I

14  think I have to determine in deciding whether to confirm

15  this plan under 1129(a)(3), I must conclude that it is

16  proposed in good faith and that the plan proponents have

17  acted in good faith.  I just do not want to be in a

18  position to conclude on this record that that is so.  I

19  cannot conclude on this record that that is so.

20          I think that the contractual relationship

21  between Cerberus and the CEO, Mr. Crowley, did taint the

22  process, and I think that, if anything, the ultimate

23  fairness of the process in bankruptcy is a paramount

24  principle to be protected by the Bankruptcy Court.

39

1          Maybe we would be at the same place today

2   if that contractual relationship had not been there, if

3   it had been disclosed to all parties, but I don't know

4   that and I don't think anybody will know that.

5          We are at a terrible place.  The Equity

6   Committee, even on its numbers, which I agree with the

7   Creditors' Committee's counsel and their valuation expert

8   and the cross-examination of the Equity Committee expert

9   does point out the questionable nature of that valuation.

10          I think under any of the numbers the

11   company is insolvent today.  But I don't think I can

12   confirm a plan based on that fact because I think that

13   because of the process being tainted by this relationship

14   which began in November of 1999, and perhaps in August of

15   1999, has so tainted the debtors' restructuring of its

16   debt, the debtors' negotiations towards a plan, even the

17   debtors' restructuring of its operations.

18          I think on that point I think it is a shame

19   that Mr. Crowley and perhaps Cerberus and the debtor

20   itself is tainted in this manner because I think there is

21   evidence that Mr. Crowley did do a good job operationally

22   in helping the debtor turn around.  But I can't conclude

23   that the debtor might not have done even better had there

24   not been this relationship.  I don't know.  That's the

39

1    problem. I don't know what would have happened without

2    this actual conflict of interest. I do think it's an

3    actual conflict of interest.

4                    I think that the actions of Mr. Crowley to

5    hide the relationship, and I think that EC-20 did show an

6    intent to hide the relationship and to hide his request

7    for additional compensation in Winterland in exchange for

8    his efforts here did at least evidence that he, himself,

9    believed that this relationship should not be disclosed

10    and, therefore, did, in fact, taint his ability to serve

11    as CEO of the debtor.

12                    Whether it opens up a Pandora's box or

13    encourages other noteholders or other parties in future

14    bankruptcies to try the same thing, I'm not as concerned

15    about that, but I just do not want my name confirming a

16    plan where this type of activity occurred for a year

17    before the plan was proposed for confirmation. I just

18    cannot conclude that it's proposed in good faith for

19    those reasons.

20                    I do not have the ability to suggest a

21    different plan. I do not have the ability to give an

22    exemption from Stark II.

23                    So I leave it to the debtor to see where it

24    goes from here for now. I'll look for a form of order if

30

1    someone wants to present me with one.

2                    MR. MINUTI:  We will, Your Honor.

3                    THE COURT:  We'll stand adjourned.

4                    MR. LEVY:  Thank you, Your Honor.

5                    (The hearing was then concluded at

6    3:35 p.m.)

7                              - - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

31

1    State of Delaware    )
                          )
2    County of New Castle )

3

4

5                        C E R T I F I C A T E

6

7          I, Kathleen E. White, Registered Professional
     Reporter and Notary Public, do hereby certify that the
8    foregoing record, pages 1 to 91, inclusive, is a true and
     accurate transcript of my stenographic notes taken on
9    Thursday, December 21, 2000, in the above-captioned
     matter before the Federal Bankruptcy Court.

10         IN WITNESS WHEREOF, I have hereunto set my hand
     and seal this 24th day of December, 2000, in
11   New Castle County.

12

13                       KATHLEEN E. WHITE,
14                       Notary Public-Reporter

15

16

17

18

19

20

21

22

23

24

# EXHIBIT B

271 B.R. 228                                                                        Page 1
271 B.R. 228
**(Cite as: 271 B.R. 228)**

▷
Briefs and Other Related Documents

United States Bankruptcy Court,D. Delaware.
In re CORAM HEALTHCARE CORP. and
Coram, Inc., Debtors.
**Nos. 00-3299(MFW), 00-3300(MFW).**

Dec. 21, 2001.

Chapter 11 debtors filed request for confirmation of their second joint plan of reorganization, and official committee of equity holders objected. The Bankruptcy Court, Mary F. Walrath, J., held that continuous conflict of interest under which debtors' chief executive officer and president had been operating, in receiving almost $1 million per year under his separate employment agreement with one of debtors' largest creditors, tainted debtors' entire reorganization effort, including their negotiations toward plan, and prevented court from confirming plan on "good faith" grounds.

Confirmation denied.

West Headnotes

**[1] Bankruptcy 51 ⟷3502.5**

51 Bankruptcy
51XIV Reorganization
51XIV(A) In General
51k3502 Good Faith; Motive
51k3502.5 k. "Good Faith.". Most Cited Cases
Continuous conflict of interest under which corporate Chapter 11 debtors' chief executive officer and president had been operating, in receiving almost $1 million per year under his separate employment agreement with one of debtors' largest creditors, tainted debtors' entire reorganization effort, including their negotiations toward plan, and prevented court from confirming plan on statutory "good faith" grounds, though conflict was ultimately disclosed, and although debtors hired financial advisory firm to investigate CEO's relationship with debtors and "sprinkle holy water on the

situation." Bankr.Code, 11 U.S.C.A. § 1129(a)(3).

**[2] Bankruptcy 51 ⟷3502.5**

51 Bankruptcy
51XIV Reorganization
51XIV(A) In General
51k3502 Good Faith; Motive
51k3502.5 k. "Good Faith.". Most Cited Cases
"Good faith" standard for confirmation of Chapter 11 plan requires that plan be proposed with honesty, with good intentions, and with basis for expecting that reorganization can be effected with results that are consistent with objectives and purposes of the Bankruptcy Code. Bankr.Code, 11 U.S.C.A. § 1129(a)(3).

**[3] Bankruptcy 51 ⟷3502.1**

51 Bankruptcy
51XIV Reorganization
51XIV(A) In General
51k3502 Good Faith; Motive
51k3502.1 k. In General. Most Cited Cases
Bankruptcy court has considerable discretion in deciding, based on totality of circumstances, whether Chapter 11 plan has been proposed in good faith, with the most important feature being inquiry into plan's fundamental fairness. Bankr.Code, 11 U.S.C.A. § 1129(a)(3).

**[4] Bankruptcy 51 ⟷3622**

51 Bankruptcy
51XIV Reorganization
51XIV(D) Administration
51k3622 k. Debtor in Possession, in General. Most Cited Cases
Chapter 11 debtor-in-possession is bound by duty of loyalty that includes an obligation to refrain from self dealing, and to avoid conflicts of interest and appearance of impropriety.

**[5] Bankruptcy 51 ⟷3622**

51 Bankruptcy

271 B.R. 228                                                                                   Page 2
271 B.R. 228
**(Cite as: 271 B.R. 228)**

51XIV Reorganization
51XIV(D) Administration
51k3622 k. Debtor in Possession, in General.
Most Cited Cases
Duty of loyalty that is owed by Chapter 11 debtor-in-possession is also owed by its senior officers.

**[6] Bankruptcy 51 ⟜3622**

51 Bankruptcy
51XIV Reorganization
51XIV(D) Administration
51k3622 k. Debtor in Possession, in General.
Most Cited Cases
Chapter 11 debtor corporation's chief executive officer and president had fiduciary duty to estate, that included duty of loyalty and obligation to avoid any direct, actual conflict of interest.

**[7] Bankruptcy 51 ⟜3622**

51 Bankruptcy
51XIV Reorganization
51XIV(D) Administration
51k3622 k. Debtor in Possession, in General.
Most Cited Cases
In corporate Chapter 11 reorganization case, liability may be imposed where fiduciary was serving more than one master or was subject to conflicting interests, notwithstanding lack of any fraudulent intent or harm.

**[8] Bankruptcy 51 ⟜3622**

51 Bankruptcy
51XIV Reorganization
51XIV(D) Administration
51k3622 k. Debtor in Possession, in General.
Most Cited Cases
In corporate Chapter 11 reorganization case, even disclosure of conflict of interest may not be sufficient to permit approval of transaction involving an actual conflict of interest.

**\*229** Laura Davis Jones, Rachel S. Lowy, Christopher J. Lhulier, Pachulski Stang Ziehl Young &

Jones, P.C., Wilmington, DE, David M. Friedman, Athena Foley, Adam L. Shiff, Kasowitz, Benson, Torres & Friedman, LLP, New York City, for debtors and debtors in possession.

Mark D. Collins, Deborah E. Spivack, Richards Layton & Finger, P.A., Wilmington, DE, Chaim J. Fortgang, Theodore Gewertz, Wachtell Lipton Rosen & Katz, New York City, for Committee of Unsecured Creditors.

Mark Minuti, Tara Lattomus, Saul Ewing, LLP, Wilmington, DE, Richard F. Levy, Theodore J. Low, Benjamin D. Schwartz, Altheimer & Gray, Chicago, IL, for Equity Committee.

Karen C. Bifferato, Connolly, Bove, Lodge & Hutz, Wilmington, DE, Allen B. Miller, Weil Gotshal & Manges, LLP, New York City, for Senior Noteholders.

Kenneth Eckstein, Philip Bentley, Marjorie Sheldon, Kramer Levin Naftalis & Frankel, LLP, New York City, for Goldin Associates, LLC.

Edwin J. Harron, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, for Coram Resource Network.

Elio Battista, Jr., The Bayard Firm, Wilmington, DE, Gregory D. Saputelli, Obermayer Rebmann Maxwell & Hippel, LLP, Cherry Hill, NJ, for Coram Resource**\*230** Network Committee of Unsecured Creditors.

Don A. Beskrone, Office of U.S. Trustee, Wilmington, DE.

*OPINION* FN1

FN1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.MARY F. WALRATH, Bankruptcy Judge.

This case is before the Court on the request of Coram Healthcare Corporation ("CHC") and Coram, Inc. ("Coram" and collectively with CHC "the Debtors") for approval of their Second Joint

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw

271 B.R. 228                                                                     Page 3
271 B.R. 228
**(Cite as: 271 B.R. 228)**

Plan of Reorganization, dated August 1, 2001 ("the Second Plan"). The Official Committee of Equity Security Holders of CHC objected to confirmation of the Second Plan. For the reasons set forth below, we deny confirmation of the Second Plan.

## I. *FACTUAL BACKGROUND*

### A. *The Business of CHC and Coram*

Through acquisitions in the mid 1990's, the Debtors became a leading provider of alternative site infusion therapy services in the United States. Infusion therapy involves the intravenous administration of drug therapies for nutrition, anti-infection, HIV, blood factor, pain management, chemotherapy and other conditions. The Debtors financed their acquisitions by amassing large amounts of debt. As a result of that debt, the Debtors had financial difficulties through much of the late 1990's.

### B. *Crowley, Cerberus and the Debtors*

In April 1997, Cerberus Partners, L.P. ("Cerberus"), Goldman Sachs Credit Partners, L.P. ("Goldman") and Foothill Capital Corporation ("Foothill" and collectively with Cerberus and Goldman "the Noteholders") purchased unsecured Notes issued by the Debtors with a face amount of $250 million. Cerberus, Goldman and Foothill acquired approximately 36%, 45% and 19% of the Notes, respectively. Subsequently, the Debtors agreed to allow a principal of Cerberus, Stephen Feinberg ("Feinberg"), to represent the interests of the Noteholders on the CHC board of directors. Feinberg served as a director from June 1998 until July 24, 2000.

During 1998, Feinberg met David D. Crowley, a turnaround consultant with a focus in the healthcare field ("Crowley"). In 1998 or early 1999 Crowley joined Cerberus' "bench" of CEO consultants, who are available to work for Cerberus

with troubled companies on a project-by-project basis. In July 1999, Crowley and Feinberg struck an oral agreement by which Cerberus agreed to pay Crowley $80,000 a month plus expenses to serve as a consultant to distressed companies in which Cerberus had a stake. Shortly thereafter, in August 1999, at the suggestion of Cerberus, the Debtors hired Crowley as a consultant to their CEO.

During the fall of 1999, the Debtors were experiencing severe financial difficulties. As a result, their CEO resigned. In November 1999, the Debtors executed a restructuring and forbearance agreement with the Noteholders. As a condition to that agreement, the Debtors agreed to hire Crowley as their new CEO. The Debtors began negotiating with Crowley about the terms of his employment agreement, which the Debtors described as very difficult because of Crowley's compensation demands.

**\*231** On November 12, 1999, while the negotiations with the Debtors were still ongoing, Crowley sent a "Personal & Confidential" letter to Feinberg, requesting additional compensation from Cerberus, in the form of incentive bonuses for consulting work he was doing on Cerberus' behalf for other distressed companies. That additional compensation was to be paid in consideration for Crowley signing an employment contract with the Debtors.

On November 18, 1999, Crowley signed a three year employment agreement with the Debtors. On November 19, 1999, Crowley executed a Consulting Agreement memorializing his oral agreement with Feinberg and Cerberus (by which Cerberus agreed to pay Crowley $80,000 a month) and increasing the performance-based bonus due to Crowley for his work on another distressed company, Winterland Productions, Inc. ("Winterland").

Section 2.3 of the Consulting Agreement with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

271 B.R. 228                                                                                                Page 4
271 B.R. 228
**(Cite as: 271 B.R. 228)**

Cerberus states that Crowley "will have such duties as are assigned or delegated ... by ... Feinberg;" that he "will devote his entire business time, attention, skill and energy exclusively to the business of [Cerberus] (or any ... Companies ... to which [he] is assigned by [Cerberus] );" and that he "will use his best efforts to promote the success of [Cerberus'] business (or the business of such ... Company)."

Under section 6.3 of the Consulting Agreement, Cerberus had the right to terminate Crowley "for cause," including Crowley's "failure to follow the reasonable instructions of [Cerberus] ..., Feinberg, or the Board of Directors of [the Debtors]."

Section 3.1 of the Consulting Agreement states that Crowley's salary "shall be reduced and offset ... for any directors fees, salary, consulting payments, bonuses or other cash incentive payments that [Crowley] may receive from any [of Cerberus' business] other than [the Debtors]."

Neither Crowley, nor Feinberg (who was a director of the Debtors at the time) disclosed the terms of the Consulting Agreement between Cerberus and Crowley to the Debtors.<sup>FN2</sup>

> FN2. Crowley testified that he did disclose to the Debtors that he "had a relationship with Cerberus." However, he, Feinberg and all the members of the Debtors' board of directors testified that the terms of that relationship were not disclosed.

### C. *Financial Difficulties*

Despite efforts to cut costs, the Debtors faced enormous financial difficulties by the end of 1999. As a result, the Debtors began contemplating restructuring options and consulted with bankruptcy counsel. On June 9, 2000, the Debtors sold their pharmacy business, generating approximately $38 million in net cash proceeds. Those proceeds were used in part to pay down the Debtors'

secured revolving line of credit, which had been provided by the Noteholders. On July 14, 2000, the Debtors, at the direction of Crowley, made a $6.3 million interest payment in cash to the Noteholders for their unsecured Notes. Under the terms of the Notes, the Debtors could have paid the interest payment "in kind," i.e., by adding it to the outstanding principal balance of the Notes. Crowley did not tell the board of directors, or bankruptcy counsel, about the cash payment to the Noteholders until after it had been made.

A few days later on July 24, 2000, Feinberg resigned from the Debtors' board of directors. On August 8, 2000, as a result of their mounting financial difficulties, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. **\*232** Since then, the Debtors have continued to operate their businesses in the ordinary course of business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. Crowley has continued to serve as CEO of the Debtors.

As of the bankruptcy filing date, the Noteholders were owed in excess of $252 million and the trade creditors were owed approximately $7.5 million. On August 22, 2000, the United States Trustee appointed an Official Committee of Unsecured Creditors ("the Creditors' Committee"). The Creditors' Committee includes two Noteholders and one trade creditor. On October 18, 2000, the United States Trustee appointed an Official Committee of Equity Security Holders to represent the interests of the holders of CHC common stock ("the Equity Committee").

### D. *First Plan of Reorganization*

On the petition date, the Debtors filed their First Joint Plan of Reorganization ("the First Plan"). The First Plan provided for the cancellation of all shareholder interests and the issuance of the stock of the Debtors to the Noteholders. The First Plan proposed paying the rest of the general unsecured

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

271 B.R. 228                                                                                    Page 5
271 B.R. 228
**(Cite as: 271 B.R. 228)**

creditors $2 million. The First Plan was supported by the Noteholders and the Creditors' Committee but was opposed by the Equity Committee.

In December, 2000, a hearing was held over five days to consider confirmation of the First Plan. During discovery related to those hearings, the terms of Crowley's Consulting Agreement with Cerberus were revealed for the first time.

At the conclusion of the confirmation hearings, we found that Crowley's Consulting Agreement with Cerberus created an actual conflict of interest on his part. We further held that the conflict of interest "has ... tainted the Debtors' restructuring of its debt, the Debtors' negotiations towards a plan, even the Debtors' restructuring of its operations." (Dec. 21, 2000 N.T. at p. 88.) We concluded that "the ultimate fairness of the process in bankruptcy is a paramount principle to be protected by the Bankruptcy Court" and that that process had been tainted by Crowley's conflict of interest. (*Id.* at p. 87.) As a result, we concluded that we were unable to find that the Debtors had proposed their plan in good faith in accordance with section 1129(a)(3) of the Bankruptcy Code and, accordingly, denied confirmation of the First Plan. FN3

> FN3. The Equity Committee had also opposed confirmation of the First Plan on the basis that the Debtors were undervaluing their enterprise worth and that there was equity for shareholders. Although we expressed some doubt as to the Equity Committee's valuation testimony, we did not address this issue since we concluded that the Debtors' Plan was unconfirmable at any rate.

E. *The Goldin Report and the Special Committee*

Following denial of confirmation of the First Plan, the Debtors created a special committee of independent directors ("the Special Committee"). The Special Committee appointed Harrison J. Goldin

of Goldin Associates, L.L.C. ("Goldin"), a financial advisory firm specializing in distressed situations, to perform an impartial evaluation of the Debtors' affairs, Crowley's relationship with Cerberus, and other issues relating to confirmation of a plan.

On February 26, 2001, we granted the Debtors' motion to retain Goldin to investigate the extent of Crowley's conflict of interest and the damage, if any, which was done to the Debtors as a result. At that time, we also directed the parties to stay *233 litigation between them FN4 and directed that Goldin attempt to mediate a plan.

> FN4. The Equity Committee had filed a Motion seeking authority to prosecute an action *inter alia* against Crowley for breach of fiduciary duty.

After his investigation, Goldin circulated to the parties a draft report and solicited comments in June, 2001. On July 11, 2001, Goldin issued his final report ("the Goldin Report"). Again, this was circulated to the parties, but not filed with the Court. The Goldin Report concluded that:
1. Crowley and Feinberg should have disclosed the full extent of the Crowley/Cerberus relationship to the Debtors' other directors and officers and the failure to do so was a breach of their respective fiduciary duties.
2. There was no evidence that the Debtors' books and records were compromised or materially impaired by Crowley's conflict of interest.
3. There was no evidence that Crowley or Feinberg intended or expected that Crowley would seek to advance Cerberus' interests to the detriment of the Debtors.
4. There was no evidence that Cerberus (or the other Noteholders) ever instructed Crowley to act contrary to the Debtors' interests.
5. Crowley did advance the interests of Cerberus at the expense of the Debtors by making the $6.3 million cash payment to the Noteholders on July 14, 2000, at a time when the Debtors' cash was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

271 B.R. 228                                                                                          Page 6
271 B.R. 228
**(Cite as: 271 B.R. 228)**

low and a bankruptcy filing was under active consideration. Nonetheless, Goldin concluded that the cash payment did not affect the Debtors' solvency, the Noteholders' position vis-a-vis other creditors or impact other creditors.

6. The Debtors did suffer damages caused by the undisclosed conflict of interest, namely, the professional fees ($5 to $6 million) and possible business losses ($7 to $9 million) resulting from the Debtors' inability to obtain confirmation of the First Plan.

7. Crowley's bonus compensation under his agreement with the Debtors should be reduced by $7.5 million, resulting in Crowley receiving a $5.9 million bonus in addition to his base salary of $650,000.

### F. *The Second Plan of Reorganization*

The Special Committee, after consultation with Goldin, determined to incorporate Goldin's recommendations into a revised plan of reorganization. Under the Second Plan, the Noteholders will again receive all the equity in CHC. The Second Plan provides that Crowley's compensation will be reduced as recommended by the Goldin Report. The Second Plan also provides that the shareholders will receive a distribution of $10 million in cash so long as their class votes in favor of the Second Plan and the creditors do not object to confirmation on the basis of the absolute priority rule.

The shareholders did not, however, accept the Second Plan by the percentages required by the Code. Once again, the Equity Committee opposed confirmation of the Plan.[FN5]

> FN5. The Official Committee of Unsecured Creditors appointed in the Coram Resource Network, Inc. ("R-Net") case also objected to confirmation. That objection was resolved by the agreement of the Debtors that confirmation of the Second

Plan would not release any claim R-Net or its Committee might have against the Debtors.

### G. *Second Plan Confirmation Hearing*

Hearings to consider confirmation of the Second Plan were held on seven days over **\*234** the past two months. Mr. Goldin testified regarding the focus and scope of his examination. Specifically, he limited his investigation to events prior to the confirmation hearing in December, 2000. He did not investigate any of the activities of the Debtors since that time. Significantly, he did not determine whether Crowley continued to receive compensation under the Cerberus agreement. He did not ask and no one disclosed that fact. Nor did Goldin determine whether there was any ongoing harm to the Debtors by the continuation of Crowley as CEO and president of the Debtors after December 2000, as a result of his continued compensation by Cerberus under his Consulting Agreement. Mr. Goldin testified, however, that he assumed Crowley would do no harm to the Debtors after his arrangement with Cerberus had been revealed because he had done no harm prior to it being disclosed.

Mr. Amaral, a member of the board of directors and the Special Committee [FN6], testified that Goldin was hired to "sprinkle holy water on the situation" and make everything all right. Other than hire Goldin and review his report, the Special Committee took no other action in response to denial of confirmation of the First Plan. Significantly, it did not conduct any investigation of Crowley's conflict of interest, did not require that Crowley cease accepting any compensation from Cerberus and did not even ask Crowley if the conflict persisted.[FN7]

> FN6. Although he is a member of the Special Committee, Mr. Amaral was formerly the CEO of the Debtors, was integral to bringing in Crowley, and negotiated the

terms of Crowley's compensation for the Debtors.

FN7. Although Crowley testified that he told the Board of Directors that he continued to receive compensation from Cerberus, we do not credit that testimony. All of the directors testified in their depositions that he did not tell them (nor did they ask him) whether he continued to receive that compensation.

## II. *DISCUSSION*

### A. *Lack of Good Faith Under Section 1129(a)(3)*

[1] In order for a court to confirm a plan it must be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).

[2][3] "The good faith standard requires that the plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.' " *In re Zenith Electronics Corp., 241 B.R. 92, 107 (Bankr.D.Del.1999)* (*quoting In re Sound Radio, Inc., 93 B.R. 849, 853 (Bankr.D.N.J.1988)*) FN8. In evaluating the totality of circumstances surrounding a plan a court has " 'considerable judicial discretion' in finding good faith, with the most important feature being an inquiry into the 'fundamental fairness' of the plan." *In re American Family Enterprises, 256 B.R. 377, 401 (D.N.J.2000)*(*quoting In re New Valley Corp., 168 B.R. 73, 80-81 (Bankr.D.N.J.1994)*).

FN8. *See also Hanson v. First Bank of South Dakota, N.A., 828 F.2d 1310, 1315 (8th Cir.1987)*(must have reasonable likelihood plan will achieve result consistent with the Code); *Connell v. Coastal Cable T.V., Inc., 709 F.2d 762, 764 (1st Cir.1983)*(plan must bear some relationship to Code's objective of resuscitating a

financially troubled company); *In re Mortgage Inv. Co., 111 B.R. 604, 611 (Bankr.W.D.Tex.1990)*(good faith requires a legitimate, honest purpose to reorganize and a reasonable probability of success).

At the conclusion of the hearing on the First Plan, we concluded that the Debtors' CEO and President had an actual conflict of interest by virtue of the fact that he had a separate employment contract with one **\*235** of the Debtors' largest creditors under which he was being paid almost $1 million per year. Because the Consulting Agreement required that Crowley obey the instructions of Cerberus and because the compensation being paid him under that agreement was not insubstantial FN9, we concluded that the Consulting Agreement created an actual conflict of interest.

FN9. The Debtors, Noteholders and Crowley argued that the $1 million compensation being paid to Crowley under the Consulting Agreement was not high considering his expertise in troubled companies in the healthcare industry. However, it is certainly more than a de minimis amount and is more than the base salary which the Debtors themselves were paying Crowley.

Today we are faced with a similar task. Nothing, in fact, has changed since the first confirmation hearing. Crowley continues to receive almost $1 million a year from one of the Debtors' largest creditors, while serving as the Debtors' CEO and President. Under his agreement with Cerberus, he is required to obey its instructions or risk having the agreement terminated and losing his $1 million. This is an actual conflict of interest, as we concluded at the first confirmation hearing. FN10

FN10. At the second confirmation hearing, evidence was presented that the agreement between Crowley and Cerberus is also contrary to the express provisions of the Debtors' corporate policy which at all rel-

271 B.R. 228                                                                                              Page 8
271 B.R. 228
**(Cite as: 271 B.R. 228)**

evant times provided that actual conflicts of interest must be avoided and that any action that might create a potential conflict of interest must be disclosed and approved in advance.

B. *Duty of Loyalty Owed by Debtors' CEO*

[4] A debtor in possession is bound by a duty of loyalty that includes an obligation to refrain from self dealing, to avoid conflicts of interests and the appearance of impropriety. *See e.g., Lopez-Stubbe v. Rodriguez-Estrada* (*In re San Juan Hotel Corp.*), 847 F.2d 931, 950 (1st Cir.1988); *Bennett v. Gemmill* (*In re Combined Metals Reduction Co.*), 557 F.2d 179, 196-97 (9th Cir.1977).

[5] The duty of loyalty owed by a debtor in possession is also owed by its senior officers. As the Supreme Court articulated in *Wolf v. Weinstein:*
The concept of leaving the Debtor in possession, as a "receivership without a receiver," was designed to obviate the need to appoint a trustee for the supervision of every small corporation undergoing reorganization, even though it appeared capable of carrying on the business during the proceeding .... But so long as the Debtor remains in possession, it is clear that the corporation bears essentially the same fiduciary obligation to the creditors as does the trustee for the Debtor out of possession. Moreover, the duties which the corporate Debtor in possession must perform during the proceeding are substantially those imposed upon the trustee. It is equally apparent that in practice *these fiduciary responsibilities fall not upon the inanimate corporation, but upon the officers and managing employees who must conduct the Debtor's affairs under the surveillance of the court.* If, therefore-as seems beyond dispute from the very terms of the statute-the trustee is himself a fiduciary ... logic and consistency would certainly suggest that those who perform similar tasks and incur like obligations to the creditors and shareholders should not be treated differently under the statute for this purpose.

*Wolf v. Weinstein,* 372 U.S. 633, 649-50, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963)(emphasis **236** added).FN11

FN11. The Supreme Court reaffirmed this standard for debtors in possession under chapter 11 of the Bankruptcy Code in *Commodity Futures Trading Com'n v. Weintraub,* 471 U.S. 343, 355, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985).

[6] Crowley, as Chief Executive Officer and President of the Debtors, has a fiduciary duty to the estate, which includes the duty of loyalty and an obligation to avoid any direct actual conflict of interest. In this case, Crowley's actual conflict of interest goes beyond the mere appearance of impropriety. Crowley cannot serve the interests of both the Debtors and a large creditor, Cerberus. Under the Consulting Agreement, Cerberus has the discretion to fire Crowley if he fails to follow its instructions, resulting in the loss of $1 million per year in compensation to Crowley. That control over Crowley, and indirectly the Debtors, is simply not proper.

Crowley himself demonstrated the insidious effect of that conflict when he caused the Debtors to pay in cash, rather than Notes, the $6.3 million interest payment due to the Noteholders immediately before the bankruptcy filing. Crowley's explanation that the payment was made to maintain the Noteholders' support is unconvincing. The Debtors, under Crowley's direction, had recently repaid the Noteholders almost $38 million and had no legal obligation to pay the $6.3 million in cash. Crowley's assertion that he preferred to pay cash rather than add the amount to the Debtors' debt structure is also incredible. The Debtors have argued that they are hopelessly insolvent; therefore it would make no difference if the Debtors were underwater by an additional $6.3 million in debt.

In contrast, Mr. Goldin readily admitted that every company facing the prospect of a bankruptcy fil-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

271 B.R. 228                                                                                          Page 9
271 B.R. 228
**(Cite as: 271 B.R. 228)**

ing seeks to conserve cash. Having cash available at the early stages of a bankruptcy case gives a debtor significant operational advantages, as well as an enhanced negotiating position vis-a-vis its creditors. At a minimum, the actions of Crowley denied the Debtors that option.

Crowley asserts, however, that the Consulting Agreement with Cerberus deals not with his services as CEO of the Debtors but for work which he is performing for Cerberus in connection with another company, Winterland. We, quite simply, do not believe this. Crowley testified that he is working "more than full time" on the Debtors' affairs for a base compensation of $650,000. This is in contrast to compensation of $1 million allegedly for serving only as chairman of the board of Winterland.[FN12] We do not accept Crowley's assertion that his compensation from Cerberus under the Consulting Agreement is solely for his work for Winterland.[FN13]

> **FN12.** Both the agreements provide incentive bonuses for Crowley based on the companies' performance.

> **FN13.** It was also disclosed in the confirmation hearings held on the Second Plan that Winterland is itself in a bankruptcy proceeding. Given the failure of Cerberus and Crowley to disclose the Consulting Agreement in this case, we are forwarding a copy of this Opinion to Judge Randall Newsome who is handling the Winterland case to apprise him of these facts.

Actual conflicts of interest of debtor's officers in bankruptcy are usually found in the context of prosecution of avoidance actions which the debtor may have against the officers themselves or against creditors whose debt was guaranteed by the officers. Such a conflict of interest may warrant appointment of an impartial trustee. *See, e.g.,* *In re Tel-Net Hawaii, Inc.,* 105 B.R. 594, 595

(Bankr.D.Hawai'i 1989)(controlling shareholder as fiduciary to estate had **\*237** a conflict of interest where preferential transfers were made for liabilities guaranteed by controlling shareholder warranting appointment of an impartial trustee); *In re Sal Caruso Cheese, Inc.,* 107 B.R. 808, 820 (Bankr.N.D.N.Y.1989)(president's failure to pursue preferential transfers against supplier for liabilities guaranteed by president warranted conversion of case to chapter 7 for bad faith).

There is a similar conflict of interest here, though more attenuated. In this case, the $6.3 million payment to the Noteholders might be avoidable as a preference. The Debtors have taken no action to pursue that preference and, while the Second Plan preserves such actions, since the Noteholders would own the Debtors post-confirmation it is unlikely they will sue themselves. Crowley's contractual relationship with Cerberus, just like a guarantee, creates a disincentive for him to cause the Debtors to pursue such an action.

While a debtor in possession has discretion not to pursue avoidance actions, the fact that the Debtors' CEO has a contractual impediment to pursuing that action raises questions about the reasons the Debtors in this case chose not to pursue that action. As we noted in the first confirmation hearing, given the actual conflict of interest which the Debtors' CEO has, we are unable to conclude that any action taken by the Debtors which may impact on the rights of Cerberus were taken without any undue consideration of the interests of Cerberus. Consequently, we must once again deny confirmation of the Debtors' Plan because we are unable to determine under all of the circumstances that the Debtors' Second Plan has been proposed in good faith under section 1129(a)(3).

### C. *Harm to the Debtors*

The Debtors argue that we must confirm the Debtors' Second Plan because they hired an independent investigator who concluded that the conflict of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

271 B.R. 228                                                                                                                    Page 10
271 B.R. 228
**(Cite as: 271 B.R. 228)**

interest did not result in any harm to the Debtors. We cannot accept this "no harm, no foul" argument for several reasons.

First, there is really no evidence that there was no harm resulting from the conflict of interest. In fact, Mr. Goldin concluded that the Debtors did suffer harm as a result of Crowley's conflict because it caused a delay in confirmation of the Debtors' First Plan, thereby resulting in loss of profits and additional expenses to the Debtors' estates of $12 to $15 million.

Furthermore, although Mr. Goldin concluded that the $6.3 million payment to the Noteholders on the eve of bankruptcy did not cause harm to the Debtors, we disagree. All responsible advisors to companies contemplating a bankruptcy filing recommend that cash be conserved (not spent) on the eve of bankruptcy. Having cash gives the debtor the ability to continue to operate and a position of strength in negotiations with creditors. That position of strength was eroded by Crowley's directing the Debtors to pay the Noteholders in cash, when they could have paid in Notes.

In addition, Goldin investigated only the actions of Crowley prior to the confirmation hearing on the First Plan in December, 2000.[FN14] Mr. Goldin stated that he **238** believed his job was limited to determining whether any harm was caused by the conflict of interest as of that date. There was no investigation by Goldin (or the Debtors)[FN15] of Crowley's continued conflict of interest or whether any harm has been suffered by the Debtors since then. This is particularly highlighted by the fact that neither Goldin nor the Debtors' Special Committee even asked Crowley whether he continued to be compensated by Cerberus.

FN14. The Equity Committee also criticizes the method used by Goldin in investigating the conflict situation: by using informal interviews with the interested parties rather than by formal discovery and

depositions under oath and by failing to investigate why the Debtors' performance was so much worse than its competitors during this period. (The Equity Committee's theory is that Crowley did not operate the Debtors to their optimum in order to keep their value low to justify stripping equity of any ownership interest.) While we make no conclusion about which method is better, we do note that Goldin discovered nothing that the Equity Committee had not already discovered in the discovery taken by it in connection with the Debtors' confirmation proceedings in December, 2000.

FN15. The members of the Special Committee testified in their depositions that they did nothing with respect to the conflict of interest other than hire Goldin.

Thus, there is absolutely no evidence from which the Court can conclude that the Debtors have suffered no harm from Crowley's continued conflict of interest. Mr. Goldin's assertion that there must be no harm since the disclosure of the relationship because no harm was caused by Crowley when the relationship was hidden is not logical, nor is it borne out by the facts. Crowley did cause harm to the Debtors while his relationship with Cerberus was hidden and there is no reason to assume he did not cause harm to the Debtors when that relationship was disclosed.

[7] Finally, even if there were no evidence of harm to the Debtors, appropriate sanctions may still be warranted. In a corporate reorganization proceeding, where a fiduciary was serving more than one master or was subject to conflicting interests, liability may be imposed, notwithstanding lack of fraudulent intent or harm. See *Woods v. City Nat. Bank & Trust Co. of Chicago,* 312 U.S. 262, 268, 61 S.Ct. 493, 85 L.Ed. 820 (1941)("Only strict adherence to these equitable principles can keep the standard of conduct for fi-

271 B.R. 228                                                                                                      Page 11
271 B.R. 228
**(Cite as: 271 B.R. 228)**

duciaries 'at a level higher than that trodden by the crowd'."). In *Woods,* the Supreme Court denied compensation to an attorney who had a conflict of interest, notwithstanding that no actual harm was shown.

In *Mosser v. Darrow,* the Supreme Court stated that "Equity tolerates in bankruptcy trustees no interest adverse to the trust. This is not because such interests are always corrupt but because they are always corrupting." *Mosser v. Darrow,* 341 U.S. 267, 271, 71 S.Ct. 680, 95 L.Ed. 927 (1951) (personal dealings in securities adverse to the interests of the debtor by employees of the trustee imposed liability on the employees, despite lack of evidence of any wrongdoing).

Therefore, we conclude that the actual conflict of interest mandated that the Debtors do more than they did in this case. Notwithstanding the fact that the Debtors learned in December, 2000, that Crowley had a conflict of interest, neither the Debtors nor their Special Committee required that Crowley disassociate himself from Cerberus. In fact, they did not even ask whether he continued to be bound by the Consulting Agreement. Given the fact that Crowley had not disclosed the agreement in the first place, the Debtors should have asked for full disclosure and required that Crowley sever all agreements with Cerberus as a condition of continued employment. The "don't ask, don't tell" approach adopted by the Debtors and their Special Committee does not fulfill their fiduciary duty to these estates.

### D. *Disclosure Does Not Cure the Conflict of Interest*

The Debtors argue that any problem caused by the conflict of interest has been **\*239** cured by its disclosure. They note that the agreement between Cerberus and Crowley has now been disclosed in the Debtors' filings with the SEC and in the Disclosure Statement accompanying the Second Plan.

However, the Court cannot help but observe that the disclosure came only after the agreement came to light in discovery in connection with the First Plan. Neither Cerberus nor Crowley voluntarily disclosed the agreement to the Debtors or to the Court. As noted, the failure to disclose was a violation of the Debtors' corporate policy.FN16

> FN16. Even if the Debtors' corporate policy did not require such disclosure, the Court would expect a debtor in possession to disclose to the Court and its creditors any agreement which its senior management might have with its largest creditors similar to the agreement at issue here.

[8] Further, even disclosure of the conflict may not be sufficient to permit approval of a transaction involving an actual conflict of interest. *See, e.g., In re Allied Gaming Management, Inc.,* 209 B.R. 201, 203 (Bankr.W.D.La.1997) (debtor's former accountant and general manager could not acquire estate property under reorganization plan because there is an absolute bar on fiduciaries acquiring estate property and it "created an impermissible appearance of impropriety"); *In re Grodel Mfg., Inc.,* 33 B.R. 693, 696 (Bankr.D.Conn.1983)(former trustee could not purchase stock in a reorganized company under a proposed plan of reorganization, based upon the appearance of impropriety).

The Debtors argue that the actions of the Special Committee were consistent with the guidance provided in our decision in *Zenith,* 241 B.R. 92. We find that case easily distinguishable. *Zenith* involved a prepackaged Chapter 11 plan negotiated between a debtor-corporation and its controlling shareholder. Under the plan the shareholder was to receive 100% of the equity in the reorganized debtor in exchange for its forgiveness of $200 million of debt and new funding of $60 million. In analyzing "good faith" under section 1129(a)(3), we concluded that that section was "broad" and incorporated non-bankruptcy law

271 B.R. 228                                                                          Page 12
271 B.R. 228
**(Cite as: 271 B.R. 228)**

such as Delaware corporate law, as well as principles of bankruptcy law. *Id.* at 108. Under Delaware corporate law, we concluded that we were required to determine whether the plan was "entirely fair" because it dealt with a transaction between a company and its controlling shareholder. *Id.* Under Delaware corporate law this requires both a fair process and a fair price.

Applying those principles, we concluded that the price paid by the shareholder to acquire its new equity interest in the debtor was fair in light of the debtor's value as a going concern. We also held that the process was fair because the plan was negotiated and approved, after appropriate disclosures, by separate counsel representing the debtor and the controlling shareholder. *Id.*

This case is distinguishable. Here initially there were not appropriate disclosures of the conflict of interest of Crowley. Furthermore, there can be no finding that the Debtors have acted in good faith in this case because Crowley has continued to serve as the Debtors' CEO. This is not a situation, like *Zenith,* where the conflict related to one transaction, the plan; the conflict in this case transcends every single thing Crowley does on behalf of the Debtors. Because Cerberus is such a large creditor of this estate and because the Consulting Agreement requires that Crowley follow the directions of Cerberus, **\*240** to determine "entire fairness" in this case would require that every single action of the Debtors be examined or that Crowley be excluded from consideration of every decision that could affect Cerberus' interests. This has not been done, and cannot be done, given the CEO's pervasive role in the affairs of a corporation.

While the Special Committee and the Goldin Report focused on disclosure, they failed to enforce the separate boundaries necessary between a debtor and creditor in formulating a Chapter 11 plan of reorganization.

We easily conclude from the totality of circumstances surrounding the Second Plan that a continuous conflict of interest by the CEO of the Debtor precludes the Debtors from proposing a plan in good faith under 1129(a)(3). As we held in denying confirmation of the First Plan, Crowley's conflict of interest is a violation of his fiduciary duty to the Debtors and the estate and is so pervasive as to taint the "Debtors' restructuring of its debt, the Debtors' negotiations towards a plan, even the Debtors' restructuring of its operations." (Dec. 21, 2000 N.T. at p. 88.) The Debtors' hiring of Goldin to "sprinkle holy water on the situation" does not cure the conflict or evidence good faith.

IV. *CONCLUSION*

For all the foregoing reasons, we cannot conclude that the Second Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code as being proposed in good faith. An appropriate Order is attached.

**ORDER**

AND NOW, this **21ST** day of **DECEMBER, 2001,** for the reasons set forth in the accompanying opinion, it is hereby

**ORDERED** that confirmation of the Second Joint Plan of Reorganization of Coram Healthcare Corporation and Coram, Inc., under Chapter 11 of the Bankruptcy Code filed on August 1, 2001, is hereby **DENIED.**

Bkrtcy.D.Del.,2001.
In re Coram Healthcare Corp.
271 B.R. 228

Briefs and Other Related Documents (Back to top)

• 2001 WL 34836743 () Report of Independent Restructuring Advisor Goldin Associates, L.L.C. (Jul. 11, 2001)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

271 B.R. 228                                                                     Page 13
271 B.R. 228
**(Cite as: 271 B.R. 228)**


END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

315 B.R. 321                                                                                    Page 1
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

**H**
Briefs and Other Related Documents

United States Bankruptcy Court,D. Delaware.
In re CORAM HEALTHCARE CORP. and
Coram, Inc., Debtors.
**Nos. 00-3299 (MFW), 00-3300 (MFW).**

Oct. 5, 2004.

**Background:** Chapter 11 trustee and equity holders' committee sought to confirm their competing Chapter 11 plans.

**Holdings:** The Bankruptcy Court, Mary F. Walrath, Chief Judge, held that:

7(1) proposed settlement negotiated by trustee with other corporation which was itself in bankruptcy, pursuant to which this other corporation agreed to reduce, to $7.95 million, its $41 million claim against estate, thereby permitting a 100% payout to unsecured creditors, in exchange for trustee's release of counterclaim against it, would be approved as being above lowest point in range of reasonableness;

9(2) process by which trustee had negotiated a settlement of estate's claims against noteholders was not unreasonable or fundamentally unfair;

15(3) trustee's proposed Chapter 11 plan could provide for release of estate's claims against noteholders;

16(4) plan could not provide for release of third party claims;

21(5) in deciding whether to confirm proposed Chapter 11 plan that provided for cancellation of interests of debtors' current equity holders in return for cash distribution, bankruptcy court would accept, as more accurate measure of going concern value of Chapter 11 debtors, the $220 million value indicated by trustee's experts;

26(6) noteholders were entitled to postpetition interest on their unsecured claims, before any distribution was made to equity holders;

36(7) plan proposed by equity holders' committee had not been accepted by any "impaired" class; and

38(8) even assuming that equity holders' plan was confirmable, court would confirm trustee's competing plan.

Trustee's plan confirmed.

West Headnotes

**[1] Bankruptcy 51 ⟨⟩3032.1**

51 Bankruptcy
51IX Administration
51IX(A) In General
51k3032 Compromises
51k3032.1 k. In General. Most Cited Cases
Compromises are generally favored in bankruptcy. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

**[2] Bankruptcy 51 ⟨⟩3033**

51 Bankruptcy
51IX Administration
51IX(A) In General
51k3032 Compromises
51k3033 k. Judicial Authority or Approval. Most Cited Cases
Approval of compromise or settlement is within sound discretion of bankruptcy court. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

**[3] Bankruptcy 51 ⟨⟩3033**

51 Bankruptcy
51IX Administration
51IX(A) In General
51k3032 Compromises

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

315 B.R. 321                                                                                            Page 2
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

51k3033 k. Judicial Authority or Approval. Most Cited Cases

To approve proposed settlement, bankruptcy court does not have to be convinced that proposed settlement is the best possible settlement, but need only conclude that settlement falls within reasonable range of litigation possibilities; in other words, settlement need only be above lowest point in range of reasonableness. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

**[4] Bankruptcy 51 ☜3033**

51 Bankruptcy
51IX Administration
51IX(A) In General
51k3032 Compromises
51k3033 k. Judicial Authority or Approval. Most Cited Cases

In deciding whether to approve proposed settlement, bankruptcy court should consider the following: (1) probability of success in litigation; (2) complexity, expense and delay of litigation involved; (3) possible difficulties in collection; and (4) paramount interests of creditors. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

**[5] Bankruptcy 51 ☜3033**

51 Bankruptcy
51IX Administration
51IX(A) In General
51k3032 Compromises
51k3033 k. Judicial Authority or Approval. Most Cited Cases

In deciding whether to approve proposed settlement negotiated by trustee, bankruptcy court should defer to trustee's judgment, as long as there is legitimate business justification for his action. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

**[6] Bankruptcy 51 ☜3033**

51 Bankruptcy
51IX Administration

51IX(A) In General
51k3032 Compromises
51k3033 k. Judicial Authority or Approval. Most Cited Cases

Mere fact that proposed settlement between Chapter 11 trustee and a corporation involved in its own bankruptcy case had been approved by court in this other case, as being reasonable for the corporation and its creditors, was not evidence that settlement was above lowest point in range of reasonableness in debtors' own Chapter 11 case; one-sided settlement will be cheered by side which it favors even though it is terrible deal for the side it disfavors. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

**[7] Bankruptcy 51 ☜3033**

51 Bankruptcy
51IX Administration
51IX(A) In General
51k3032 Compromises
51k3033 k. Judicial Authority or Approval. Most Cited Cases

Proposed settlement negotiated by Chapter 11 trustee with other corporation which was itself in bankruptcy, pursuant to which this other corporation agreed to reduce, to $7.95 million, its $41 million claim against estate, thereby permitting a 100% payout to unsecured creditors, in exchange for trustee's release of counterclaim against it, would be approved as falling above lowest point in range of reasonableness, in light of trustee's uncertain prospects of prevailing on counterclaim, considerable cost of litigating counterclaim, and fact that corporation had itself filed for bankruptcy, thereby clouding prospects of recovery by trustee, even if he prevailed on counterclaim. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

**[8] Bankruptcy 51 ☜3033**

51 Bankruptcy
51IX Administration
51IX(A) In General

315 B.R. 321                                                                                   Page 3
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

51k3032 Compromises
51k3033 k. Judicial Authority or Approval. Most Cited Cases
Contribution of $56 million in cash and assumption of debt that noteholders would contribute under proposed compromise negotiated by Chapter 11 trustee was not rendered illusory, for purposes of deciding whether compromise should be approved, simply because compromise provided that noteholders were to receive controlling interest in debtor, thereby allegedly enabling them to compel repayment of this $56 million contribution at any time. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

**[9]** Bankruptcy 51 ⟨⟩3032.1

51 Bankruptcy
51IX Administration
51IX(A) In General
51k3032 Compromises
51k3032.1 k. In General. Most Cited Cases
Process by which Chapter 11 trustee had negotiated a settlement of estate's claims against noteholders was not unreasonable or fundamentally unfair, simply because trustee did not independently investigate these claims prior to settling them, but relied upon investigation previously conducted by equity committee, or because trustee settled claims without filing, or even threatening to file, lawsuit against noteholders. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

**[10]** Bankruptcy 51 ⟨⟩3032.1

51 Bankruptcy
51IX Administration
51IX(A) In General
51k3032 Compromises
51k3032.1 k. In General. Most Cited Cases
Chapter 11 trustee's failure to place debtors on market to determine their enterprise value, prior to entering into proposed settlement that, in exchange for $56 million contribution from noteholders, purported to give them a controlling in-

terest in reorganized debtors and to release estate's claims against them, did not make proposed settlement unreasonable or fundamentally unfair; trustee stated that sale was not pursued because of negative effect that it could have on debtors' operating results. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

**[11]** Bankruptcy 51 ⟨⟩3032.1

51 Bankruptcy
51IX Administration
51IX(A) In General
51k3032 Compromises
51k3032.1 k. In General. Most Cited Cases
Proposed settlement that, in exchange for $56 million contribution from noteholders, would give them a controlling interest in reorganized Chapter 11 debtors and release estate's claims against them, was above lowest point in range of reasonableness, given substantial costs, in amounts of up to $6 million, of pursuing estate's claims against noteholders, delay that this would entail, and minimal likelihood of success. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A

**[12]** Bankruptcy 51 ⟨⟩3033

51 Bankruptcy
51IX Administration
51IX(A) In General
51k3032 Compromises
51k3033 k. Judicial Authority or Approval. Most Cited Cases
Where compromise is part of proposed plan of reorganization, bankruptcy court has duty to determine that proposed compromise is fair and equitable. Bankr.Code, 11 U.S.C.A. § 1123(b)(3)(A).

**[13]** Bankruptcy 51 ⟨⟩3033

51 Bankruptcy
51IX Administration
51IX(A) In General

315 B.R. 321                                                                      Page 4
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

51k3032 Compromises
51k3033 k. Judicial Authority or Approval. Most Cited Cases
In deciding whether to approve compromise which is part of proposed plan of reorganization, bankruptcy court should consider all factors relevant to full and fair assessment of wisdom of proposed compromise. Bankr.Code, 11 U.S.C.A. § 1123(b)(3)(A).

**[14] Bankruptcy 51 ⟨⟩3555**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3548 Requisites of Confirmable Plan
51k3555 k. Settlement, Adjustment, or Enforcement of Claims. Most Cited Cases
Relevant factors that bankruptcy court should consider in deciding whether it is appropriate, as part of compromise underlying proposed reorganization plan, to grant release of nondebtors are as follows: (1) whether there is identity of interest between debtor and nondebtor, such that suit against non-debtor will deplete estate's resources; (2) whether nondebtor has contributed substantial assets to Chapter 11 plan; (3) whether release is necessary to debtor's reorganization; (4) whether creditors and equity holders overwhelmingly accept plan and support release of non-debtors; and (5) whether debtor's plan provides for payment of all, or substantially all, of claims of creditors and equity holders.

**[15] Bankruptcy 51 ⟨⟩3555**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3548 Requisites of Confirmable Plan
51k3555 k. Settlement, Adjustment, or Enforcement of Claims. Most Cited Cases
Proposed Chapter 11 plan could provide for release of estate's claims against noteholders, where this release was essential prerequisite to agree-

ment by noteholders to provide $56 million of funding for plan, funding that would permit repayment in full of all creditors, other than noteholders, and substantial distribution of at least $40 million to equity holders, and where plan had overwhelming support of creditors.

**[16] Bankruptcy 51 ⟨⟩3555**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3548 Requisites of Confirmable Plan
51k3555 k. Settlement, Adjustment, or Enforcement of Claims. Most Cited Cases
Proposed Chapter 11 plan could not provide for release of third party claims against noteholders, to extent that third parties in question had not voted in favor of plan.

**[17] Bankruptcy 51 ⟨⟩3568(2)**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3566 Confirmation; Objections
51k3568 Effect
51k3568(2) k. Conclusiveness. Most Cited Cases
Chapter 11 plan is contract, that may bind those who vote in favor of it.

**[18] Bankruptcy 51 ⟨⟩3568(2)**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3566 Confirmation; Objections
51k3568 Effect
51k3568(2) k. Conclusiveness. Most Cited Cases
To extent creditors or shareholders had voted in favor of plan negotiated by Chapter 11 trustee, which provided for release of any claims they might have against noteholders, creditors and shareholders were bound thereby.

**[19] Bankruptcy 51 ⟨⟩3555**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3548 Requisites of Confirmable Plan
51k3555 k. Settlement, Adjustment, or Enforcement of Claims. Most Cited Cases
Provision in Chapter 11 trustee's proposed plan of reorganization, that purported to release third party claims against trustee, equity committee and their respective agents and professionals, was impermissible, to extent that release purported to protect trustee and other parties from liability for their gross negligence or wilful misconduct.

**[20] Bankruptcy 51 ⟜3555**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3548 Requisites of Confirmable Plan
51k3555 k. Settlement, Adjustment, or Enforcement of Claims. Most Cited Cases
Provision in Chapter 11 trustee's proposed plan of reorganization, that purported to release debtors' officers and directors from claims against them, was not permissible, given lack of evidence of any contribution by any director or officer supporting such a release.

**[21] Bankruptcy 51 ⟜3538**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3538 k. Valuation. Most Cited Cases
In deciding whether to confirm proposed Chapter 11 plan that provided for cancellation of interests of debtors' current equity holders in return for cash distribution, bankruptcy court would accept, as more accurate measure of going concern value of Chapter 11 debtors, the $220 million value indicated by trustee's experts using generally accepted valuation methodologies and management's possibly conservative projections, rather than the $279 million figure indicated by experts retained

by equity committee, who took aggressive and optimistic views as to valuation and strength of debtors, and whose valuation was largely premised on assumption that debtors were comparable to specialty pharmacy companies, even though debtors' business relied heavily on services provided by nurses, and though, given chronic nursing shortage, debtors had increased costs not shared by specialty pharmacy companies.

**[22] Bankruptcy 51 ⟜3538**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3538 k. Valuation. Most Cited Cases
Valuation of Chapter 11 debtors, for plan confirmation purposes, had to include all assets of debtors, even those which outside buyer might not value.

**[23] Bankruptcy 51 ⟜3538**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3538 k. Valuation. Most Cited Cases
In valuing Chapter 11 debtors, for purposes of deciding whether to confirm proposed Chapter 11 plan that provided for cancellation of interests of debtors' current equity holders in exchange for cash distribution, bankruptcy court would not include assets that would be distributed under plan and that reorganized debtors would not retain, and would not include amortization for goodwill where goodwill had already been included in calculating debtors' going concern value.

**[24] Bankruptcy 51 ⟜3538**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3538 k. Valuation. Most Cited Cases
Net operating losses (NOLs) that would be pre-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

315 B.R. 321                                                                                     Page 6
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

served on sale of debtors' assets to creditors under Chapter 11 plan, even though they would be lost upon sale to outside buyer and thus would have no value to such a buyer, had to be considered by court in valuing debtors' assets, for purposes of deciding whether to confirm proposed Chapter 11 plan that provided for cancellation of interests of debtors' current equity holders and for grant of equity interest to noteholders.

**[25] Bankruptcy 51 ☜3538**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3538 k. Valuation. Most Cited Cases
While net operating losses (NOLs) possessed by Chapter 11 debtors were part of value that note-holders would acquire under trustee's proposed Chapter 11 plan, which provided for cancellation of interests of debtors' current equity holders and for grant of equity interest to noteholders, value of these NOLs would be discounted by court, in deciding whether proposed plan could be confirmed, to account for possibility of a successful challenge by the Internal Revenue Service (IRS).

**[26] Bankruptcy 51 ☜2836**

51 Bankruptcy
51VII Claims
51VII(A) In General
51k2836 k. Post-Petition Interest. Most Cited Cases

**Bankruptcy 51 ☜3565**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3563 Fairness and Equity; "Cram Down."
51k3565 k. Unsecured Creditors and Equity Hold-ers, Protection Of. Most Cited Cases
Noteholders were entitled to postpetition interest

on their unsecured claims, before any distribution was made to equity holders, in Chapter 11 case filed by solvent debtors who were reorganizing rather than liquidating. Bankr.Code, 11 U.S.C.A. § 1129(b)(2).

**[27] Bankruptcy 51 ☜2836**

51 Bankruptcy
51VII Claims
51VII(A) In General
51k2835 Interest
51k2836 k. Post-Petition Interest. Most Cited Cases

**Bankruptcy 51 ☜3565**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3563 Fairness and Equity; "Cram Down."
51k3565 k. Unsecured Creditors and Equity Hold-ers, Protection Of. Most Cited Cases

**Interest 219 ☜31**

219 Interest
219II Rate
219k31 k. Computation of Rate in General. Most Cited Cases

**Interest 219 ☜36(1)**

219 Interest
219II Rate
219k32 Stipulations as to Rate
219k36 Construction and Operation
219k36(1) k. In General. Most Cited Cases
Though noteholders were entitled to postpetition interest on their unsecured claims before any dis-tribution was made to equity holders, postpetition interest would be calculated at federal judgment rate, rather than at contractual default rate, where it was consultation agreement between debtors' officer and one of these noteholders that created conflict of interest which tainted debtors' reorgan-

Westlaw.

315 B.R. 321                                                                                                    Page 7
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

ization efforts, and which delayed their emergence from bankruptcy, and where, even if other noteholders were not involved in this conflict, they benefited from $6 million cash payment which debtors had made prepetition at other noteholder's direction, such that it was neither fair nor equitable to allow postpetition interest at more than federal judgment rate. Bankr.Code, 11 U.S.C.A. § 1129(b)(2).

**[28] Bankruptcy 51 ⚏3565**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3563 Fairness and Equity; "Cram Down."
51k3565 k. Unsecured Creditors and Equity Holders, Protection Of. Most Cited Cases

**Interest 219 ⚏31**

219 Interest
219II Rate
219k31 k. Computation of Rate in General. Most Cited Cases

**Interest 219 ⚏36(1)**

219 Interest
219II Rate
219k32 Stipulations as to Rate
219k36 Construction and Operation
219k36(1) k. In General. Most Cited Cases
Specific facts of each case will determine what rate of postpetition interest is fair and equitable and should be allowed, under "absolute priority" rule on unsecured claims, before any distribution is made to equity holders. Bankr.Code, 11 U.S.C.A. § 1129(b)(2).

**[29] Bankruptcy 51 ⚏3550**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3548 Requisites of Confirmable Plan

51k3550 k. Classification of Claims. Most Cited Cases
Separate classification of unsecured claims in proposed Chapter 11 plan is not improper per se. Bankr.Code, 11 U.S.C.A. § 1122.

**[30] Bankruptcy 51 ⚏3550**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3548 Requisites of Confirmable Plan
51k3550 k. Classification of Claims. Most Cited Cases
Though proposed Chapter 11 plan may place similar claims in separate classes and still be confirmable, such separate classification of similar claims is not permitted to extent it would be unreasonable. Bankr.Code, 11 U.S.C.A. § 1122.

**[31] Bankruptcy 51 ⚏3550**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3548 Requisites of Confirmable Plan
51k3550 k. Classification of Claims. Most Cited Cases
Where sole purpose and effect of creating multiple classes of claims in proposed Chapter 11 plan is to mold outcome of voting to obtain vote in favor of plan by at least one impaired class and to effectuate a "cramdown," each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in determining whether proposed reorganization should proceed. Bankr.Code, 11 U.S.C.A. §§ 1122, 1129.

**[32] Bankruptcy 51 ⚏3550**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3548 Requisites of Confirmable Plan
51k3550 k. Classification of Claims. Most Cited

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

315 B.R. 321                                                                    Page 8
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

Cases

Proper determination of whether claims are "substantially similar," for purposes of classifying them in Chapter 11 case, focuses on the nature or legal attributes of claims and not on status or circumstances of claimant; emphasis is not upon the holder so much as it is upon that which is held. Bankr.Code, 11 U.S.C.A. § 1122.

**[33] Bankruptcy 51 ⟜3550**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3548 Requisites of Confirmable Plan
51k3550 k. Classification of Claims. Most Cited Cases
Where treatment provided to unsecured trade creditors under Chapter 11 plan proposed by equity holders' committee was actually less favorable than that provided to separately classified unsecured debt, committee could not justify this separate classification based on importance of this trade debt to debtors' reorganization efforts. Bankr.Code, 11 U.S.C.A. § 1122.

**[34] Bankruptcy 51 ⟜3550**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3548 Requisites of Confirmable Plan
51k3550 k. Classification of Claims. Most Cited Cases
Unsecured claim possessed by inside creditor should not have been classified separately, in Chapter 11 plan proposed by equity holders' committee, from that of unsecured trade creditors, especially where inside creditor was given more favorable treatment. Bankr.Code, 11 U.S.C.A. § 1122.

**[35] Bankruptcy 51 ⟜3550**

51 Bankruptcy

51XIV Reorganization
51XIV(B) The Plan
51k3548 Requisites of Confirmable Plan
51k3550 k. Classification of Claims. Most Cited Cases
Noteholders who, unlike trade creditors, had not provided any service to Chapter 11 debtors, but whose unsecured claims against debtor arose from purchase of debtors' notes, represented voting interest that was sufficiently distinct from trade creditors to merit separate voice in reorganization case. Bankr.Code, 11 U.S.C.A. § 1122.

**[36] Bankruptcy 51 ⟜3544**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3541 Acceptance
51k3544 k. Eligibility to Vote; Impairment. Most Cited Cases

**Bankruptcy 51 ⟜3563.1**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3563 Fairness and Equity; "Cram Down."
51k3563.1 k. In General. Most Cited Cases
Mere fact that Chapter 11 plan proposed by equity holders' committee provided for payment of post-petition interest on unsecured claims only at federal judgment rate, or at such other rate as was determined by bankruptcy court to be appropriate at confirmation hearing, did not mean that unsecured creditors, who would be paid principal amount of their claims in full together with such interest as court allowed, were "impaired" by proposed plan; accordingly, acceptance of plan by this class of creditors was not sufficient to satisfy statutory requirement for "cramdown." Bankr.Code, 11 U.S.C.A. § 1124(a)(1).

**[37] Bankruptcy 51 ⟜3544**

315 B.R. 321                                                                 Page 9
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3541 Acceptance
51k3544 k. Eligibility to Vote; Impairment. Most
Cited Cases
If proposed plan of reorganization does not leave
creditor's rights entirely unaltered, then creditor's
claim is "impaired." Bankr.Code, 11 U.S.C.A. §
1124(a)(1).

**[38] Bankruptcy 51 ⏍3548.1**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3548 Requisites of Confirmable Plan
51k3548.1 k. In General. Most Cited Cases
Even assuming that Chapter 11 plan proposed by
equity holders' committee had been accepted by at
least one impaired class, and was otherwise con-
firmable, bankruptcy court would confirm com-
peting Chapter 11 plan proposed by trustee, where
trustee's plan was clearly favored by creditors, and
where trustee's plan provided for immediate cash
payment to creditors and presented significantly
less uncertainty than plan proposed by equity
holders' committee. Bankr.Code, 11 U.S.C.A. §
1129(c).

*326 Kenneth E. Aaron, Esquire, Weir & Partners
LLP, Laura Davis Jones, Rachel Lowy Werkhe-
iser, Pachulski, Stang, Ziehl, Young & Jones, Etta
Rena Wolfe, Smith, Katzenstein & Furlow LLP,
Wilmington, DE, for debtors.
Bill B. Berke, Cape Coral, FL, Karen C. Bifferato,
Esquire, Connolly Bove Lodge & Hutz LLP,
Mark D. Collins, Shannon Stacy Frazier, Richard,
Layton & Finger, Charlene D. Davis, Steven T.
Davis, Obermayer, Rebmann, Maxwell & Hippel,
LLP, John D. Demmy, Michael F. Duggan, Phil-
lips, Goldman & Spence, Aaron A. Garber, Pep-
per Hamilton LLP, Carl N. Kunz III, Morris,
James, Hitchens & Williams LLP, Gwendolyn M.
Lacy, Connolly, Bove, Lodge & Hutz, Adam G.

Landis, Landis, Rath & Cobb LLP, Thomas G.
Macauley, Zuckerman and Spaeder LLP, Kevin J.
Mangan, Monzack and Monaco P.A., Katharine
L. Mayer, McCarter & English, Kerri K. Mum-
ford, Landis, Rath & Cobb LLP, Francis J.
Murphy, Murphy, Spadaro & Landon, Marc Jef-
frey Phillips, Connolly, Bove, Lodge & Hutz
LLP, Jason Custer Powell, Ferry & Joseph,
Richard W. Riley, Duane Morris LLP, Donna L.
Schoenbeck, Schoenbeck & Schoenbeck, Stephen
W. Spence, Phillips, Goldman & Spence, William
F. Taylor, Jr., McCarter & English LLP, Etta
Rena Wolfe, Smith, Katzenstein & Furlow LLP,
Wilmington, DE, Gail Cooperman, Sills, Cummis,
Radin, Tischman, Epstein & Gr, Ivan Kaplan,
Sills, Cummis, Radin, Tischman, Epstein & Gr,
Newark, NJ, Martin E. Dollinger, Greenbaum,
Row, Smith, Ravin, Davis & Himmel LLP, Iselin,
NJ, Lisa Hill Fenning, Dewey, Ballantine LLP,
Los Angeles, CA, Jennifer Gloss, Redwood City,
CA, Matthew A. Gold, Argo Partners Inc.,
Michelle Kahleen McMahon, Heller, Ehrman,
White & McAuliffe, New York City, Bret Han-
nifin, Burbank, CA, Peter A. Kline, Miller, Mor-
ton, Caillat & Nevis, LLP, San Jose, CA, Freder-
ick A. Nicoll, Nicoll & Davis LLP, Paramus, NJ,
Joel L. Perrell Jr., Miles & Stockbridge P.C., Bal-
timore, MD, James S. Simko, Davis, Graham &
Stubbs LLP, Denver, CO, Adam M. Spence,
Towson, MD, for creditor.
Robert K. Beste, Jr., Cohen, Seglias, Pallas,
Greenhall & Furman, Wilmington, DE, for de-
fendant.
Kimberly D. Newmarch, Deborah E. Spivack,
Richards, Layton & Finger, Wilmington, DE, for
Creditor Committee.
*327 Barry E. Bressler, Wilbur L. Kipnes,
Richard A. Barkasy, Michael J. Barrie, Schnader,
Harrison, Segal & Lewis LLP, Philadelphia, PA,
and John B. York, Weir & Partners LLP, Wilm-
ington, DE, for trustee.

*OPINION* [FN1]

315 B.R. 321                                                                                                    Page 10
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

FN1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.MARY F. WALRATH, Chief Judge.

Before the Court is the request of the chapter 11 trustee of Coram Healthcare Corporation ("CHC") and Coram, Inc. ("Coram" and collectively with CHC "the Debtors") for approval of the Trustee's Second Amended Joint Plan of Reorganization ("the Trustee's Plan"). The Official Committee of Equity Security Holders ("the Equity Committee") objects to confirmation of the Trustee's Plan and, instead, seeks approval of the Equity Committee's Second Amended Joint Plan of Reorganization ("the Equity Committee's Plan"). For the reasons set forth below, we will confirm the Trustee's Plan, if it is amended in accordance with this Opinion.

## I. *FACTUAL BACKGROUND*

The Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code ("the Code") on August 8, 2000 ("the Petition Date"). On that same day, the Debtors filed their First Joint Plan of Reorganization ("the Debtors' First Plan"). The Debtors' First Plan provided for: (1) the cancellation of all shareholder interests; (2) the issuance of new stock (representing 100% of the Debtors' equity) to Cerberus Partners, L.P. ("Cerberus"), Goldman Sachs Credit Partners L.P. ("Goldman"), and Foothill Capital Corporation ("Foothill") who collectively held 100% of the Debtors' outstanding unsecured notes (collectively "the Noteholders"); and (3) payment of $2 million to the other general unsecured creditors. The Equity Committee opposed the Debtors' First Plan.

In December 2000, at the conclusion of the confirmation hearings on the Debtors' First Plan, we found that the Debtors' CEO, Dan Crowley, was also employed as a consultant by Cerberus (the largest Noteholder). We concluded that this employment created a conflict of interest which tainted the Debtors' restructuring efforts. As a result, we denied confirmation of the Debtors' First Plan because we were unable to find that the Debtors had proposed their plan in good faith in accordance with section 1129(a)(3) of the Code.

Thereafter, the Debtors created a special committee of independent directors ("the Special Committee") to review the Debtors' affairs and propose a new plan of reorganization. The Special Committee retained Harrison J. Goldin to perform an impartial investigation. After consultation with Goldin, the Debtors proposed a new plan of reorganization ("the Debtors' Second Plan"), which provided that the Noteholders would receive all of the Debtors' equity and the shareholders would receive $10 million (if their class voted in favor of the Second Plan and the creditors did not object to confirmation on the basis of the absolute priority rule). The Equity Committee opposed the Debtors' Second Plan. We held confirmation hearings to consider the Debtors' Second Plan over seven days in November and December 2001. On December 21, 2001, we denied confirmation of the Debtors' Second Plan. We found that the employment relationship between Crowley and Cerberus had not changed since the first confirmation hearings. Accordingly, we again held that we could not conclude that the Debtors' Second Plan satisfied the requirements of section 1129(a)(3).

**\*328** Following the denial of the Debtors' Second Plan, we granted a motion for the appointment of a chapter 11 trustee to oversee the Debtors' operations and to facilitate the reorganization process. On March 7, 2002, the Court approved the United States Trustee's selection of Arlin M. Adams ("the Trustee") as the chapter 11 trustee in the Debtors' jointly administered cases.

On December 19, 2002, the Equity Committee filed the Equity Committee's Plan, and on May 2,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003, the Trustee filed the Trustee's Plan.[FN2] The Trustee's Plan provides for: (1) a settlement with the Noteholders ("the Noteholders Settlement") whereby the Noteholders will release their preferred stock and the remaining $9 million due on their notes,[FN3] make a $56 million contribution to the Debtors' estate, and receive a release from the Trustee of any claims, including derivative claims, that the Debtors may have against them, their officers, directors, and employees; (2) an immediate cash payment to the unsecured creditors of 100% of their allowed pre-petition claims plus the payment of post-petition interest (calculated at the federal judgment rate) from the net proceeds of the estate's claims against Crowley, certain outside directors, and PriceWaterhouseCoopers ("the Retained Litigation"); (3) the retention by Reorganized Coram of $10 million in working capital; (4) the cancellation of the shareholders' equity for a pro-rata distribution of the remaining Plan Funding Cash (which the Trustee estimates will be approximately $40 million) and the remaining net proceeds from the Retained Litigation Claims; (5) a settlement of the claims of Coram Resource Network, Inc. and Coram Independent Practice Association, Inc. (collectively "R-Net") for an allowed general unsecured claim of $7.95 million;[FN4] (6) the dissolution of CHC; and (7) the issuance of all the common and preferred stock in Reorganized Coram to the Noteholders.

> FN2. Both the Equity Committee's Plan and the Trustee's Plan have been amended several times. Currently before us is the Equity Committee's Second Amended Plan filed on June 16, 2003, and the Trustee's Second Amended Joint Plan of Reorganization filed on April 15, 2004. (The Equity Committee filed a Third Amended Plan on June 14, 2004, several months after the confirmation hearings had ended and briefing was almost complete. However, that Plan was withdrawn.)

> FN3. During the course of this bankruptcy case, the Debtors entered into three transactions whereby the Noteholders exchanged debt for Coram preferred stock. This was done to maintain sufficient equity in Coram to avoid violation of the Omnibus Budget Reconciliation Act of 1993 ("Stark II").

> FN4. R-Net is an affiliate of the Debtors. An involuntary chapter 11 proceeding was filed against R-Net on August 19, 1999. R-Net's Plan of Reorganization, which incorporates the settlement with the Debtors, was confirmed on December 23, 2003, but is conditioned on the Trustee's Plan being confirmed. The R-Net Settlement also includes a waiver of the claims that R-Net may have against the Noteholders, their officers, directors, and employees.

The Equity Committee's Plan provides for: (1) the immediate cash payment to the general unsecured creditors, other than the Noteholders, of the full amount of their allowed claims with interest to the extent required by law; (2) payment in full of the reduced claim of R-Net, $7.95 million, plus 2% from the Reorganized Debtors' net recoveries from the Litigation Claims [FN5] (to a maximum of $6 million); (3) the satisfaction **329** of the Noteholders' allowed claims through the issuance of New Senior Notes [FN6] and New Preferred Stock;[FN7] and (4) the retention by the shareholders of their equity interests in the Debtors. The Equity Committee's Plan also provides that a special litigation committee of the Board of Directors of the Reorganized Debtors will have full and ultimate authority over the prosecution and settlement of the Litigation Claims.

> FN5. The Litigation Claims under the Equity Committee's Plan include actions against Goldman, Foothill, Cerberus, Feinberg, and/or Crowley alleging causes of action under the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), breaches of fiduciary duties, and fraudulent misrepresentation.

FN6. The term sheet for the New Senior Notes provides that they will: (1) be for the total amount of the Noteholders' allowed general unsecured claim for the remaining Notes held by them; (2) mature 60 months after the Plan's effective date; (3) have no amortization prior to maturity; (4) accrue interest at the rate of 8.0% per annum payable semi-annually, in arrears; and (5) be redeemable at the option of the Reorganized Debtors at any time at par plus accrued interest.

FN7. The term sheet for the New Preferred Stock provides that it will: (1) be for the total allowed claim of the Noteholders on account of their preferred stock; (2) contain an 11% per annum dividend, payable in arrears in kind or, at the option of the Reorganized Debtors, in cash; (3) be redeemed at the option of the Reorganized Debtors at any time (within 66 months of the effective date of the Equity Committee's Plan) at the Liquidation Preference amount plus any accrued and unpaid dividends.

Hearings to consider the two plans were held over twelve days between September 30, 2003, and April 20, 2004. At the conclusion of the confirmation hearings, the parties submitted post-confirmation briefs. The matter is now ripe for decision.

## II. JURISDICTION

This Court has jurisdiction over confirmation of the competing plans pursuant to 28 U.S.C. §§ 1334(b) & 157(b)(2)(A) & (L).

## III. DISCUSSION

Currently before the Court are two competing plans of reorganization. Each plan proponent contends that its plan satisfies the provisions of the Code and is preferable to the other plan, which it argues does not satisfy the Code's requirements.

### A. Confirmability of the Trustee's Plan

The Equity Committee asserts that the Trustee's Plan does not satisfy the requirements of the Code. In particular, the Equity Committee contends that the Trustee's Plan does not satisfy section 1129(a)(3) because the R-Net Settlement and the Noteholders Settlement were not proposed in good faith. The Equity Committee also contends that the Trustee's Plan violates the absolute priority rule and is not fair and equitable because it gives the Noteholders more than the amount of their claims by granting them releases and issuing them all of the stock of Reorganized Coram.

The Trustee disagrees. He contends that he proposed both settlements in good faith because they are in the best interests of the Debtors. Further, the Trustee argues that his Plan does not violate the absolute priority rule because it provides shareholders with a greater distribution than the value of their interests.

### 1. Evaluation of Settlements

[1][2][3] Compromises are generally favored in bankruptcy. *See Myers v. Martin (In re Martin),* 91 F.3d 389, 393 (3d Cir.1996). The consensual resolution of claims minimizes litigation and expedites the administration of a bankruptcy estate. *Id.* Under Rule 9019 of the Federal Rules of Bankruptcy Procedure, the approval of a compromise settlement is within the sound discretion of the bankruptcy court. *See, e.g.,* **\*330**_Conn. Gen. Life Ins. Co. v. United Cos. Fin Corp. (In re Foster Mortgage Corp.),_ 68 F.3d 914, 917-18 (5th Cir.1995); *LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.),* 841 F.2d 159, 162 (7th Cir.1987). In approving a settlement, the court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

315 B.R. 321                                                                                                    Page 13
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

does not have to be convinced that the settlement is the best possible compromise. *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y.1994). Rather, the court must only conclude that the compromise or settlement falls within the reasonable range of litigation possibilities. *In re Penn Central Transp. Co.*, 596 F.2d 1102, 1114 (3d Cir.1979). That is, the settlement need only be above "the lowest point in the range of reasonableness." *Official Unsecured Creditors' Comm. of Pa. Truck Lines. Inc. v. Pa. Truck Lines, Inc. (In re Pa. Truck Lines, Inc.)*, 150 B.R. 595, 598 (E.D.Pa.1992).

[4][5] When determining whether to approve a settlement, the bankruptcy court should consider: (1) the probability of success in the litigation; (2) the complexity, expense, and delay of the litigation involved; (3) the possible difficulties in collection; and (4) the paramount interests of creditors. *See, e.g., Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *Martin*, 91 F.3d at 395. Additionally, the court should defer to a trustee's judgment so long as there is a legitimate business justification for his action. *Martin*, 91 F.3d at 395.

### a. R-Net Settlement

The Trustee argues that the R-Net Settlement is proper because: (1) the settlement substantially reduces the amount of the R-Net claim from more than $41 million to $7.95 million, thereby permitting the payment of 100% to the other unsecured creditors under the Trustee's Plan; (2) the Debtors' counterclaim against R-Net is uncollectible because R-Net is in its own bankruptcy proceeding; and (3) settling with R-Net will allow the Trustee to avoid protracted, expensive, inconvenient, and uncertain litigation. The Trustee notes that the Equity Committee does not contest the proposed settlement amount; the Equity Committee incorporates the same figure in its Plan.

Although the Equity Committee does not disagree with the amount of the R-Net Settlement, it argues that the settlement is not in the best interests of the Debtors' estate because it releases R-Net's claims against the Noteholders. The Equity Committee asserts that using estate funds to pay for the release of claims against the Noteholders is not proper.

The Noteholders argue, of course, that R-Net has no claim against them and that, therefore, the releases they obtain under the R-Net Settlement are of no significance. That alone is unconvincing. If that were true, then the Noteholders would not be insisting upon a release from R-Net in this case.

[6] In addition, the Noteholders assert that the R-Net Settlement has been approved as reasonable in the R-Net case, without any objection by the creditors of R-Net. Therefore, the Noteholders argue that the R-Net Settlement must be reasonable. We also discount this argument. The fact that the settlement is reasonable to R-Net and its creditors does not mean that it is reasonable to the Debtors and their creditors. In fact, a one-sided settlement would be cheered by the side it favors even though it is a terrible deal for the side it disfavors. Thus, the fact that the settlement has been approved in the R-Net case is not evidence of its reasonableness in this case.

[7] However, there is sufficient evidence in this case to support the approval of the R-Net Settlement. The Noteholders**331** are correct that there are serious impediments to the assertion of a claim against them by the R-Net estate. First, the R-Net claim against the Debtors is based on allegations of breach of contract relating to services rendered to Aetna, not on the Crowley conflict of interest. Second, there is a question whether the R-Net Creditors' Committee had the authority to prosecute any action against the Noteholders, since it was vested with authority only to prosecute actions against the Debtors. (Exh. Cerb-15.) *See, e.g., Official Comm. of Unsecured Creditors*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

315 B.R. 321                                                                                         Page 14
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

*of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.), 330 F.3d 548, 579-80 (3d Cir.2003).*

Additionally, the Trustee argues that the cost of litigating with R-Net would be prohibitive because there are twenty-five named parties and at least eleven law firms involved. He estimates the cost to be in the millions of dollars. He also notes that, because R-Net is in its own bankruptcy proceeding, the collection of any judgment that the Trustee may win against it is questionable. The benefits of the settlement are clear: the reduction of R-Net's claim against the Debtors from $41 million to $7.95 million, the avoidance of the cost and delay inherent in litigating with R-Net, and the agreement by the Noteholders to fund the Trustee's Plan.

We conclude that the Trustee has established that the R-Net Settlement satisfies the test for approval of a compromise because: (1) the probability of the Trustee's success in the litigation is not assured; (2) it is very likely that the Trustee will have enormous difficulty in collecting from R-Net and in proposing a consensual plan of reorganization in this case that pays R-Net's asserted claim; and (3) the expense, inconvenience and delay caused by that litigation will adversely affect all the creditors in this case. *See, e.g., TMT Trailer Ferry, 390 U.S. at 424, 88 S.Ct. 1157.* Further, the paramount interest of the creditors in this case supports the settlement because it will permit the confirmation of a plan expeditiously that results in full payment to the general unsecured creditors. *See, e.g., Martin, 91 F.3d at 395.* Accordingly, the R-Net Settlement has been proposed in good faith and can be approved.

### b. *Noteholders Settlement*

The Trustee seeks approval of the Noteholders Settlement because it provides a complete recovery for creditors plus a significant recovery (at least $40 million) for shareholders. That settlement also preserves the estate's claims against

Crowley and the outside directors for the benefit of the shareholders. Therefore, the Trustee asserts that the Noteholders Settlement is in the best interests of the estate.

The Equity Committee argues, however, that the Noteholders Settlement is improper because it provides no material value to the estate and has no cost to the Noteholders. This argument had more merit when the Trustee's Plan provided that the $56 million contribution by the Noteholders would be in the form of a loan. Since the Reorganized Coram would be solvent upon emergence from bankruptcy, it would be able to repay that loan. Therefore, the Equity Committee's argument that the Noteholders were getting something (releases and the equity in the Reorganized Coram) for nothing had some validity.

[8] However, the Trustee's Plan has now been amended to provide that the Noteholders' contribution will be in the form of $38 million in cash and $18 million in the assumption of the IRS debt. Even as modified, though, the Equity Committee argues that the contribution by the Noteholders is a mirage. It argues that the **\*332** Noteholders are contributing money to a company that they will control. Thus, it argues, the Noteholders will be able to repay their $56 million contribution to themselves at any time. We disagree with this analysis. The contribution of the Noteholders (together with the Debtors' cash on hand of approximately $40 million) will be used to fund the Trustee's Plan, including distributions exceeding $49 million to administrative, priority, and general unsecured creditors and approximately $40 million to the shareholders. (Exh. T-8.) The remainder will be used to assure that Reorganized Coram has sufficient working capital ($10 million) to operate. Therefore, the contribution of the Noteholders to the rehabilitation of the Debtors is not illusory as the Equity Committee suggests.

[9] The Equity Committee also argues that the Noteholders Settlement is fundamentally unfair. It

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

315 B.R. 321                                                                                          Page 15
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

argues that the Trustee cannot show that the Note-holders Settlement is reasonable because the Trustee did not independently investigate the claims the estate has against the Noteholders and settled those claims without filing (or even threatening to file) a lawsuit against them. We reject this argument, however, because it is in essence only a complaint about the Trustee's negotiating strategy. Rather than sue first and settle later, the Trustee sought to reach a compromise with all the parties before positions became hardened as a result of legal action. The Trustee met with both the Equity Committee and the Noteholders and asked both to give him their best case against the other. This process was not "fundamentally unfair" as suggested by the Equity Committee. Instead it was a reasonable effort to achieve a consensual plan which is the hallmark of a successful chapter 11 reorganization case. Unfortunately, the Trustee reached a settlement only with the Noteholders, not with the Equity Committee.

Although the Trustee did not do an independent investigation of the claims, he did meet at length with the Equity Committee which had done an extensive investigation into the facts surrounding the Cerberus/Crowley relationship. In fact, the Equity Committee provided the Trustee with a draft complaint against the Noteholders and provided documents and other evidence to support that suit. We conclude that it was prudent and cost-effective for the Trustee, in determining what course of action to take, to rely on the Equity Committee's findings, rather than re-inventing the wheel. That the Trustee did not take the course of action advocated by the Equity Committee does not mean his tact was wrong.

[10] The Equity Committee also complains that the Trustee settled with the Noteholders before putting the Debtors on the market and determining what their enterprise value was. We accept the Trustee's assertion that a sale was not pursued because of the negative effect it could have on the

operating results of the Debtors. Again, we find the Equity Committee's argument on this point to be more of a disagreement about the means by which the settlement was reached rather than about the substance of the settlement itself.

[11] Turning to the substance, we note that, although courts generally apply the three factor approach enunciated in *TMT Trailer Ferry* to determine whether a settlement is reasonable, the parties in this case agree that the first factor, the probability of success in litigation, dominates our review.

The Trustee contends that the probability of succeeding on the claims against Foothill and Goldman is low. He asserts **\*333** that his testimony and the testimony of Jerome Shestack established that the claims against Goldman and Foothill would probably not survive a motion for summary judgment, thus making a settlement preferable to litigation. The Trustee also contends that his conclusion is supported by the testimony of the Equity Committee's own witness, Roderick McKlevie, who refused to opine that these claims would survive a motion for summary judgment.

The Trustee also asserts that it is proper for him to settle the Racketeering Influenced and Corrupt Organizations Act ("RICO") claims against Cerberus and Feinberg. The Trustee asserts that RICO claims are particularly difficult to prove because they require proof of a culpable person who conducts the affairs of a distinct enterprise through a pattern of racketeering in a way that proximately causes injury. 18 U.S.C. § 1962 (2000). He asserts that the burden of establishing a RICO pattern is substantial and costly.

In its draft complaint against those parties, the Equity Committee asserted that the RICO scheme was to put the Debtors into bankruptcy so that the Noteholders could obtain the equity. The Trustee presented evidence rebutting this assertion. Shestack testified that, at the time the scheme al-

315 B.R. 321                                                                    Page 16
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

legedly began, the Debtor was already in a terrible financial position and a bankruptcy filing was imminent. (12/11/04 Shestack at 46-47.) He also testified that the plaintiff would have a tough time establishing that Crowley forced the Debtors into bankruptcy. In fact, the evidence suggests that Crowley actually improved the financial position of Coram by reducing debt and increasing earnings. (*Id.* at 51.)

The Equity Committee alleges, however, that the fact that Crowley caused the Debtors to make a $6.3 million pre-petition payment to the Noteholders when they could have satisfied the Noteholders with notes establishes a RICO scheme. We agree with the Trustee that these allegations alone do not establish a viable claim. Although the pre-petition payment was unnecessary and improper considering the inevitable bankruptcy filing, this money was in fact due to the Noteholders. Thus, while this payment may have hurt the Debtors' cash position, we cannot agree with the Equity Committee that this establishes a scheme to force the Debtors into bankruptcy.

Further, the Equity Committee asserts that the sale of CPS (a subsidiary of the Debtors) for substantially less than it was worth supports the existence of a RICO scheme. We disagree. If, as the Equity Committee asserts, the Noteholders' scheme was to drive the Debtors into bankruptcy so they could "steal" the company for themselves, it is inconceivable that they would have allowed the Debtors to sell CPS (which the Committee characterizes as the "crown jewel" of the Debtors) for less than its fair value. Furthermore, the evidence shows that the CPS sale was approved by the Debtors' board of directors before Crowley even became the CEO. (12/11/04 Shestack at 53.) In fact, the testimony establishes that Crowley was able to obtain a higher bid for CPS than was previously approved by the board and the Debtors' investment banker. (*Id.*) Thus, we cannot conclude that the sale of CPS establishes a scheme to put the Debt-

ors into bankruptcy.

Even if a RICO pattern or scheme could be proven, however, the Trustee argues that it would be difficult to prove causation and damages. In fact, the Trustee contends that the position of the Equity Committee's expert was novel: assuming causation by simply comparing the Debtors to an index of peer companies. The expert testified that since the Debtors under-performed**334** this group of peer companies, they must have been harmed by the Noteholders' scheme. The Trustee challenges this conclusion. He argues that it is not proper to assume that every shortfall in the Debtor's performance is attributable to the conduct of Crowley and Cerberus. Therefore, he asserts that it will be difficult to establish what harm was caused to the Debtors by the Noteholders. With these inherent difficulties of proving a RICO scheme and establishing damages, the Trustee believes that the $56 million settlement is reasonable.

Finally, the Trustee asserts that there is essentially no evidence that the Noteholders Settlement is unreasonable. The Equity Committee's expert, McKelvie, could not address the reasonableness of the settlement. Instead, McKelvie testified that he would defer to the people who had a better understanding of the facts and circumstances to determine its reasonableness. (3/5/04 McKelvie at 8, 16.) The Equity Committee's other witnesses also failed to address the reasonableness of the settlement. Although they talked about what the damages could be if the Equity Committee proved its theories, they did not address the issue of whether $56 million was reasonable as a compromise of the suit.

While we recognize that a successful lawsuit against the Noteholders could produce damages that exceed $56 million, we conclude that the Noteholders Settlement is above the lowest point in the range of reasonableness. *See, e.g.,* Pa. Truck Lines, 150 B.R. at 598. We agree with the

315 B.R. 321                                                                          Page 17
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

Trustee that the claims against Goldman and Foothill have a low probability of success. No facts were presented to the Court to establish that they participated in a conspiracy to put the Debtors into bankruptcy. Even the RICO action against Cerberus and Feinberg is fraught with difficulty. Although we found that Crowley had a conflict of interest because of his undisclosed $1 million contract with Cerberus, success is far from guaranteed in a RICO action. A plaintiff in a RICO case often has a tough time proving causation and damages. Although we agree that there is significant evidence establishing that Crowley breached his fiduciary duties, there is no guarantee that the Trustee (or Equity Committee) could prove causation and damages in a suit against Cerberus and Feinberg. Further prosecuting that action will be costly. The parties apparently agree that the cost to the estate to prosecute such an action could be as much as $6 million. (Equity Committee's Third Amended Disclosure Statement at 30; 12/11/03 Sheshack at 76.) Additionally, if the prior proceedings in this case are any indication, the delay inherent in prosecuting those claims would be lengthy. Accordingly, we agree with the Trustee that the Noteholder Settlement is reasonable considering the cost of pursuing the litigation and the likelihood of success.

### c. *Releases Under a Plan*

[12][13] The Trustee seeks approval of the settlements as part of the Trustee's Plan, which is permitted by section 1123(b)(3)(A).FN8 Where a compromise is part of a plan of reorganization, however, the court has the duty "to determine that a proposed compromise forming part of a reorganization plan is fair and equitable." *TMT Trailer Ferry, 390 U.S. at 424, 88 S.Ct. 1157.* The standards for approval of a settlement under section 1123 are generally the same as those under Rule 9019, *335 though the court should consider all factors relevant to a "full and fair assessment of the wisdom of the proposed compromise." *Id.*

FN8. Section 1123(b)(3)(A) states that: " (b) Subject to subsection (a) of this section, a plan may-... (3) provide for-(A) the settlement or adjustment of any claim or interest belonging to the debtor or the estate." 11 U.S.C. § 1123(b)(3)(A).

Where releases are granted to non-debtors under a plan of reorganization, additional factors are often relevant to determine the fairness of the compromise. *See, e.g., Gillman v. Continental Airlines (In re Continental Airlines), 203 F.3d 203, 212-14 (3d Cir.2000); In re Genesis Health Ventures, Inc., 266 B.R. 591, 608 (Bankr.D.Del.2001); In re Zenith Elecs. Corp., 241 B.R. 92, 110 (Bankr.D.Del.1999).*

### i. *Release by Debtors*

[14] In *Zenith* we identified five factors which are relevant to determine whether a release of a non-debtor by the debtor is appropriate: (1) an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources; (2) a substantial contribution to the plan by the non-debtor; (3) the necessity of the release to the reorganization; (4) the overwhelming acceptance of the plan and release by creditors and interest holders; and (5) the payment of all or substantially all of the claims of the creditors and interest holders under the plan. *Zenith, 241 B.R. at 110* (citing *In re Master Mortgage Inv. Fund, Inc., 168 B.R. 930, 937 (Bankr.W.D.Mo.1994)).*

[15] We conclude that the Trustee's Plan meets this standard for approval of the release of the Noteholders by the estate. The Trustee's Plan does provide for repayment in full in cash of all creditors (except the Noteholders) and for a substantial distribution to the shareholders (at least $40 million). This is made possible by the substantial contribution (of $56 million) by the Noteholders to the Plan funding. The releases given to the Noteholders are an essential part of the Plan, since

Westlaw.

315 B.R. 321                                                                                    Page 18
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

they would not provide the funding without the releases. The Trustee's Plan has been overwhelmingly accepted by all creditors who have voted on the Plan.FN9 Although the shareholders rejected the Trustee's Plan as a class, over 68% in number of those who voted did accept that Plan. Although the Noteholders do not share an identity of interest with the estate on the matter of the litigation (unlike a debtor's insurance carrier or directors and officers who may have indemnification agreements with the debtor), as the largest creditors and preferred shareholders they do share a common goal of achieving a reorganization of the Debtors. Therefore, we conclude that the Trustee's Plan, and the releases granted by the Debtors and the estate to the Noteholders, may be approved as fair and equitable.

> FN9. Class 3 (general unsecured creditors) voted in favor of the Trustee's Plan by 96.6% in amount and 87.2% in number. Class 4 (the Noteholders) voted in favor of the Trustee's Plan by 100% in amount and number.

ii. *Release of Noteholders by Third Parties*

[16] However, as we noted in *Zenith,* the provision of a plan of reorganization which purports to grant a release of claims by third parties against a non-debtor cannot be approved under the above standards. 241 B.R. at 111. The Trustee (and the Court) do not have the power to grant a release of the Noteholders on behalf of third parties. *See, e.g., In re Digital Impact, Inc.,* 223 B.R. 1, 14 (Bankr.N.D.Okla.1998) (bankruptcy court does not have jurisdiction to approve non-debtor releases by third parties); *In re Arrowmill Dev. Corp.,* 211 B.R. 497, 506 (Bankr.D.N.J.1997) ("Keeping in mind the Third Circuit's analysis that section 524(e) specifically**336 limits the scope of the discharge, and that the Bankruptcy Code does not contemplate a discharge of nondebtors, this court holds that plans of reorganization may not contain provisions which dis-

charge nondebtors."); *In re Elsinore Shore Assocs.,* 91 B.R. 238, 252 (Bankr.D.N.J.1988) (plan provisions deeming non-debtor proponents and their principals to be discharged and released from any and all claims were prohibited by the Code and relevant case law); *In re Monroe Well Serv., Inc.,* 80 B.R. 324, 334 (Bankr.E.D.Pa.1987) (debtors could not obtain confirmation of a plan which would attempt, over the objection of creditors, to discharge the obligations of non-debtors). Thus, to the extent the Trustee's Plan seeks approval of a release by third parties of claims they may have against the Noteholders (other than derivative claims which the Trustee has waived), it cannot be approved.

[17][18] However, a Plan is a contract that may bind those who vote in favor of it. *See, e.g., Zenith,* 241 B.R. at 111 (allowing release by any creditor who actually voted in favor of the plan); *Arrowmill,* 211 B.R. at 506 ("When a release of liability of a nondebtor is a consensual provision, however, agreed to by the effected [sic] creditor, it is no different from any other settlement or contract...."); *In re West Coast Video Enters., Inc.,* 174 B.R. 906, 911 (Bankr.E.D.Pa.1994) ("each creditor bound by the terms of the release must individually affirm same"); *Monroe Well Serv.,* 80 B.R. at 334-35 ("a plan provision permitting individual creditors the option of providing a voluntary release to nondebtor plan funders does not violate 11 U.S.C. § 524(e)."). Therefore, to the extent creditors or shareholders voted in favor of the Trustee's Plan, which provides for the release of claims they may have against the Noteholders, they are bound by that.

The cases cited by the Trustee and the Noteholders to support the third party releases are clearly distinguishable. The *Vencor* case did not deal with whether a plan could allow a release of a third party claim; instead it involved whether a plan which had been confirmed could be modified or vacated because it contained such releases. We

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

315 B.R. 321                                                                          Page 19
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

held that modification or vacation was not permitted because the request had been filed beyond the time allowed in the Code and Rules. *In re Vencor, Inc., 284 B.R. 79, 83 (Bankr.D.Del.2002). But see In re Davis Broad., Inc., 176 B.R. 290, 292 (M.D.Ga.1994)* (holding that bankruptcy court erred in not vacating confirmation order because court did not have jurisdiction to grant releases of third party claims, even though no creditor had objected).

Similarly, the *PWS* and *United Artists* cases cited by the Trustee are distinguishable because they do not involve third party releases of the nature present in this case. Both of those cases dealt with provisions exculpating professionals for actions taken during the chapter 11 case. *See, e.g., United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.), 315 F.3d 217, 226 (3d Cir.2003); In re PWS Holding Corp., 228 F.3d 224, 236-37 (3d Cir.2000).*

In *PWS,* the exculpation clause provided that the professionals and members of the creditors' committee were not subject to claims of creditors for their actions during the chapter 11 case except for gross negligence or wilful misconduct. *PWS, 228 F.3d at 245.* The Court held that such a provision was not unreasonable or violative of *section 524(e),* because it merely restated the standard by which such parties would be liable to creditors under section 1103 of the Code. *Id.* at 246.

In *United Artists,* there was a proposed release of nondebtors by third parties, but **\*337** it was limited to those who had accepted the plan. *United Artists, 315 F.3d at 224-25.* The Court also approved an indemnification provision in the plan of reorganization, finding that such a provision was reasonable when considered in the context of state law. *Id.* at 229-33.

The issues addressed in those cases are not what is before us, which is the release of third party claims against a non-debtor. Consequently, we are

not persuaded that the third party releases of the Noteholders in this case, to the extent they have not been accepted by the parties affected, can be approved.

### iii. *Other Miscellaneous Releases*

[19] Though not raised by any of the parties, we find that there are additional releases contained in the Trustee's Plan which cannot be approved. Specifically, the Trustee's Plan purports to release third party claims against the Trustee, the Equity Committee and their respective agents and professionals. (Trustee's Plan at §§ 9.2 & 9.4.) Such provisions are not permissible except to the extent they are limited to post-petition activity which does not constitute gross negligence or wilful misconduct. *See, e.g., PWS Holding Corp., 228 F.3d at 236-37* (holding that exculpation clause in plan which frees parties and professionals from third party claims is permissible so long as it is restricted to applicable standard of the duty owed to the estate by that party and professional). To the extent the Trustee's Plan provides any release beyond the *PWS* ruling, it must be modified.

[20] Similarly, section 9.1 of the Trustee's Plan purports to grant a release of the Debtors and their officers and directors (excluding Crowley and certain others). No release of the Debtors is appropriate, since the Debtors are entitled only to the discharge provided by section 1141(d). No evidence has been presented of any contribution made by any director or officer of the Debtors supporting any release of them by the Debtors or any third party. *See, e.g., Continental Airlines, 203 F.3d at 212-14* (holding that releases of directors and officers were not appropriate in absence of proof of substantial and necessary contribution to the reorganization plan). Consequently, section 9.1 of the Trustee's Plan must be stricken.

### 2. *Valuation of the Debtors*

The Equity Committee further asserts that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

315 B.R. 321                                                                                      Page 20
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

Trustee's Plan is not confirmable because the Noteholders receive all the equity in Reorganized Coram, which is worth much more than the Noteholders' claims. Therefore, the Equity Committee argues that it is not fair and equitable under section 1129(b). *See, e.g., In re Exide Techs.*, 303 B.R. 48, 61 (Bankr.D.Del.2003) ("a corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims") (quoting *Genesis Health Ventures*, 266 B.R. at 612). Thus, a determination of the Debtors' value directly impacts whether the Trustee's Plan is "fair and equitable."

Both the Trustee and the Equity Committee conducted their own valuations of the Debtors. The Trustee presented an enterprise valuation prepared by Ewing Bemis and Co. and SSG Capital Advisors, LLP (collectively "EB/SSG") while the Equity Committee presented a valuation prepared by Deloitte & Touche, LLP ("Deloitte"). Both EB/SSG and Deloitte determined the going concern value of the Debtors by applying the three standard valuation methodologies: (1) comparable public company analysis; (2) comparable transaction analysis; and (3) discounted cash flow analysis. *Id.* at 66. Despite using the same valuation methodologies, **\*338** the end results were far from similar. Deloitte and EB/SSG included different assets in reaching their valuation conclusions, attached different weights to the three valuation methodologies, and took different positions regarding management's projections.

a. *Going Concern Value*

[21] The Equity Committee argues that the Trustees' experts undervalued the Debtors. In fact, the Equity Committee asserts that EB/SSG produced a low valuation to establish that equity was out of the money thereby providing support for the Trustee's Plan. The Equity Committee asserts that EB/SSG reached their low valuation by improperly relying on management projections that were biased and incorrect in four ways. First, EB/SSG

accepted reserves created by management that had no basis in historical or industry experience. Second, EB/SSG's analysis accepted management's cash flow projections despite the fact that they contained computational errors that produced a low discounted cash flow. Third, EB/SSG did not conduct an independent analysis to determine whether any of management's original or revised projections were consistent with the market or the Debtors' actual performance. Finally, the Equity Committee contends that the EB/SSG valuation varied from the traditional valuation methodologies because they rejected multiples that produced results that they felt were outside the range of reasonableness or that did not fit their conclusions about the market.

In response, the Trustee argues that the EB/SSG enterprise value is more realistic than Deloitte's because EB/SSG properly relied on management's projections, financial models, and other assumptions. Although EB/SSG did make minor adjustments to some of the figures, their valuation was based heavily on management's numbers. After applying the valuation methodologies, EB/SSG relied on their experience in the purchase and sale of healthcare companies to calculate a going concern value of approximately $220 million.

The Equity Committee argues that its enterprise valuation is more appropriate than the Trustee's. Deloitte did not use management's projections because it felt they were too conservative. Instead, Deloitte applied upside projections previously prepared by the Debtors' own experts, EB/SSG.FN10 Deloitte also adjusted EBITDA for items that it determined were not regular charges. Accordingly, before it applied the standard valuation methodologies, Deloitte made significant adjustments to the Debtors' established reserves, cash flow projections, growth projections, and EBITDA. Finally, Deloitte concluded that higher multiples were appropriate because of the Debtors' recent performance and because it determined

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

315 B.R. 321                                                                    Page 21
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

the Debtors have a significant "specialty pharma-ceutical" component. As a result, Deloitte con-cluded that the proper going concern value of the Debtors was approximately $279 million.

> FN10. Before filing the Trustee's Plan, the Trustee considered selling the Debtors as a going concern. At that time, EB/SSG mod-ified management's projections to create an upside projection.

The Trustee contends that the Deloitte valuation overvalues the Debtors. He asserts that Deloitte reached an inflated value by making numerous ad-justments to management's projections and utiliz-ing inflated multiples. The Trustee contends that Deloitte was able to obtain its artificially high valuation of the Debtors by mischaracterizing the company as a specialty**339** pharmaceutical com-pany. While the Trustee admitted that a small por-tion of the Debtors' business could be called spe-cialty pharmaceutical, he argues that characteriz-ing the company as such is very inaccurate be-cause the Debtors operate under a vastly different business model. The Trustee also argues that it was inappropriate for Deloitte to substitute its own aggressive projections for management's carefully prepared projections. The Trustee asserts that Deloitte's inflated projections fail to recog-nize significant price pressures in the industry. Fi-nally, the Trustee contends that Deloitte was able to achieve its artificially high valuation by making an excessive number of adjustments to earnings before interest, taxes, depreciation and amortiza-tion ("EBITDA"), raising the Debtors' EBITDA by 40%. The Trustee asserts that this was inappro-priate because no purchaser would accept such ex-tensive adjustments by a seller.

Before we proceed with our analysis of the com-peting valuations, we recognize each side's incent-ives to either overvalue or undervalue the Debt-ors. *Exide,* 303 B.R. at 61. We also understand that preparing valuations of companies is not an exact science. Experts and industry analysts often

disagree on the appropriate value, even when em-ploying the same analytical tools. "Simply put, when it comes to valuation issues, reasonable minds can and often do disagree. This is because the output of financial valuation models are driven by their inputs, many of which are subjective in nature." *Peltz v. Hatten,* 279 B.R. 710, 736-37 (D.Del.2002). Although valuations are subjective, there are proper and improper methods of per-forming a valuation.

In *Exide,* the Court was faced with a situation similar to this case when it was asked to determ-ine "whether the Plan was proposed by self-interested management for the purpose of maxim-izing value and benefits to the Prepetition Lenders, who, it is alleged, will receive in excess of the full value of their claims." *Exide,* 303 B.R. at 58. To answer this question, the *Exide* Court was also required to analyze two competing valu-ations of the debtor. *Id.* While both experts used traditional valuation methodologies to determine the debtor's value, they reached different conclu-sions. *Id.* at 59. The debtor's expert used a "market-based approach" by analyzing the price that could be realized for the debtor's assets in their current state. Its expert made numerous sub-jective determinations that reduced the multiples prior to applying the valuation formula. *Id.* at 60. The creditors' committee argued that the most ac-curate way to determine the value of the debtor was by a straight-forward application of the three traditional valuation methodologies. The *Exide* Court agreed with the Committee and concluded that adjusting the company's value for the "taint" of bankruptcy was not appropriate because it would cause the debtor to be undervalued. *Id.* at 66. Accordingly, it held that the debtor's numer-ous downward adjustments were inappropriate. *Id.* at 68.

In this case, both parties argue that the opposing valuation does not comply with *Exide.* The Equity Committee asserts that the EB/SSG valuation sub-

jectively rejected the results of several traditional valuation methodologies. It asserts that the focus by EB/SSG on what a buyer would pay for the Debtors unfairly depressed the value because the Debtors are currently in bankruptcy. In contrast, the Trustee asserts that the Deloitte valuation does not comply with *Exide* because Deloitte rejected management's projections and adjusted the Debtors' projected growth rate upward, thereby achieving an **\*340** artificially inflated value before it applied the traditional valuation methodologies.

We conclude that the Equity Committee's reliance on *Exide* is misplaced. The *Exide* Court did not depart from established Third Circuit precedent that valuations must be analyzed in a realistic framework assuming a willing seller and a willing buyer. *Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 134 F.3d 188, 193-94 (3d Cir.1998)*. Here, the evidence did not establish that EB/SSG departed from the three traditional valuation methodologies in an attempt to artificially reduce the Debtors' value. The evidence simply shows that EB/SSG utilized management's conservative projections in a straight-forward application of those methodologies.

The Equity Committee's assertions that management's projections are flawed because they are inconsistent with historical and industry experience is inaccurate. We accept as credible the testimony of the Debtors' representatives who described in detail the process of preparing and vetting the projections. Although there were minor computational errors, the overall product was reasonable and should not have been discarded whole cloth by the Equity Committee's expert. Further, the use of the EB/SSG "upside projections" by Deloitte was inappropriate. Those projections were a sales piece prepared by EB/SSG at a time when the Trustee was contemplating a sale of the Debtors. No buyer would have relied upon them as an indication of the Debtor's value, nor should we.

We also disagree with the Equity Committee's assertion that valuation experts must include every possible valuation result. While the Court in *Exide* discredited the numerous subjective modifications to the valuation results made by the debtor's expert, the Court did not hold that a valuation expert must include unreasonable valuation results. *Exide, 303 B.R. at 64*. Instead, the Court rejected those results that strayed too far from generally accepted valuation methods. *Id.* After our review of the evidence, we cannot conclude that EB/SSG strayed from generally accepted valuation methodologies. While we agree that their numerical inputs (management's projections) may have been conservative, the evidence does not establish that EB/SSG made inappropriate downward adjustments. *See id.* at 66. Accordingly, we do not find that the EB/SSG valuation is improper.

In contrast, we conclude that the Deloitte valuation is inconsistent with *Exide* because of Deloitte's numerous adjustments. Deloitte made many subjective adjustments to management's projections, growth rate, and its EBITDA. Deloitte also selected earnings multiples and comparable companies that would produce higher valuation figures. Specifically, Deloitte's valuation was largely premised on its assumption that the Debtors were comparable to specialty pharmacy companies. In fact, we find that the Debtors' business operations are very different, relying heavily on services provided by nurses. Given the chronic nursing shortage, the Debtors have increased costs which specialty pharmacy companies do not have. Further, given price pressures in, and the mature nature of, the Debtors' industry, we conclude that Deloitte's assumed growth rate of the Debtors was unrealistic. Although Deloitte did apply the three traditional valuation methodologies, we find that it made the type of adjustments which the *Exide* Court criticized. That is, Deloitte took aggressive and optimistic views regarding the valuation and strength of the Debtors. Therefore, we do not find that the Deloitte valu-

315 B.R. 321                                                                                     Page 23
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

ation is an accurate reflection of the Debtors' value. Rather **\*341** we accept the Debtors' valuation, $220 million, as the proper value of the Debtors as going concerns.

### b. *Confirmation Value*

The Equity Committee also argues that a proper valuation must include all elements of value available to the estate at the time of confirmation of the plan. Accordingly, the Deloitte valuation added to the going concern value of the Debtors the value of cash on hand, net operating losses ("NOLs"), goodwill amortization, and litigation claims. Although the Trustee recognizes that these additional assets exist, he argues that Deloitte should not have included them in its valuation because a purchaser would not pay for them. Even if these assets should be considered, the Trustee argues that Deloitte improperly inflated their worth.

[22] We agree with the Equity Committee that the valuation of the Debtors for purposes of confirmation must include all assets, even those a buyer may not value. *See, In re New York, New Haven & Hartford R.R. Co.,* 4 B.R. 758, 772-73, 790-96 (D.Conn.1980) (a proper confirmation valuation needs to take into account all elements of value available to a debtor); 7 *Collier on Bankruptcy,* ¶ 1129.06[2][a] (15th ed. rev.2003). Under the Trustee's Plan, the Debtors are not being sold to an outside buyer. Instead, the Noteholders are acquiring the Debtors. Therefore, we must determine what assets the Noteholders are acquiring and what their value is to the Noteholders.

[23] However, contrary to the Equity Committee's suggestion, we conclude that the valuation should not include the estate's litigation claims against PriceWaterhouseCoopers, Crowley, and the other directors, because the Trustee's Plan specifically provides that these assets will be distributed under the plan to the shareholders, after the unsecured creditors have received post-petition interest (at the federal judgment rate) on their claims. Since

these "assets" are not being retained by the Reorganized Debtors (or the Noteholders) it is improper to account for them in the valuation.

We also find that Deloitte improperly considered the value of Coram's goodwill amortization. Goodwill amortization is an intangible asset. It is part of what a buyer purchases when it buys a company as a going concern (as opposed to simply buying hard assets). Therefore, the determination of the going concern value already includes this asset. Consequently, we decline to add goodwill amortization to the Debtors' going concern value, because doing so would double count that asset.

[24] However, we conclude that Deloitte properly included the NOLs since their value is preserved for Reorganized Coram (and the Noteholders) under the Trustee's Plan. NOLs are often lost when a company is sold, because there is a change of ownership of more than 50%. *See* 26 U.S.C. § 172 (2002). The Internal Revenue Code has an exception, however, which allows the preservation of NOLs where ownership is transferred to creditors under a chapter 11 plan. *Id.* at § 382. Therefore, although the NOLs have no value to an outside buyer, we agree with the Equity Committee that they should be considered here because the Trustee's Plan contemplates their preservation for the benefit of Reorganized Coram (and the Noteholders). *See, New York, New Haven & Hartford R.R.,* 4 B.R. at 772-73. In fact, NOLs can be a reorganized debtor's largest asset. *See* Chaim J. Fortgang & Thomas M. Mayer, *Valuation in Bankruptcy,* 32 UCLA L.Rev. 1061, 1129-30 (1985).

**\*342** [25] Nonetheless, we do not agree with Deloitte's position that the NOLs are worth $32.9 million. Scott Moeller ("Moeller"), Coram's Director of Taxation, testified that if the IRS challenged the Debtors' position, the NOLs would likely retain no value. (11/20/03 Moeller at 55.) Moeller testified that the Debtors' NOLs arose from the realization of losses on a consolidated

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

315 B.R. 321                                                                                    Page 24
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

basis. Moeller also admitted that while in bankruptcy the Debtors canceled debt. (*Id.* at 48). While the cancellation of debt in bankruptcy is not included in taxable income, the company must reduce certain tax attributes by the amount of the cancelled debt. (*Id.*) The Debtors took the position that the cancellation of debt exclusion should be done on a separate entity basis rather than on a consolidated basis, thereby reducing the NOLs by only $8 million. (*Id.* at 48-49.)

Moeller testified that the IRS could argue that the Debtors may not take such inconsistent positions. If the Debtors were required to treat the reduction of debt on a consolidated basis, much of the NOLs would be lost. Moeller testified that the IRS position is strengthened by the Supreme Court ruling in *United Dominion Indus., Inc. v. United States,* 532 U.S. 822, 834-35, 121 S.Ct. 1934, 150 L.Ed.2d 45 (2001) (concluding that consolidation of NOLs was the only proper method for an affiliated group of corporations). Accordingly, Moeller testified that there is a high likelihood that the IRS could successfully challenge the Debtors' tax positions, thereby limiting their use of the NOLs. The Trustee asserts that the Equity Committee's feasibility expert admitted the likelihood of a successful IRS challenge.

Recognizing that there is a level of risk associated with the NOLs, we conclude that it is proper to value them in accordance with the testimony of Patrick Hurst ("Hurst"), the Noteholders' rebuttal witness. Although Hurst testified that the NOLs should not be utilized because no buyer would pay for them, he opined that the risk adjusted present value is approximately $10 million. We conclude that $10 million is a fair valuation of the Debtors' NOLs, which should be added to the value of the Debtors being retained by the Noteholders.

The Equity Committee also argues that the Debtors' cash on hand adds value to the company (and the Noteholders). EB/SSG testified that this cash

would not be available to a buyer, because it would be used to pay down claims. However, it is not proper for the Trustee to discount the cash on hand without similarly discounting the amount of claims against the estate. Therefore, we conclude that the value of the Debtors must include $31.2 million (the $41.2 million cash on hand minus the $10 million in operating capital on which the valuation of the Debtors as a going concern was premised).

Finally, the Equity Committee asserts that the claims against the Noteholders (which are being released as a result of the Noteholders Settlement) are valuable assets of the estate that must be considered in determining what the Noteholders are receiving under this Plan. The Equity Committee asserts that those claims have a value in excess of $1 billion because of the fact that damages are trebled in RICO cases. As noted above, the Trustee and Noteholders contested both the validity of the RICO claims and the calculation of damages by the Equity Committee.

We agree with the Trustee and the Noteholders that the Equity Committee's damage expert was not credible. We cannot conclude that, simply because the Debtors did not perform as well as its peers in the industry, they were damaged by the Noteholders' actions. Nor can we **\*343** conclude that, if the Debtors were damaged by the Noteholders, its damages are determined by comparing its performance to those of its peers. Many other factors can account for the Debtors' poor performance.

In the absence of credible proof of damages by the Equity Committee, we are left with the value that the Trustee and Noteholders have put on the claims: the $56 million that the Noteholders will pay to get a release of those claims. We recognize, of course, that $56 million is being contributed by the Noteholders for more than the releases (for 100% of the equity of Reorganized Coram for instance). However, based on the evidence presen-

315 B.R. 321                                                                                    Page 25
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

ted, we can safely conclude that the value of those claims is no more than $56 million.

After considering the competing valuations, the competing incentives of the parties, and the divergent evidence offered in support of the valuations we conclude that the value of the Debtors is less than $317 million.FN11

> FN11. This figure is calculated by adding the going concern value of $220 million determined by EB/SSG, the $31.2 million in cash on hand, the $10 million in present value of the NOLs, and the value of the claims being released (less than $56 million). This figure fits within the range of valuations (from $150 to $376 million) done over the years by the various experts retained by the Noteholders, the Debtors, the Trustee and the Equity Committee. (*See* Exh. T-14, Cerb-13.)

### 3. Amount of Noteholders' Claims

To determine whether the Noteholders are receiving more than their allowed claims, we must determine the correct amount of their claims. The Equity Committee asserts that we should allow the Noteholders' claims only at the amount as of the Petition Date (approximately $252 million). In contrast, the Trustee and the Noteholders assert that those claims and entitled to post-petition interest at the contract rate (currently the default rate of 15%) and, therefore, total at least $343 million. The Equity Committee argues that no post-petition interest should be allowed. Alternatively, if we determine that interest is due, the Equity Committee insists that it be at the federal judgment rate rather than the contract rate.

#### a. *Allowance of Post-Petition Interest*

[26] The Trustee and the Noteholders argue that the Noteholders are entitled to post-petition interest pursuant to section 1129(b)(2). That section

requires that creditors receive payment of their claims in order of priority and in full before lesser claims or interests share in the assets of the reorganized debtor. *See, e.g., In re Dow Corning Corp.,* 244 B.R. 678, 689 (Bankr.E.D.Mich.1999) (*Dow II*) (recognizing that creditors must receive payment in their established order of priority in full before lesser interests may share in the assets of the reorganized entity). This requirement is commonly referred to as the "absolute priority rule." The Noteholders and the Trustee assert that providing a distribution to shareholders before the Noteholders receive post-petition interest violates the requirements of the absolute priority rule.

The Equity Committee asserts that denying post-petition interest to the Noteholders does not offend the absolute priority rule because that rule requires only that senior creditors receive payment of the allowed amount of their *claims* and that a claim does *not* include unmatured interest. 11 U.S.C. § 502(b)(2).FN12 Therefore, the **\*344** Equity Committee argues that the absolute priority rule is not offended if the Noteholders receive only the full value of their claims as of the Petition Date.

> FN12. Section 502(b)(2) states that: "the court ... shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in lawful currency of the United States in such amount, except to the extent that ... (2) such claim is for unmatured interest." 11 U.S.C. § 502(b)(2).

We disagree with the Equity Committee's arguments. While section 502(b)(2) provides that an allowed claim does not include interest unmatured as of the petition date, it does not prohibit the award of interest to creditors in all circumstances. *See, e.g., Dow II,* 244 B.R. at 691.

For instance, where there is an allowed claim, secured by property which is worth more than the

315 B.R. 321                                                                                          Page 26
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

value of the claim, the secured claimant is entitled to post-petition interest on the claim. 11 U.S.C. § 506(b); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 372, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (noting that over-secured claimants are entitled to interest on their claims).

Further, in a chapter 7 liquidation case, where a debtor is solvent, a creditor is entitled to receive, as a fifth priority claim, post-petition interest. *See* 11 U.S.C. § 726(a)(5); *Onink v. Cardelucci (In re Cardelucci),* 285 F.3d 1231, 1234 (9th Cir.2002); *Dow II,* 244 B.R. at 691. Creditors must receive at least as much under a chapter 11 plan of reorganization as they would in a liquidation under chapter 7. 11 U.S.C. § 1129(a)(7).

Additionally, section 1124 contemplates that creditors may be paid interest when they are treated as unimpaired under a plan of reorganization. 11 U.S.C. § 1124(1) (to be unimpaired a plan must not alter a creditor's legal, equitable or contractual rights). *See also Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.),* 324 F.3d 197, 206 (3d Cir.2003) (explaining that in 1994 Congress amended section 1124 to overrule authority which had deprived unimpaired creditors of post-petition interest from solvent debtors); *Dow II,* 244 B.R. at 686 (holding that "a creditor's contractual right to interest retains validity during the pendency of chapter 11 reorganization.").

Consequently, we conclude that payment of post-petition interest before any distribution to equity holders in a chapter 11 case is not prohibited by the Code and, in fact, may be required. *See, e.g., Groundhog, Inc. v. San Joaquin Estates, Inc. (In re Joaquin Estates, Inc.),* 64 B.R. 534, 536 (9th Cir. BAP 1986) (bankruptcy court abused its discretion in denying post-petition interest to unsecured creditor of solvent debtor in chapter 11 since interest would be paid under § 726); *In re Gaines,* 178 B.R. 101, 103 (Bankr.W.D.Va.1995) (interest must be paid to unsecured creditors under

chapter 11 plan if debtor is solvent).

The Equity Committee asserts, however, that approving post-petition interest on the Noteholders' claims would not be fair and equitable. The Equity Committee contends that denying post-petition interest to the Noteholders is "fair and equitable" because Cerberus created and continued Crowley's conflict of interest.

The cases cited by the Equity Committee do not support its arguments. The *Time Sales* and *Kingsboro Mortgage* cases dealt with the effectiveness of a subordination agreement between creditors in liquidation cases under the Bankruptcy Act. *In re Time Sales Fin. Corp.,* 491 F.2d 841, 844 (3d Cir.1974) (finding that subordination agreement did not clearly require payment of post-petition interest to senior creditor before junior creditors could get **\*345** any distribution in bankruptcy case); [FN13] *Bankers Life Co. v. Mfrs. Hanover Trust Co. (In re Kingsboro Mortgage Corp.),* 514 F.2d 400, 401 (2d Cir.1975) (subordination agreement did not require that senior creditors receive post-petition interest before junior creditors received principal distribution in bankruptcy liquidation case).

> FN13. The *Time Sales* Court did not preclude the possibility that the senior creditor could get paid post-petition interest if the subordination agreement stated that clearly. 491 F.2d at 845.

The instant case does not involve the interpretation of a subordination agreement; instead it deals with the interpretation of the Code provisions dealing with the allowance of interest on claims and the priority of distributions to creditors and shareholders. In addition, the cases cited by the Equity Committee involved a dispute between two groups of creditors rather than the relative rights of creditors vis-a-vis shareholders. Further, those cases were decided under the Bankruptcy Act rather than the Bankruptcy Code. Therefore,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

315 B.R. 321                                                                                          Page 27
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

we conclude that the cases cited by the Equity Committee are inapposite.

The cases cited by the Trustee and the Noteholders are on point and do support a finding that in certain circumstances an award of post-petition interest may be made to creditors under a chapter 11 reorganization plan before a distribution is made to shareholders. *See, e.g., Cardelucci, 285 F.3d at 1234* (holding that when a debtor is solvent, the creditors are entitled to receive post-petition interest at the legal rate under a chapter 11 plan of reorganization); *Dow II, 244 B.R. at 692* (holding that when a debtor is solvent, the creditors are entitled to receive post-petition interest at the contract rate under a chapter 11 plan of reorganization).

However, The Trustee's liquidation analysis (which the Equity Committee does not dispute) demonstrates that the Debtors' liquidation value (approximately $134 million) does not exceed the amount of its outstanding debt (at least $300 million). In this case, though, it is relevant to compare the amount of debt to the confirmation value ($317 million) because the Debtors are reorganizing instead of liquidating. Under that scenario the Debtors are solvent, and post-petition interest should be paid before shareholders get a distribution. *Cardelucci, 285 F.3d at 1234; Dow II, 244 B.R. at 686. See also, Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship), 115 F.3d 650, 654 (9th Cir.1997)* (holding that "the Plan violated the general absolute priority rule provided in the Code because it does not pay interest on Liberty's unsecured claim.").

Thus, we conclude that the Noteholders are entitled to post-petition interest on their unsecured claims.

### b. *Rate of Post-Petition Interest*

[27] If post-petition interest is appropriate at all,

the Equity Committee argues that it should accrue at the federal judgment rate. *28 U.S.C. § 1961(a).*FN14 *See, e.g., Cardelucci, 285 F.3d at 1234* (interest may be paid at the federal judgment rate only).

> FN14. *Section 1961 of title 28* provides that: "Interest shall be allowed on any money judgment in a civil case recovered in a district court.... Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield...." *28 U.S.C. § 1961. Section 1961* is applicable to bankruptcy courts as well as district courts. *See In re Dow Corning Corp., 237 B.R. 380, 386 (Bankr.E.D.Mich.1999)* (*Dow I*) (citing *In re Goldblatt Bros., Inc., 61 B.R. 459, 466 n. 4 (Bankr.N.D.Ill.1986)*).

**\*346** The Equity Committee asserts that paying a creditor post-petition interest at its contract rate eliminates any incentive that the creditor would have to negotiate in good faith so that the case can be concluded expeditiously. In this case, in particular, the Equity Committee urges that paying the contract rate of interest is inequitable since the Noteholders are responsible for the delay in achieving a reorganization because of their relationship with Crowley.

*Section 1129(a)(7)* requires a plan of reorganization to provide non-consenting impaired creditors with at least as much as they would receive if the debtor was liquidated in chapter 7. *11 U.S.C. § 1129(a)(7).* As noted above, in a chapter 7 liquidation case, where the debtor is solvent, a creditor must receive post-petition interest on its claim before shareholders receive any distribution. *11 U.S.C. § 726(a)(5).*

*Section 726(a)(5)* provides that a creditor must receive post-petition "interest at the legal rate." However, neither the Code nor its legislative his-

315 B.R. 321                                                              Page 28
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

tory provides a definition of what that interest rate is. Most courts, however, conclude that term means the federal judgment rate. *See, e.g., Cardelucci,* 285 F.3d at 1234; *In re Dow Corning Corp.,* 237 B.R. 380, 387 (Bankr.E.D.Mich.1999) ("*Dow I*"); *In re Melenyzer,* 143 B.R. 829, 832-33 (Bankr.W.D.Tex.1992).

Those courts reason that the purpose of post-petition interest is to compensate creditors for the delay between the petition date and the time of payment. *Cardelucci,* 285 F.3d at 1235; *Dow I,* 237 B.R. at 405. This is the same purpose served by post-judgment interest. *Cardelucci,* 285 F.3d at 1235; *Dow I,* 237 B.R. at 405-6. Because an allowed claim is the equivalent of a money judgment, these courts conclude that the federal judgment rate is the appropriate federal statutory rate of interest to be applied for post-petition interest. *Cardelucci,* 285 F.3d at 1235; *Dow I,* 237 B.R. at 391, 406.

The Equity Committee suggests that our analysis end at this point and, if we conclude that the Noteholders are entitled to post-petition interest, that it be allowed only at the federal judgment rate. However, we are not convinced that Congress intended to supplant a party's contractual right to interest in all circumstances under chapter 11. *See Dow II,* 244 B.R. at 686 (holding that section 726(a) is applicable to chapter 11 cases through section 1129(a)(7) and merely sets the minimum that creditors must receive); *In re Schoeneberg,* 156 B.R. 963, 969 (Bankr.W.D.Tex.1993) (holding that the best interest test in section 1129(a)(7) requires that a creditor receive post-petition interest at the contract rate pursuant to section 726(a)(5)).

[28] Thus, we are not persuaded by the Equity Committee that section 1129(b) *requires* the use of the federal judgment rate for post-petition interest to be paid under a chapter 11 plan of reorganization. Instead, we conclude that the specific facts of each case will determine what rate of in-

terest is "fair and equitable". *Dow II,* 244 B.R. at 692 (holding that amount of interest which should be paid to creditors in chapter 11 case is within the court's discretion).

In making that determination in this case, we conclude that the actions of Cerberus and the other Noteholders are relevant. As we recognized at the conclusion of the first confirmation hearing, Crowley's consultation agreement with Cerberus created an actual conflict of interest that tainted the Debtors' restructuring of its debt, the Debtors' negotiation of a plan, and the Debtors' ultimate emergence from bankruptcy. The delay (and the additional expenses incurred by the Debtors inherent **\*347** in that delay FN15) is largely attributable to that conflict. It would be grossly unfair to pay the Noteholders default interest during that delay.

> FN15. Goldin estimated that the conflict of interest caused damages to the Debtors at least in the amount of additional professional fees ($5 to $6 million) and possible business losses ($7 to $9 million) resulting from the inability to confirm the Debtors' First Plan.

Further, Goldin determined that Crowley did advance the interests of Cerberus (and the other Noteholders) by causing the Debtors to pay them $6.3 million in cash (instead of additional notes) at a time when the Debtors' cash was low and a bankruptcy filing was under active consideration. Further, despite our conclusion at the first confirmation hearing and the Goldin report, the conflict of interest did not cease. In fact, Crowley continued to receive almost $1 million a year from Cerberus, while serving as the Debtors' CEO and President. *In re Coram Healthcare Corp.,* 271 B.R. 228, 235 (Bankr.D.Del.2001). Under his agreement with Cerberus, Crowley was required to obey its instructions or risk the termination of his agreement. *Id.* At the conclusion of the second confirmation hearing, we held that Crowley

315 B.R. 321                                                                                                Page 29
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

should have been excluded from every decision that could have affected Cerberus' interests. *Id.* at 240.

As a result of these peculiar facts, we conclude that allowing the Noteholders to accrue post-petition interest at their contractual default rate would not be fair and equitable. Certainly the actions of Cerberus warrant this conclusion. Even if the other Noteholders were not involved in the actual conflict of interest by Crowley, however, we conclude that they also should not get the contractual default rate of interest for the post-petition period. All the Noteholders received the benefit of the $6 million in cash (as opposed to notes) paid by the Debtors at Crowley's direction immediately before the bankruptcy case was filed. To the extent Crowley acted to advance Cerberus' interests in this case, he necessarily advanced the interests of the Noteholders. Further, the Noteholders have consistently acted as a group in this case in advancing their interests and opposing the Equity Committee. Consequently, we do not feel compelled by the equities to pay them a default rate (15%) or their contract rate (9%) of interest while the Debtors were in bankruptcy. Therefore, we conclude that the federal judgment rate is fair and equitable.

Allowing the Noteholders' claims (with interest at the federal judgment rate) results in a claim of approximately $262 million. All other outstanding claims against the Debtors total approximately $49 million. (Exh T-8.) Therefore total claims are approximately $311 million. The value of the Debtors is less than $317 million. Consequently, the shareholders' equity totals no more than $6 million. Since the Trustee's Plan provides a greater distribution to shareholders (at least $40 million), we find that the Noteholders are not receiving more under that Plan than the allowed amount of their claims.

Accordingly, we conclude that the Trustee's Plan (so long as the releases are modified as detailed above) is fair and equitable and complies with

section 1129(a) and (b).

B. *Confirmability of the Equity Committee's Plan*

The Trustee and the Noteholders argue that the Equity Committee's Plan is not confirmable because it fails to meet several of the requirements of the Code. The Trustee and the Noteholders initially object to the Equity Committee's Plan because they assert that no impaired class of **\*348** creditors voted to accept that Plan. 11 U.S.C. § 1129(a)(10) (court shall confirm a plan of reorganization only if there is at least one impaired class that votes to accept the plan).

From the Report of Plan Voting filed on June 11, 2004, it is clear that no class of impaired creditors in the Coram case accepted the Equity Committee's Plan. However, that Report states that in the CHC case,[FN16] class CHC 3 did accept the Equity Committee's Plan by 77.1% in amount and 59.5% in number. *See* 11 U.S.C. § 1126(c) (a class of claims has accepted a plan if at least two thirds in amount and one half in number of claims voting on the plan have accepted it).

> FN16. Unlike the Trustee's Plan, the Equity Committee's Plan separately classified the Coram and CHC creditors.

1. *Classification of Claims*

The Trustee and the Noteholders assert that, although class CHC 3 did appear to accept the Equity Committee's Plan, that class was improperly constituted. The Trustee argues that instead of one class of unsecured creditors, the Equity Committee's Plan improperly classifies unsecured claims in three classes: the R-Net claim, the Noteholders' claims and the general unsecured claims. *See, e.g., FGH Realty Credit Corp. v. Newark Airport/Hotel Ltd. P'ship,* 155 B.R. 93, 99 (D.N.J.1993) ("Unsecured claims will, generally speaking, comprise one class, whether trade, tort, publicly held debt or a deficiency of a secured

315 B.R. 321                                                                                               Page 30
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

creditor [because] they are claimants of equal rank entitled to share pro rata in values remaining after payment of secured and priority claims.")(quoting *In re 266 Washington Assocs., 141 B.R. 275, 282 (Bankr.E.D.N.Y.1992)*).

[29] We disagree with the Trustee's argument that separate classification of unsecured claims is *per se* improper. Section 1122 of the Code provides that claims that are not "substantially similar" may not be placed in the same class; it does not expressly prohibit placing "substantially similar" claims in separate classes. 11 U.S.C. § 1122(a). In fact, the Third Circuit has approved separate classification of unsecured claims. *In re Jersey City Med. Ctr., 817 F.2d 1055, 1061 (3d Cir.1987)* (approving classification of general unsecured creditors into different classes: doctors' indemnification claims, medical malpractice claims, employee benefit claims and trade claims). *See also, Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.), 800 F.2d 581, 587 (6th Cir.1986)*; *Barnes v. Whelan, 689 F.2d 193, 200-01 (D.C.Cir.1982)*; *In re LeBlanc, 622 F.2d 872, 879 (5th Cir.1980)*.

The Trustee and the Noteholders argue, nonetheless, that the classification in the Equity Committee's Plan is improper because it is used solely to create an accepting impaired class. They assert that the Equity Committee gerrymanders the votes by separately classifying the unsecured creditors, because this is the only way it can obtain an accepting class of impaired creditors. They argue that, if the Equity Committee's Plan properly classified the unsecured creditors in one class, it would not have an accepting class of impaired creditors.

The Equity Committee responds that the separate classification of unsecured claims is permissible because it is rational and is not designed to gerrymander the votes. The Equity Committee contends that allowing the votes of the trade creditors

to be dominated by the Noteholders' **\*349** opposition to the Equity Committee's Plan would be improper.

[30] Even though similar claims may be placed in separate classes, plan proponents cannot do so when it would be unreasonable. The Third Circuit has held that "it seems clear that the Code was not meant to allow a [plan proponent] complete freedom to place substantially similar claims in separate classes." *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs. (In re Route 37 Bus. Park Assocs.), 987 F.2d 154, 158 (3d Cir.1993)*. If a plan proponent could separately classify substantially similar claims at its discretion, it could construct a classification scheme designed to secure approval through arbitrary classes. *Id.* This would effectively eliminate the requirement of plan acceptance by creditors. *Id.* Accordingly, the Third Circuit found that "the classification of claims or interests must be reasonable." *Id.* (quoting *Jersey City Medical, 817 F.2d at 1061*).

[31] Where the sole purpose and effect of creating multiple classes is to mold the outcome of the voting to effectuate a "cram down," each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in determining whether the proposed reorganization should proceed. *John Hancock, 987 F.2d at 159*. *See also, Phoenix Mutual Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture), 995 F.2d 1274, 1279 (5th Cir.1991)* ("thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan").

[32] A proper determination of whether claims are "substantially similar" focuses on the nature of the claims. *In re FF Holdings Corp. & Farm Fresh, Inc., 1998 U.S. Dist. LEXIS 10741 \*13 (D.Del. Feb. 17, 1998)*. The "primary analysis centers upon the legal attributes of the claims and not upon the status or circumstances of the claimant. Emphasis is not upon the holder so much as it is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

upon that which is held." *Id.* (quoting *In re Northeast Dairy Coop. Fed'n. Inc., 73 B.R. 239, 250 (Bankr.N.D.N.Y.1987)*).

Currently, the Noteholders,[FN17] R-Net and the trade creditors hold general unsecured claims against the Debtors' estate with the same priority. The R-Net claims arose from services provided by R-Net to Coram in connection with an agreement with Aetna U.S. Healthcare. They are substantially similar to those of the general unsecured creditors in legal attributes and priority status. The Noteholders' claims, however, arose from the purchase of notes, not the provision of services to the Debtors.

> FN17. Although the Noteholders converted much of their unsecured claims to preferred stock so that the Debtors complied with Stark II, the terms of that conversion required that their claims be treated as general unsecured claims for purposes of confirmation of the plan.

[33] The Equity Committee argues that the separate classification of R-Net is proper because it does not provide any ongoing services to the Debtors, while the trade creditors currently are, and will in the future be, providing services to Re-organized Coram. Numerous courts have held that separate classification and treatment of trade claims is acceptable if the separate classification is justified because they are essential to a reorganized debtor's ongoing business. *See, e.g., FF Holdings,* 1998 U.S. Dist. LEXIS at *16; *In re Richard Buick, Inc., 126 B.R. 840, 852 (Bankr.E.D.Pa.1991).*

However, we do not agree that the asserted justification is convincing in this *350 case. If the continued support of the Debtors' reorganization by the trade creditors was so important to justify their separate classification, the Equity Committee's Plan would provide them with more favorable treatment. Instead, the Equity Committee's

Plan proposes to treat trade creditors less generously than it treats R-Net.

[34] Finally, the Equity Committee argues that separately classifying R-Net's claims is proper because, as an insider creditor, it was in a superior position to evaluate the risks of dealing with the Debtors. However, a proper determination of what claims are "substantially similar" focuses on the legal attributes of the claims, not who holds them. *FF Holdings,* 1998 U.S. Dist. LEXIS 1074 *13. The legal attributes of R-Net's general unsecured claim are no different from the legal attributes of the trade creditors' general unsecured claim. Thus, separately classifying R-Net because it is an insider is not appropriate, especially since R-Net is given more favorable treatment.[FN18]

> FN18. One might argue that R-Net's votes should not be considered because it is an insider. However, section 1129(a)(10) provides that courts should not consider "any *acceptance* of the plan by an insider" in determining whether there is an accepting class of creditors. 11 U.S.C. § 1129(a)(10) (emphasis added). The votes of an insider *rejecting* a plan are not excluded under that section. *See In re United Marine, Inc., 197 B.R. 942, 946 (Bankr.S.D.Fla.1996).*

We conclude that, based on applicable Third Circuit precedent, the separate classification of R-Net is improper. *See John Hancock, 987 F.2d at 157.* Therefore, R-Net's claims must be included in the same class as the trade creditors. However, that has no effect on the vote of class CHC 3 to accept the Equity Committee's Plan. The class CHC 3 creditors would still have accepted the Equity Committee's Plan by 71% in amount and 58% in number (as opposed to 71% in amount and 59.5% in number under the current classification). (*See* Report of Plan Voting filed on June 11, 2004.)

[35] The Trustee and the Noteholders also argue

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that the Noteholders' claims should be included in the same class as the general unsecured creditors and R-Net in the Equity Committee's Plan. The Equity Committee argues that the Noteholders' claims should remain separately classified. It argues that those claims arose from the purchase of notes, not the provision of services. Therefore, the Noteholders' claims are not similar to the other general unsecured claims because they did not provide services to them and clearly will not be providing future services to Reorganized Coram. In addition, the Equity Committee argues that the inequitable conduct of the Noteholders mandates their separate treatment because the Noteholders should not be permitted to control the vote of the unsecured creditor class. We reject this argument, however, because classification of claims should not be permitted solely on the basis of how the plan proponent thinks the creditor will vote. That is gerrymandering.

However, we also reject the argument of the Trustee and the Noteholders that the Code mandates that the Noteholders be placed in the general unsecured creditor class. The Trustee's Plan, which the Noteholders support, classifies (and treats) the Noteholders separately from the general unsecured claims. Thus, it is disingenuous for the Trustee to assert that the separate classification of those claims in the Equity Committee's Plan is improper. Further, we are convinced that the Noteholders do represent a voting interest that is sufficiently distinct from the trade creditors to merit a separate voice in this reorganization**\*351** case. *See, e.g., John Hancock, 987 F.2d at 159*.

Accordingly, we conclude that the Equity Committee's Plan does not properly classify R-Net's claim, but this has no effect on the voting. Further, we conclude that the separate classification of the Noteholders was reasonable.

### 2. *Impairment*

[36][37] The Trustee and the Noteholders also ar-

gue that the Equity Committee's Plan is not confirmable because it lacks an accepting vote from an "impaired" class of creditors. Section 1124 provides that a claim is impaired under a plan if the plan alters the legal, equitable, or contractual rights of the claimant. *See* 11 U.S.C. § 1124(a)(1). That is, if the proposed plan of reorganization does not leave the creditor's rights entirely unaltered, the creditor's claim is impaired. *PPI Enters., 324 F.3d at 202*.

The Equity Committee's Plan classifies the unsecured creditors' claims as impaired because, the Equity Committee asserts, its Plan alters the rights of creditors by providing them with post-petition interest at the federal judgment rate. We disagree. The Equity Committee's Plan provides that the creditors will get paid in cash the allowed amount of their claims plus Full Interest, which is defined as "the federal judgment rate (28 U.S.C. § 1961) or at such other interest rate as is determined by the Court at the Confirmation Hearing, that will cause the Plan to conform to and meet the requirements of applicable law...." (Equity Committee's Plan at 5, 14.) The Equity Committee's Disclosure Statement explains that "all creditors, other than the Noteholders and Preferred Stockholders, will be paid the full amount of their Allowed Claims in Cash after the Equity Committee Plan is confirmed, together with *interest to the extent required by law*." (Equity Committee's Third Amended Disclosure Statement at p. 28 (emphasis added).) Thus, the Equity Committee's Plan provides for interest to the general unsecured creditors in class CHC 3 and C 3 at whatever rate is determined to be the proper rate of interest due them. The Equity Committee's Plan does not impair creditors' rights at all.

The Equity Committee appears to confuse "two distinct concepts: (1) plan impairment, under which the [plan proponent] alters the 'legal, equitable and contractual rights to which the claim entitles the holder of such claim,' and (ii) statutory

315 B.R. 321                                                                                    Page 33
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

impairment, under which the operation of a provision of the Code alters the amount that the creditor is entitled to under nonbankruptcy law." *See PPI Enters., 324 F.3d at 203* (quoting *In re PPI Enters. (U.S.), Inc., 228 B.R. 339, 353 (Bankr.D.Del.1998)*).

It is not the Equity Committee's Plan which limits the rights of the class CHC 3 and C 3 creditors. Instead, if their rights are altered at all, it is because of the Code and decisional law under the Code. Accordingly, these claims are not impaired under section 1124(1). Consequently, we conclude that the Equity Committee's Plan contains no impaired class which has voted to accept the Plan. Thus, it is not confirmable. 11 U.S.C. § 1129(a)(10).

### C. *Which Plan Should Be Confirmed*

[38] Even if we were to conclude that the Equity Committee's Plan is confirmable, we would still not confirm it over the Trustee's Plan. Section 1129(c) provides that "[i]f the requirements of subsection (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm." *352 11 U.S.C. § 1129(c). In this case, the preferences of the creditors clearly favor the Trustee's Plan. According to the Report of Plan Voting, the creditors accepted the Trustee's Plan by substantial margins: 100% of the Noteholders and 96.6% in amount and 87.2% in number of the general unsecured creditors. In contrast, the Noteholders unanimously rejected the Equity Committee's Plan and the Coram general unsecured creditors (including the R-Net claim) rejected the Plan by 99.9% in amount and 37.5% in number. The general unsecured creditors of CHC voted in favor of the Equity Committee's Plan by a margin of 77.1% in amount and 58% in number. Creditors were permitted to express a preference on their ballots; eighteen preferred the Trustee's Plan while one Coram creditor and nine CHC creditors

preferred the Equity Committee's Plan. From the vote it is clear that the creditors prefer the Trustee's Plan to the Equity Committee's Plan.

The shareholders preferred the Equity Committee's Plan, though not by overwhelming numbers. Three hundred eighty (380) shareholders voted in favor of the Trustee's Plan while four hundred fifty-six (456) voted in favor of the Equity Committee's Plan. One hundred seventy-two (172) expressed a preference for the Trustee's Plan, while two hundred sixty-eight (268) expressed a preference for the Equity Committee's Plan.

There is an additional reason to confirm the Trustee's Plan over the Equity Committee's Plan: the Trustee's Plan is more feasible. The Trustee's Plan provides for immediate payment of creditors (from cash on hand and funds contributed by the Noteholders) and the issuance of stock to the Noteholders. There is no payout over time and, therefore, no uncertainty that the Plan can be consummated.

In contrast, the Equity Committee's Plan provides for an extended period (over five years) before the Noteholders will be paid in full. Even without considering the arguments of the Noteholders and the Trustee that Reorganized Coram's operations will not be sufficient to make those payments, we can easily conclude that the Equity Committee's Plan presents more uncertainty than the Trustee's Plan.

Further, under the Equity Committee's Plan, the stock in CHC will remain in the hands of the existing shareholders. Consequently, under the Equity Committee's Plan, the Reorganized Debtors will have to maintain a net equity in accordance with Stark II. This will likely lead to the need for additional financing or reorganization. In contrast, under the Trustee's Plan, the stock will be issued to the Noteholders. As a privately held company, Reorganized Coram will not be required to comply with the net equity require-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

315 B.R. 321                                                                    Page 34
315 B.R. 321, 94 A.F.T.R.2d 2004-6268
**(Cite as: 315 B.R. 321)**

ments of Stark II.

Consequently, we conclude that the Trustee's Plan, if modified, is preferable and should be confirmed.

### IV. *CONCLUSION*

For the reasons stated above, we conclude that the Equity Committee's Plan improperly classifies unsecured creditors and has not been accepted by an impaired class of claims. Therefore, we conclude that it is not confirmable.

Although we find that providing the Noteholders with releases from third parties who have not consented to those releases is not fair and equitable and that the other release provisions of the Plan are improper, we conclude that the Trustee's Plan otherwise is confirmable. Accordingly, we will confirm the Trustee's Plan, if it is modified in accordance with this Opinion.

Bkrtcy.D.Del.,2004.
In re Coram Healthcare Corp.
315 B.R. 321, 94 A.F.T.R.2d 2004-6268

Briefs and Other Related Documents (Back to top)

• 2001 WL 34836743 () Report of Independent Restructuring Advisor Goldin Associates, L.L.C. (Jul. 11, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ARLIN M. ADAMS, Chapter 11 Trustee of the Post-Confirmation Bankruptcy Estates of CORAM HEALTHCARE CORPORATION, a Delaware Corporation, and of CORAM, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>DANIEL D. CROWLEY; DONALD J. AMARAL; WILLIAM J. CASEY; L. PETER SMITH; AND SANDRA L. SMOLEY,<br><br>Defendants. | : : : : : : : : : : : : : : : : | Case No. ___0 4 - 1 5 6 5___<br><br><br>JURY TRIAL DEMANDED |

2004 DEC 29  PM 4: 25
FILED U.S. DISTRICT COURT DISTRICT OF DELAWARE

## COMPLAINT

Plaintiff, Arlin M. Adams, as Chapter 11 Trustee of the Post-Confirmation Bankruptcy Estates of Coram Healthcare Corporation and its wholly owned subsidiary Coram, Inc. (collectively "Coram"), brings this action for breaches of fiduciary duty against Daniel D. Crowley, the former Chairman and CEO of Coram and a member of its Board of Directors ("Crowley"), and former Board members Donald J. Amaral, William J. Casey, L. Peter Smith, and Sandra L. Smoley arising out of Crowley's conflict of interest and breach of his duty of loyalty. Before he entered into a November 30, 1999 employment agreement with Coram, Crowley had already entered into an Employment Agreement with Cerberus Partners L.L.P. ("Cerberus"), one of Coram's three major lenders, under which Cerberus paid Crowley $80,000 per month. The head of Cerberus, Stephen Feinberg, sat on Coram's Board. Crowley did not

disclose to Coram's Board the existence of his Employment Agreement with Cerberus or its terms. Although the Board was aware that Crowley had some "relationship" with Cerberus, the other Board members failed to exercise any business judgment or otherwise make any good faith attempt to fulfill their fiduciary duties to Coram and its stockholders in connection with Crowley's employment. They made no inquiries and approved Crowley's employment agreement with Coram without investigating or learning that Crowley was receiving $80,000 each month from Cerberus. The Board's inaction continued even after the existence of the conflict was brought to their attention.

When these facts were brought to light in connection with Coram's bankruptcy proceeding, the Bankruptcy Court on December 21, 2000, refused to confirm Coram's proposed plan of reorganization, finding that it was not submitted in good faith because Crowley had an actual conflict of interest that tainted Coram's operations and proposed restructuring. Despite this clear finding, Crowley continued for the next year to accept $80,000 per month from Cerberus, and the Board took no remedial action whatsoever and did not inquire whether Crowley continued to receive these payments. To the contrary, the Board attempted to ratify and bless their own breaches of fiduciary duty by retaining an independent advisor whose assignment, in the words of defendant Amaral, was "to sprinkle holy water" on the situation. On December 21, 2001, the Bankruptcy Court rejected this cynical and bad faith ploy and refused to confirm Coram's second proposed plan of reorganization. The Court found that "nothing had changed," and that the breaches by Crowley and these directors caused damages to Coram. Crowley's failure to disclose his conflict of interest and his continued acceptance of payment from Cerberus and from Coram were breaches of his duties of care, good faith and loyalty to Coram and its shareholders. By approving Crowley's retention without even basic inquiry into

2

Crowley's relationship with Cerberus and then seeking to allow Crowley to continue to receive $80,000/month from Cerberus, the other members of the Board consciously and intentionally abdicated all responsibility to consider appropriately Crowley's employment arrangements and failed to act in good faith and meet even minimal standards of attention. These serious and persistent breaches of fiduciary duty caused harm to Coram and its shareholders. The Trustee brings this action to recover those damages for the benefit of Coram's former shareholders and unsecured creditors.

## PARTIES

1.      On March 7, 2002, the United States Bankruptcy Court for the District of Delaware entered an order appointing plaintiff Chapter 11 Trustee of Coram and Coram, Inc. At the time, Coram was a publicly-traded company. On October 27, 2004, the Bankruptcy Court signed an order, deemed entered as of November 1, 2004, confirming the Trustee's Plan of Reorganization. All appeals from the confirmation order have been withdrawn, and the Trustee's plan has been implemented. Coram is now a private company owned by its former lenders.

2.      Coram is a Delaware corporation with its principal place of business in Colorado. Coram is a leading provider of alternative-site infusion therapy in the United States. Infusion therapy involves the intravenous administration of drug therapies for nutrition, anti-infection, HIV, blood factor, pain management, chemotherapy and other purposes.

3.      Defendant Daniel D. Crowley ("Crowley") is a citizen of California. He was Chairman and Chief Executive Officer of Coram from November 1999 until March 2003.

4.     Defendant Donald J. Amaral ("Amaral") is not a citizen of Pennsylvania, Delaware, or Colorado and is, on information and belief, a citizen of Nevada. He joined Coram's Board in 1995 and served as Chairman from September 1997 through November 30, 1999. From October 1995 through April 23, 1999, and from October 22, 1999 through November 30, 1999, he also served as Coram's Chief Executive Officer.

5.     Defendant William J. Casey ("Casey") is not a citizen of Pennsylvania, Delaware, or Colorado and is, on information and belief, a citizen of California. He joined Coram's Board in 1997.

6.     Defendant L. Peter Smith ("Smith") is not a citizen of Pennsylvania, Delaware, or Colorado and is, on information and belief, a citizen of Illinois. He joined Coram's Board in 1994.

7.     Defendant Sandra L. Smoley ("Smoley") is not a citizen of Pennsylvania, Delaware, or Colorado and is, on information and belief, a citizen of California. She joined Coram's Board on February 10, 2000.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332, as the action is between citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

9.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1409.

## FACTUAL ALLEGATIONS

10.     From approximately 1997 on, Cerberus, together with Goldman Sachs Credit Partners L.P. ("Goldman Sachs") and Wells Fargo Foothill ("Foothill"), owned all of Coram's debt and are collectively referred to as "the Noteholders." Cerberus owned approximately 38%. Cerberus is a substantial investor in the debt of numerous distressed companies.

11.     On May 6, 1998, Coram and the Noteholders entered into a Securities Exchange Agreement negotiated between then-CEO Amaral for Coram and Stephen Feinberg ("Feinberg"), head of Cerberus, for the Noteholders. The Securities Exchange Agreement allowed the Noteholders a seat on Coram's Board. The Noteholders designated Feinberg as their representative on the Board.

12.     In April 1999, Amaral resigned as Coram's CEO for unanticipated personal reasons. He was replaced as CEO by his second-in-command, Richard M. Smith. Amaral remained Chairman of the Board.

13.     In early 1999, Cerberus retained Crowley as a consultant to advise Cerberus in connection with its investments, especially in the health care field. Cerberus agreed to pay Crowley $10,000 per day plus expenses on a project by project basis. In July 1999, Crowley and Cerberus entered into an oral agreement pursuant to which Crowley agreed to work exclusively for Cerberus for three years at a salary of $80,000 per month plus expenses and the possibility of substantial bonuses if Cerberus' investments on which Crowley had consulted were profitable.

5

14.     In August 1999, after Crowley and Cerberus had made their oral agreement, Feinberg recommended to the Board that Coram hire Crowley as a "consultant" or "CEO coach" to work with the newly-elevated CEO, Richard Smith.

15.     Feinberg disclosed to the Board that Crowley had a relationship with Cerberus, but provided no information about that relationship. Notwithstanding their knowledge that "a relationship" existed between Crowley and Cerberus, none of Coram's directors asked any questions or requested any materials about that relationship. They approved the retention of Crowley as a consultant to CEO Richard Smith without knowing Crowley's obligations to Cerberus, the nature of his work for Cerberus, and the terms of his compensation from Cerberus. The directors agreed to pay Crowley $40,000 per month for his consulting services.

16.     In October 1999, Richard Smith claimed that Coram had constructively terminated him as CEO. In late October 1999, the Board determined to treat his departure as a resignation but also agreed that he was entitled to benefits under his employment agreement.

17.     On October 29, 1999, Crowley wrote to Amaral asking that Amaral consider hiring him in connection with Coram's ongoing "restructuring process." A copy of the October 29, 1999 letter is attached as Exhibit "A."

18.     The Noteholders offered Coram a six-month interest accrual holiday if Crowley were hired as CEO, which amounted to a cash savings to Coram of approximately $11 million. Crowley and Amaral began negotiations no later than early November 1999.

19.     On November 12, 1999, while he was negotiating with Amaral to be Coram's CEO, Crowley sent a "Personal & Confidential" letter to Feinberg requesting additional compensation from Cerberus to induce him to become CEO of Coram. At the time, Crowley was Chairman of Winterland, also a Cerberus investment. Crowley's letter, a copy of which is attached as Exhibit "B," seeks additional compensation from Cerberus for his work at Coram in the form of an increased share of the profits at Winterland.

20.     On November 15, 1999, Amaral and the Noteholders agreed on the terms of the interest forbearance agreement.

21.     On November 17, 1999, the Board approved a three-year employment agreement with Crowley, which he signed the next day. The agreement is dated as of November 30, 1999. It provides for a base annual salary of $650,000, potential bonuses of between $390,000, and $1,950,000 depending on Coram's EBIDTA, a minimum 24-month severance period, options to purchase one million shares of Coram stock at then market rates, and an acquisition bonus upon a change of control. Amaral signed the agreement for Coram. A copy of Crowley's employment agreement with Coram is attached as Exhibit "C."

22.     On November 19, 1999, Crowley executed an executive Employment Agreement with Cerberus effective as of August 1, 1999, a copy of which is attached as Exhibit "D." The Agreement does not state that Crowley had the previous day signed an employment agreement to be Coram's Chairman and CEO, although it does mention Coram. The Crowley/Cerberus Employment Agreement provides that Crowley would devote "his entire business time, attention, skill and energy exclusively to the business of the Employer [Cerberus]" by performing duties to be assigned by Feinberg. Cerberus agreed to pay Crowley a base salary

of $960,000 and the potential for bonuses. The Employment Agreement also provided that Cerberus could terminate Crowley for cause if Crowley did not follow Cerberus' reasonable instructions.

23.    As was the case with the oral agreement between Crowley and Cerberus, neither Crowley nor Feinberg disclosed the existence or the terms of their written agreement to the Board of Coram, and no member of the Board of Coram made any inquiry about the terms of the Crowley/Cerberus relationship.

24.    Coram's corporate policy provided that actual conflicts of interest must be avoided and that any action creating a potential conflict of interest must be disclosed and approved in advance. Crowley did not seek approval for his Employment Agreement with Cerberus.

25.    Crowley signed the management letter to Coram's outside auditors for the year ending December 31, 1999, and stated: "There are no instances where any officer or employee of [Coram] has an interest in a company, with which [Coram] does business that would be considered a 'conflict of interest,' that has not been disclosed or waived. Such an interest would be contrary to [Coram] policy." A copy of the management letter is attached as Exhibit "E." At the time he signed the management letter, Crowley was party to an undisclosed Employment Agreement with one of Coram's three lenders.

26.    Coram retained Crowley's wholly-owned consulting company, Dynamic Health Care Solutions, L.L.C., to act as a "consultant" to Coram. Coram paid fees to Dynamic in excess of $1 million.

27.    On February 28, 2000, Crowley wrote to the Board asking for additional compensation.  The letter, a copy of which is attached as Exhibit "F," states:

> It is also clear to me, that the assignment and the terms I accepted in November 1999 did *not* reflect the activity required to "stabilize" Coram and get it on solid footing.  This is more than just a nineteen (19) hour a day "workout".  Clearly, Coram will take longer, involve more, and will need me to stay "on task" for much longer than we envisioned when I said, "Yes".  The risks for me as a professional are also substantially different that those involved with just fixing the day to day problems of Coram.  Had the Board engaged a firm like J.Alix the charge to do the same work at Coram would have been multiples of what I am being compensated.

Crowley did not disclose that while he was working what he claims were more than 19-hour days for Coram, Cerberus was paying him $80,000 a month.

28.    In response to Crowley's demand for additional compensation, Feinberg and Crowley negotiated an amendment to Crowley's November 30, 1999 Employment Agreement, which was executed as of April 6, 2000, and signed by directors Feinberg and L. Peter Smith.  Even though the other members of the Board had been informed that Crowley had a "relationship" with Cerberus, they allowed Feinberg to conduct the negotiations with Crowley, made no inquiry concerning that relationship, nor made any independent review of Feinberg's negotiations with Crowley.  Nor did the Board retain a compensation consultant or other independent expert to review and opine regarding the fairness of Crowley's compensation under the Employment Agreement.  A copy of the Second Amendment to Employment Agreement is attached as Exhibit "G."

29.    The Second Amendment provided a new bonus structure that was far greater than the maximum $1.9 million bonus that Crowley received under the employment agreement with Coram he had signed just four months earlier.  Under the new arrangement, Crowley could claim a bonus of up to 25% of the amount by which EBIDTA for 2000 exceeded $14 million, and an additional $5 million bonus if 2000 EBIDTA exceeded $35 million.

30.    At the time Crowley and Feinberg negotiated the amendment to Crowley's Employment Agreement with Coram, Crowley anticipated that Coram would be restructured by filing a bankruptcy petition under Chapter 11 with a proposed plan of reorganization that would eliminate the public shareholders without any payment to them.

31.    Between November 30, 1999, when Crowley became CEO, and July 31, 2000, Crowley caused Coram to pay the Noteholders approximately $60 million.

32.    Feinberg resigned from the Board of Coram in July 2000.

33.    On August 8, 2000, Coram filed its Chapter 11 petition together with its first Plan of Reorganization.  The proposed Plan provided for the cancellation of all shareholders' interests and for issuing new Coram stock to the Noteholders.  The Plan was supported by Coram's three-member Creditors' Committee, which consisted of two Noteholders and one trade creditor.  The Noteholders' claims of about $250 million far exceeded Coram's trade debt of approximately $7 million.

34.    In connection with the bankruptcy proceedings, Coram filed a Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code, which stated that Crowley was

serving as a consultant to Cerberus, that he generally receives a fee from Cerberus for such services, but that he "receives no fee from Cerberus for any services he provides respecting the Debtors." Despite this latest notice of a relationship between Crowley and Cerberus, the outside directors still asked no questions and made no inquiry about this relationship. Crowley made identical statements in other Bankruptcy Court filings.

35.    On October 18, 2000, the United States Trustee appointed an Official Committee of Equity Security Holders (the "Equity Committee") to represent the interests of Coram's common shareholders. The Equity Committee obtained the Crowley/Cerberus Employment Agreement and other documents in discovery in connection with Coram's proposed Plan of Reorganization, which the Equity Committee opposed.

36.    On December 21, 2000, the Bankruptcy Court, holding that Coram had not proposed its Plan in good faith under Section 1129(a)(3) of the United States Bankruptcy Code, denied confirmation of the First Plan. In its oral ruling, the Bankruptcy Court stated that:

a.    Crowley "had an actual conflict of interest" by virtue of his contractual relationship with Cerberus. (Opinion 12/21/00, at 89.)

b.    "[T]he actions of Mr. Crowley to hide the relationship, and I think that [his letter] did show an intent to hide the relationship and to hide his request for additional compensation in Winterland in exchange for his efforts here did at least evidence that he, himself, believed that this relationship should not be disclosed and, therefore, did, in fact, taint his ability to serve as CEO of the debtor." (*Id.*)

c.    The actual conflict of interest "tainted the debtors' restructuring of its debt, the debtors' negotiations towards a Plan, even the debtors' restructuring of its operations." (*Id.*, at 88.)

A copy of the Court's ruling is attached as Exhibit "H."

37.    Even if the outside directors had not learned the terms of the Crowley/Cerberus Employment Agreement during the course of discovery, they did so upon being informed of the Bankruptcy Court's decision. Nevertheless, in the face of the Bankruptcy Court's clear finding that Crowley had a conflict of interest and breached his fiduciary duty to Coram in a pervasive way, Crowley continued to receive $80,000 per month from Cerberus, while the outside directors did absolutely nothing to meet their obligation to make inquiry about Crowley's relationship with Cerberus, a matter of material importance to Coram and its shareholders. The minutes of the Board meetings in 2001 do not reflect any discussion of whether Crowley should be permitted to stay on as Coram CEO if he continued to receive payments from Cerberus.

38.    Rather than investigate the matter, the Board members attempted to avoid the issue. In 2000, the Board formed a Special Committee consisting of its independent directors – the Board members other than Crowley. The Special Committee decided to retain Harrison J. Goldin Associates, L.L.C. ("Goldin"), a financial advisory firm, as an independent restructuring advisor. Coram filed a motion to appoint Goldin on February 1, 2001, which the Bankruptcy Court approved on February 26, 2001.

39.    As approved by the Bankruptcy Court, Goldin's assignment was to advise the Special Committee regarding Crowley's relationship with Cerberus, and potential amendments to the plan of reorganization that had been rejected. In addition, Goldin was to attempt to mediate a consensual resolution among Coram, the Equity Committee, and the Noteholders.

40.     The Bankruptcy Court approved Goldin's application to retain counsel. Goldin conducted an extensive investigation, for which Coram paid in excess of $2.5 million, although Goldin envisioned having only a "soft role."

41.     Goldin limited the scope of his inquiry to events occurring prior to December 2000.  He did not ask either Crowley or Cerberus whether Crowley continued to receive $80,000 per month from Cerberus.  In fact, Crowley received those payments throughout 2001.

42.     In describing the Special Committee's purpose in retaining Goldin as independent restructuring advisor, Amaral testified that the Board wanted Goldin "to sprinkle holy water on [the situation]."  (Amaral Deposition, 10/26/01, at 35, attached as Exhibit "I.")

43.     Goldin prepared a report of his investigation, which Coram converted into a second proposed plan of confirmation.

44.     On December 21, 2001, the Bankruptcy Court issued a written opinion denying confirmation, a copy of which is attached as Exhibit "J."  After reviewing the facts of the Crowley/Cerberus Employment Agreement and Crowley's conflict of interest as found at the hearing on the First Plan, and after hearing from Goldin, Crowley, Amaral, and others concerning events since December 2000, the Bankruptcy Court concluded:

> Nothing, in fact, has changed since the first confirmation hearing. Crowley continues to receive almost $1 million a year from one of the Debtors' largest creditors, while serving as the Debtors' CEO and President.  Under his agreement with Cerberus, he is required to obey its instructions or risk having the agreement terminated and losing his $1 million.  This is an actual conflict of interest, as we

concluded at the first confirmation hearing. (Opinion, 12/21/01, at 13.)

45.     The Bankruptcy Court found that other than hiring Goldin and reviewing his report, the outside directors did nothing in response to the Bankruptcy Court's order denying confirmation of the First Plan. The Bankruptcy Court found that the outside directors did not conduct any investigation of Crowley's conflict of interest, did not require that Crowley cease accepting any compensation from Cerberus, and did not even ask Crowley or Cerberus if the conflict or payments persisted. The Bankruptcy Court also found that Crowley did not advise the Board that he continued to receive compensation from Cerberus and rejected Crowley's testimony that his nearly $1 million annual compensation from Cerberus had nothing to do with Coram.

46.     The Bankruptcy Court rejected the proposition that Crowley's conflict of interest had caused no harm to Coram. The Bankruptcy Court found that:

> there is absolutely no evidence from which the Court can conclude
> that the Debtors have suffered no harm from Crowley's continued
> conflict of interest. Mr. Goldin's assertion that there must be no
> harm since the disclosure of the relationship because no harm was
> caused by Crowley when the relationship was hidden is not logical,
> nor is it borne out by the facts. Crowley did cause harm to the
> Debtors while his relationship with Cerberus was hidden and there
> is no reason to assume he did not cause harm to the Debtors when
> that relationship was disclosed. (Opinion, 12/21/01, at 20.)

The Bankruptcy Court concluded that "the conflict in this case transcends every single thing Crowley does on behalf of the Debtors" and "[t]he Debtors' hiring of Goldin to 'sprinkle holy water on the situation' does not cure the conflict or evidence good faith." (Id., at 24-25.)

14

47.    The Bankruptcy Court concluded that the "don't ask, don't tell" approach of the outside directors "does not fulfill their fiduciary duty to these estates." (*Id*. at 22.)

## COUNT I

### AGAINST CROWLEY
### FOR BREACH OF FIDUCIARY DUTY

48.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 47 as if fully set forth.

49.    Crowley, as an officer and director, owed Coram fiduciary duties of care, loyalty, disclosure, and good faith, including the duty to disclose actual and potential conflicts of interest. As found by the Bankruptcy Court, Crowley breached those duties. Those breaches, the Bankruptcy Court held, "transcend every single thing Crowley" did on Coram's behalf (*Id*. at 24.)

50.    As a result of Crowley's breaches of fiduciary duties, Coram has suffered damages in excess of $75,000, exclusive of interest and costs.

## COUNT II

### AGAINST AMARAL, CASEY, SMITH, AND
### SMOLEY FOR BREACH OF FIDUCIARY DUTIES

51.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 50 as if fully set forth.

15

52.     As members of Coram's Board of Directors, Amaral, Casey, Smith, and Smoley owed Coram fiduciary duties of care, loyalty, disclosure, and good faith in managing Coram's affairs.

53.     By allowing Coram to enter into an employment agreement with Crowley without first investigating Crowley's relationship with Cerberus, the Board members did not make an adequate investigation of material information reasonably available to them and breached their duties of good faith and due care.

54.     The Board members violated their fiduciary duties by allowing Feinberg, who also had a conflict of interest, to negotiate the terms of the Second Amendment to Crowley's employment agreement without any meaningful review by independent and unconflicted directors of the fairness of the Second Amendment to Coram and its shareholders.

55.     The Board members continued to breach their duties even after receiving actual knowledge of Crowley's conflict of interest.

56.     In 2001, Amaral testified that he first learned the details of Crowley's Employment Agreement with Cerberus during his December 8, 2000 deposition but expressed the opinion that the relationship did not create a conflict of interest. (Amaral Deposition, 10/26/01, at 8, 13, attached as Exhibit "I.") He further testified that he did not care about the appearance of the conflict and, therefore, did not think it necessary to ask Feinberg about the details of Crowley's relationship with Cerberus. (*Id.*, at 45.)

57.     No later than a telephonic meeting of the Board of Directors on December 27, 2000, the outside directors were fully aware of the material terms of the Crowley/Cerberus Employment Agreement.  Coram's counsel sent a complete copy of the transcript of the Bankruptcy Court's December 21, 2000 ruling to each director.  Nonetheless, the Board members took no action to investigate the conflict or its impact on Coram and its shareholders.

58.     The outside directors, either individually or as a Special Committee, never investigated: (a) whether Crowley's conflict of interest had damaged Coram or had influenced Coram's strategic direction; (b) whether all of Crowley's arrangements with Cerberus had been fully disclosed; or (c) whether Crowley continued to receive payments of $80,000 per month from Cerberus and continued to be bound by his Employment Agreement with Cerberus.  By performing no investigation whatsoever, the outside directors failed to make any good faith attempt to fulfill their fiduciary duties to Coram.  They simply abdicated their responsibilities.

59.     Amaral intentionally disregarded his responsibilities as a director of Coram.  He did not consider Crowley's Employment Agreement with Cerberus to be a conflict.  When the Bankruptcy Court found otherwise, Amaral's only action was to retain Goldin "to sprinkle holy water."  He never asked Crowley why he failed to disclose the terms of his relationship to Cerberus, and after Crowley's involuntary disclosure, Amaral never asked him or Feinberg whether the $80,000/month payments were continuing.  Amaral testified that he "didn't think it was appropriate" to ask Feinberg about the conflict.  (Amaral Deposition, 10/26/01, at 45, attached as Exhibit "I.")

17

60. Smith intentionally disregarded his responsibilities as a director of Coram. Smith did not think it important for the Board to reach its own conclusion whether the Crowley/Cerberus Employment Agreement was a conflict. Smith never asked Crowley why he failed to disclose, and after Crowley's involuntary disclosure, Smith never asked him or Feinberg whether the $80,000/month payments were continuing.

61. Casey intentionally disregarded his responsibilities as a director of Coram. Casey admitted that he did not investigate Crowley and his relationship with Cerberus between the denial of the First Plan and the issuance of Goldin's report nor did he request any one else to conduct such an investigation. Casey did not ask to see Crowley's employment agreement with Cerberus. Casey never asked Crowley why he failed to disclose. Casey never asked him or Feinberg whether the $80,000/month payments were continuing.

62. Smoley intentionally disregarded her responsibilities as a Director of Coram. Smoley admitted that she did not care what Crowley was doing outside Coram even if it might be considered a conflict of interest. Smoley never confronted Crowley or Feinberg about the nature of Crowley's relationship with Cerberus. She failed to ask Crowley or Feinberg whether the $80,000/month payments were continuing.

63. The outside directors, even though operating as a Special Committee, did not obtain independent legal advice, but relied on Coram's bankruptcy counsel.

64. The decisions of the outside directors, individually and as the Special Committee, were made without adequate information and without adequate deliberation.

65.    The outside directors, individually and as the Special Committee, failed to exercise any business judgment with respect to their actions concerning Crowley's conflict of interest.

66.    The conduct of the outside directors, individually and as the Special Committee, was an egregious breach of their fiduciary duties and was consciously indifferent to the foreseeable results of the breach.

67.    Because the Board of Directors by their knowing and wrongful inaction failed to take such steps as would be necessary to afford the transactions at issue the protection of the business judgment rule, the transactions are subject to review for entire fairness and the defendants bear the burden of showing that the transactions were fair to Coram and its stockholders.

68.    As a result of the breaches of duty of the outside directors, Coram has suffered damages in excess of $75,000, exclusive of interest and costs.

WHEREFORE, Plaintiff demands judgment against defendants for compensatory damages, disgorgement, punitive damages, costs, attorneys' fees, pre-judgment interest and such other and further relief as the Court may deem just and proper.

Respectfully submitted,

By:  _____

Rolin P. Bissell (Attorney No. 4478)
Glenn C. Mandalas (Attorney No. 4432)
YOUNG CONAWAY STARGATT & TAYLOR
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Phone: (302) 571-6600
Fax:     (302) 571-1253

OF COUNSEL:

Barry E. Bressler
Wilbur L. Kipnes
Jennifer Nestle
Han Nguyen
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Phone: (215) 751-2000
Fax:     (215) 751-2205

Dated: December 29, 2004.

# EXHIBIT E

 GENESIS INSURANCE COMPANY
STAMFORD, CONNECTICUT 06904

COMMERCIAL LINES POLICY

THIS POLICY JACKET WITH THE COMMON DECLARATIONS PAGE, COVERAGE PARTS,
AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETES THIS POLICY.

# GENESIS     GENESIS INSURANCE COMPANY

## DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY
## DECLARATIONS PAGE

Policy Number:  YXB001625A

NOTE:  THIS IS A CLAIMS MADE POLICY, PLEASE READ IT CAREFULLY.  AMOUNTS INCURRED AS DEFENSE COSTS SHALL REDUCE THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS AND SHALL ALSO BE APPLIED AGAINST THE RETENTION. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE INSURER TO DEFEND THOSE INSURED UNDER THIS POLICY.

**THIS IS A CLAIMS MADE POLICY, PLEASE READ IT CAREFULLY**

| | | |
|---|---|---|
| ITEM 1. | Insured Entity.......: | **Coram Healthcare Corporation** |
| | Principal Office....: | 1125 Seventeenth Street, Suite 2100 |
| | | Denver, CO 80202 |

ITEM 2.   Policy Period........:   From: **January 8, 1999**          To: **January 8, 2001**
(Both dates at 12:01 a.m. at the Principal Address of the Insured Entity)

ITEM 3.   Limit of Liability (Inclusive of Defense Costs):
$ 25,000,000     Aggregate Limit of Liability

ITEM 4.   Retentions Applicable to Insuring Agreements:
  A.  For Securities Claims:
    1.  Defense Costs:
      $          0   Each Director or Officer for each single Securities Claim under Insuring Agreement Section I.A., and in no event exceeding
      $          0   for all Directors and Officers under Insuring Agreement Section I.A. for each single Securities Claim; and
      $   200,000   for each single Securities Claim to which Insuring Agreements Sections I.B. or I.C. apply.
    2.  Settlements and Judgments:
      NONE   for Settlements and Judgments in Securities Claims.

  B.  For Claims other than Securities Claims:
    $          0   Each Director or Officer for each single Claim under Insuring Agreement Section I.A., and in no event exceeding
    $          0   for all Directors and Officers under Insuring Agreement Section I.A. for each single Claim; and
    $    75,000   for each single Claim to which Insuring Agreement Section I.B. applies.

ITEM 5.   Premium:
$      586,000   Two year pre-paid premium.

ITEM 6.   Premium for Discovery Period:
75% of the annualized premium, to be paid only if the eligibility requirements are met and the Discovery Period option is properly exercised

ITEM 7.   Endorsements:
This Policy includes the following attached endorsements, and all other endorsements issued by the Insurer to be attached hereto after the issuance of this Policy: 7425.EP, 7425, 7425.RE, 7458.

ITEM 8.   Notices and Information:
All notices and information required to be provided to the Insurer under this Policy shall be addressed to: Genesis Insurance Company, 25550 Chagrin Boulevard, Suite 300, Beachwood, Ohio 44122.

These Declarations along with the Application, including all materials submitted therewith, and the Directors and Officers Liability Insurance Policy, shall constitute the entire contract between the Directors, Officers, the Company and the Insurer. GENESIS INSURANCE COMPANY.

Date:  _January 8, 1999_          By:  *Michael Zartman*

Company Officer or Authorized Agent

FORM NO. GIC-7417 (9/97)

# GENESIS    GENESIS INSURANCE COMPANY

## DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

### THIS IS A CLAIMS MADE POLICY, PLEASE READ IT CAREFULLY

In consideration of the premium paid and in reliance upon the information provided in and with the Application, and subject to the terms, conditions and limitations of this Policy, the Insurer, the **Company** and the **Directors** and **Officers** agree as follows:

### SECTION I.  INSURING AGREEMENTS

A.  The Insurer will pay, on behalf of the **Directors** and **Officers**, **Loss** arising from **Claims** first made during the Policy (or **Discovery**) **Period** against the **Directors** or **Officers**, individually or collectively, for a **Wrongful Act**, except for such **Loss** which the **Company** pays to or on behalf of the **Directors** and **Officers**;

B.  The Insurer will pay, on behalf of the **Company**, **Loss** which the **Company** is required to indemnify, or which the **Company** may legally indemnify, the **Directors** or **Officers**, arising from **Claims** first made during the Policy (or **Discovery**) **Period** against the **Directors** or **Officers**, individually or collectively, for a **Wrongful Act**; and

C.  The Insurer will pay, on behalf of the **Company**, **Loss** arising from **Securities Claims** first made against the **Company** during the Policy (or **Discovery**) **Period** for a **Wrongful Act**.

### SECTION II.  DEFINITIONS

A.  "**Claim**" shall mean the following proceedings initiated against a **Director** or **Officer** for money damages or other relief, whether brought within or outside of the United States:

   (1)  any civil, arbitration or administrative proceeding commenced by: (a) service of a complaint or similar pleading, or (b) receipt of a notice of charges;
   (2)  any criminal proceeding commenced by the return of an indictment or an information;
   (3)  any appeal from the above proceedings; or
   (4)  other written or verbal demand for money or services.

   "**Claim**" shall also mean any of the above-listed proceedings initiated against a **Director**, **Officer** or the **Company** which is a **Securities Claim**.

B.  "**Company**" shall mean the **Insured Entity** and its **Subsidiaries** under Insuring Agreements Sections I.A. and I.B. Under Insuring Agreement Section I.C., "**Company**" shall mean the **Insured Entity** only.

C.  "**Defense Costs**" shall mean reasonable and necessary legal fees and expenses incurred in the investigation and/or defense of any **Claim**, including costs of attachment or similar bonds; provided, however, **Defense Costs** shall not include salaries, wages, overhead or benefit expenses of or associated with **Directors**, **Officers**, employees of the **Company**, or the **Company**.

D.  "**Determination of No Liability**" shall mean: (1)  a final judgment of no liability in a **Securities Claim** in favor of all **Directors** and **Officers** and the **Company**, after the exhaustion of all appeals, or (2)  a dismissal of a **Securities Claim** without prejudice, and without the payment of any consideration by the **Directors**, **Officers**, and/or the **Company**.

Form No. GIC-7418 (9/97)
page 1 of 8

E. "Directors" and "Officers" shall mean:

   (1) all past, current or prospective duly elected or appointed directors and officers of the Company, and their foreign equivalents for Company operations outside of the United States, including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy;

   (2) for Securities Claims only, all past, current and future employees of the Company; and

   (3) spouses of duly elected or appointed directors and officers of the Company, but only for Claims

      (i) which are based upon Wrongful Acts of the directors or officers, and not upon any alleged conduct of a spouse, and

      (ii) which are based upon either the legal status as a spouse or the joint ownership of property between a spouse and a director or officer.

F. "Loss" shall mean any amounts which the Directors or Officers are legally obligated to pay, such amounts which the Company is required to indemnify the Directors or Officers, or such amounts which the Company may legally indemnify the Directors or Officers, for Claims made against the Directors or Officers, or any amounts which the Company is legally obligated to pay for Securities Claims made against the Company, in excess of the applicable Retention, including damages, judgments, orders, Settlements, and Defense Costs; provided, however, Loss shall not include criminal or civil fines or penalties imposed by law, multiplied portions of damages in excess of actual damages, taxes, or any matter which may be deemed uninsurable under the law pursuant to which this Policy shall be construed.

G. "Outside Entity" shall mean any nonprofit entity under Section 501 (c)(3) of the Internal Revenue Code of 1986, as amended, for which any of the Directors or Officers serve as directors or officers with the consent of the Company.

H. "Policy Period" shall mean the time period from the inception date of this Policy to the expiration date as stated in Item 2 of the Declarations, or to its earlier cancellation or termination date.

I. "Securities Claim" means any Claim brought by any person or entity, directly or derivatively, based upon, arising out of, or attributable to, the purchase or sale, or offer to purchase or sell, any securities of the Company, brought by a securities holder of the Company in their capacity as a securities holder, or brought by the United States Securities and Exchange Commission.

J. "Settlement" shall mean a compromise of any Claim to which the Insurer has given its written consent pursuant to Section VI.A.

K. "Subsidiary" shall mean:

   (1) any entity in which the Insured Entity owns or at any time owned more than fifty percent (50%) of the issued and outstanding voting securities, directly or indirectly, subject to clauses (2) and (3) below for acquisitions made by the Company during the Policy Period;

   (2) any entity in which the Insured Entity acquires more than 50% of the issued and outstanding voting securities or substantially all of the assets, directly or indirectly, during the Policy Period, if such entity's total assets represent less than 20% of the Company's total assets prior to the acquisition; and

   (3) for forty-five (45) days immediately following the acquisition date, any entity in which the Insured Entity acquires more than 50% of the issued and outstanding voting securities or substantially all of the assets, directly or indirectly, during the Policy Period, if such entity's total assets represent more than 20% of the Company's total assets prior to the acquisition; provided, however, such entity will not be considered a Subsidiary or included within the definition of Company beyond such automatic forty-five (45) day period unless the Insurer specifically agrees in writing to provide such coverage, subject to such additional information, coverage terms and premium as the Insurer may require.

   The term "Subsidiary" shall also include any subsidiary of a Subsidiary.

Form No. GIC-7418 (9/97)
page 2 of 8

L.  "Wrongful Act" shall mean:

   (1)  under Insuring Agreements Sections I.A. and B., any actual or alleged act, omission, misstatement, misleading statement, neglect, error or breach of duty by the Directors or Officers in their capacity as Directors or Officers of the Company or in their capacity as directors or officers of an Outside Entity, individually or collectively;

   (2)  under Insuring Agreement Section I.C., any actual or alleged act, omission, misstatement, misleading statement, neglect, error or breach of duty by the Company, or by persons for whose actual or alleged conduct the Company is legally responsible.

## SECTION III.  DISCOVERY PERIOD

A.  If either the Insurer or Insured Entity cancels this Policy pursuant to Section VIII, or if either the Insurer or Insured Entity chooses to not renew this Policy, for any reason other than the Company's nonpayment of premium or non-compliance with the terms of this Policy, then the Insured Entity shall have the right, upon payment of the additional premium set forth in Item 6 of the Declarations, to an extension of the Policy Period for Claims first made during the period of one year after the effective date of such cancellation or nonrenewal, but only with respect to Wrongful Acts committed before such effective date and otherwise covered by this Policy. This one year extension period shall be referred to as the Discovery Period.

B.  The right to purchase the Discovery Period shall terminate unless a written request for the Discovery Period is provided to the Insurer within thirty (30) days after the effective date of cancellation or nonrenewal, together with full payment of the premium for the Discovery Period.

C.  Purchase of the Discovery Period shall not in any way increase the Limit of Liability.

D.  The additional premium paid for the Discovery Period shall be fully earned at its commencement.

## SECTION IV.  EXCLUSIONS

The Insurer shall not be liable to make any payment for Loss in connection with any Claim:

A.  Arising out of, based upon or attributable to the Directors or Officers or the Company gaining in fact any profit or advantage to which they were not legally entitled;

B.  Arising out of, based upon or attributable to the committing in fact of deliberate fraudulent, dishonest or criminal acts by the Directors or Officers, or by employees, agents or representatives of the Company;

C.  Which is insured in whole or in part by another valid policy or policies, including policies issued to an Outside Entity, regardless of whether or not any Loss arising from such Claim is collectible or recoverable under such other policy or policies; provided, however, this exclusion shall not apply to policies which are specifically excess of this Policy by reference hereto (including the Policy Number);

D.  Arising out of, based upon or in any way involving: (1) any Wrongful Act, or any fact, circumstance or situation which has been the subject of any notice given prior to the Policy Period under any insurance policy providing protection for the Directors or Officers or the Company, including any matter in any way related thereto; or (2) any other Wrongful Act which has as a common nexus any fact, circumstance, situation, event, or transaction with any fact, circumstance or situation which has been the subject of notice as described in clause (1) of this exclusion;

Form No. GIC-7418 (9/97)
page 3 of 8

E.  For actual or alleged: (1) bodily injury, sickness, disease, or death of any person, assault, battery, mental anguish, emotional distress, loss of consortium; (2) damage to or destruction of any tangible property, including loss of use thereof; or (3) invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, defamation or false light, libel or slander;

F.  For actual or alleged violations of the Employee Retirement Income Security Act of 1974, as amended, and regulations promulgated thereunder;

G.  For any actual or alleged act, omission, misstatement, misleading statement, neglect, error or breach of duty committed in the capacity as a director or officer of any entity other than the Company or an **Outside Entity**;

H.  Arising out of, based upon, or in any way involving, directly or indirectly:

    (1)  the actual, alleged or threatened discharge, disposal, migration, dispersal, release or escape of pollutants, or

    (2)  any direction, order or request to test for, monitor, remediate, clean up, remove, contain, treat, detoxify or neutralize pollutants, or to pay for or contribute to the costs of undertaking such actions including claims alleging damage to the Company or its shareholders.

    Pollutants include (but are not limited to) any solid, liquid, nuclear, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, organisms or other hazardous substances, and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

I.  Brought by, at the behest of, or with the assistance or active participation of, the **Insured Entity** or a **Subsidiary** (or any affiliated person), or any **Director or Officer** of the **Insured Entity** or a **Subsidiary**; however, this exclusion shall not apply to wrongful termination of employment actions, shareholder derivative actions which are not brought by, at the behest of, or with the assistance or active participation of a **Director or Officer** of the **Insured Entity** or a **Subsidiary**, crossclaims, or to other claims for contribution or indemnity which are part of or arise directly from a **Claim**;

J.  Arising out of, based upon, or in any way involving actual or alleged conduct in the capacity as a director, officer or employee of any **Subsidiary**, which actual or alleged conduct occurred prior to or after the time period when such subject entity was a **Subsidiary** of the **Insured Entity**;

K.  Which is indemnified by an **Outside Entity**.

NOTE: THE ACTUAL OR ALLEGED CONDUCT OF ANY DIRECTOR, OFFICER OR THE COMPANY SHALL NOT BE IMPUTED TO ANY OTHER DIRECTOR OR OFFICER FOR THE PURPOSE OF DETERMINING THE APPLICABILITY OF THE ABOVE EXCLUSIONS.

### SECTION V.  LIMIT OF LIABILITY, RETENTIONS, ALLOCATION

A.  The **Insurer** shall be liable to pay one hundred percent (100%) of covered **Loss** in excess of the applicable Retention up to the Limit of Liability stated in Item 3 of the Declarations. The Limit of Liability is the **Insurer's** maximum aggregate limit of liability for all **Loss** under all of the **Insuring Agreements** combined, arising out of all **Claims** first made during the **Policy Period** and **Discovery Period** (if applicable), regardless of the time of payment by the **Insurer**.

B.  Defense Costs shall be part of and not in addition to the Limit of Liability, and such Defense Costs shall reduce the Limit of Liability and shall also be applied against the Retention.

Form No. CIC-7418 (9/97)
page 4 of 8

C.  More than one Claim based upon or arising out of the same Wrongful Act(s), or facts, circumstances or situations, or one or more series of similar, repeated or continuous Wrongful Acts, shall be considered a single Claim, and only one Retention shall be applicable to such single Claim. Such single Claim shall be deemed to be first made on the date when the earliest Claim is first made, or on the date within the Policy Period in which notice of a potential Claim pursuant to Section VII.B. is given.

D.  One Retention amount shall apply to the covered portion of each and every single Claim. In the event a single Claim is covered under more than one Insuring Agreement, the Retentions stated in Item 4 of the Declarations shall be applied separately to the portion of the Claim covered by each Insuring Agreement, and the sum of the Retentions so applied shall constitute the Retention for each single Claim, which in total shall not exceed the largest of the applicable Retentions. Notwithstanding other Policy provisions, for purposes of determining the applicable Retention(s), the Retentions applicable to Insuring Agreement Section I.B. shall apply to Claims made against Directors or Officers, and indemnification (including advancement of defense costs) by the Company will be presumed to be required or permissible, whenever indemnification is legally permissible under the broadest applicable laws, regardless of whether the Company has agreed in its by-laws or otherwise to provide such indemnification, unless indemnification cannot be provided due to financial insolvency.

E.  Notwithstanding the foregoing provisions of Section V, the Retention(s) applicable to Securities Claims shall apply only to Defense Costs. Further, no Retention shall apply in the event of a Determination of No Liability in a Securities Claim, in which event the Insurer shall reimburse any Defense Costs paid by the Directors and Officers or the Company within the Retention amount. Such reimbursement shall be made within sixty (60) days of the Determination of No Liability, only if:

  (1)  the subject Securities Claim, or another Claim which would be treated as a single Claim with the subject Securities Claim under Section V.C., is not brought or refiled within such sixty (60) day period;

  (2)  the Determination of No Liability is not challenged by motion or appeal within such sixty (60) day period; and

  (3)  only with respect to a dismissal of or stipulation to dismiss a Securities Claim without prejudice, the Company provides a written undertaking satisfactory to the Insurer which states that such reimbursement shall be returned to the Insurer if the subject Securities Claim, or another Securities Claim which would be treated as a single Claim with the subject Securities Claim under Section V.C., is brought or refiled after the sixty (60) day period.

F.  The Company is not covered under Insuring Agreement Section I.A.; the Company is covered, subject to the Policy's terms and conditions, only with respect to indemnification of Directors or Officers under Insuring Agreement Section I.B. for Claims made against the Directors and Officers; but the Company is covered, subject to the Policy's terms and conditions, under Insuring Agreement Section I. C. for Securities Claims made against the Company. Accordingly, the Insurer has no obligation under this Policy for defense fees and costs incurred by, judgments against or settlements by the Company arising out of any Claims or other actions in which the Company is a party other than a covered Securities Claim, nor any obligation to pay any amount arising out of any legal liability that the Company has except with respect to covered Securities Claims against the Company.

G.  If both Loss covered by this Policy and other loss are incurred, either because a Claim includes both covered and non-covered matters, or because a Claim is made against both covered and non-covered parties, then the Directors, Officers, the Company and the Insurer agree to use their best efforts to determine a fair and proper allocation of all such amounts. In making such determination, the parties shall take into account the relative legal and financial exposures, and the relative benefits obtained in connection with the defense and/or settlement, of and between the covered and non-covered parties and matters involved in the Claim. In the event the parties cannot agree to an appropriate allocation percentage for the Claim, then the Insurer shall be obligated to make an interim payment of the amount of Loss, including Defense Costs, which the parties agree is not in dispute until a final allocation is agreed upon or determined pursuant to the terms of this Policy.

## SECTION VI. DEFENSE COSTS AND SETTLEMENTS

A. The Directors, Officers and the Company shall not admit liability for or settle any Claim, or incur Defense Costs in connection with any Claim, without the Insurer's prior written consent, which consent shall not be unreasonably withheld. The Insurer shall be entitled to full information and all particulars it may request in order to reach a decision as to such consent. Any Defense Costs incurred, and/or settlements or judgments agreed to prior to the Insurer's consent thereto shall not be covered by this Policy.

B. The Insurer shall, upon request, advance Defense Costs prior to the final disposition of a Claim, subject to an allocation, if any, determined in accordance with Sections V.F. and V.G., and subject further to prior satisfaction of the applicable Retention. Any agreement by the Insurer to advance Defense Costs shall be on the condition that the parties for whom the Defense Costs are advanced provide a written undertaking satisfactory to the Insurer which states that in the event it is finally established that the Insurer has no liability under the Policy to the Directors, Officers or the Company, or any of them separately, for such Claim, they agree to repay to the Insurer upon demand all Defense Costs advanced on their behalf.

C. It shall be the duty of the Directors, Officers and the Company and not the duty of the Insurer to defend Claims, and the Directors, Officers and the Company shall obtain the consent of the Insurer as to the choice of defense counsel, which consent shall not be unreasonably withheld. The Insurer shall at all times have the right, but not the duty, to associate in the investigation, defense or Settlement of any Claim that appears reasonably likely to involve the Insurer.

D. The Directors, Officers and the Company shall give the Insurer such information, assistance and cooperation as the Insurer reasonably requests, including furnishing the Insurer with copies of reports, investigations, pleadings and any other information requested by the Insurer in connection therewith.

E. The Insurer shall have the right but not the obligation to make any investigation it deems expedient with respect to a Claim and, with the consent of the Company or the person(s) against whom the Claim is made, make Settlement within the available Limit of Liability (whether above or below the applicable Retention).

## SECTION VII. NOTICE OF CLAIMS AND POTENTIAL CLAIMS

A. The Directors, Officers and/or the Company shall give the Insurer written notice as soon as practicable of any Claim first made during the Policy (or Discovery) Period, and in no event later than thirty (30) days after the expiration of the Policy (or Discovery) Period, and, for Claims deemed to be first made during the Policy Period under Section VII.B., within sixty (60) days from when such Claims are made.

B. If, prior to the effective date of the expiration of the Policy Period, the Directors, Officers or the Company first become aware of circumstances which may subsequently give rise to a Claim, and the Directors, Officers or the Company as soon as practicable during the Policy Period give written notice to the Insurer of the circumstances and the reasons for anticipating a Claim, then any Claim subsequently made based upon such circumstances (of which the Insurer receives proper notice under Section VII.A.) shall be deemed for the purposes of this Policy to have been first made during the Policy Period; provided, however, as a condition precedent for any coverage to arise hereunder, such notice must be specific and contain full particulars as to the facts and circumstances potentially giving rise to the Claim, including a narrative setting forth dates, names of the potential plaintiffs and affected Directors or Officers, names of other parties involved, the nature and scope of the anticipated Claim, and all reasons why such a Claim is reasonably to be anticipated.

## SECTION VIII. GENERAL CONDITIONS

### A. CANCELLATION OR NON-RENEWAL

(1) By acceptance of this Policy, the Company and the Directors and Officers hereby confer the exclusive power and authority to cancel this Policy to the Insured Entity. The Insured Entity may cancel this Policy by surrender thereof to the Insurer, or by mailing to the Insurer written notice stating when thereafter such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the Policy Period. Delivery of such written notice shall be equivalent to mailing.

(2) This Policy may be canceled by the Insurer by mailing to the Insured Entity written notice stating when, not less than sixty (60) days thereafter, such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the Policy Period. Delivery of such written notice by the Insurer shall be equivalent to mailing.

(3) If this Policy is canceled by the Insured Entity, the Insurer shall retain the customary short rate portion of the premium. If this Policy is canceled by or on behalf of the Insurer, the Insurer shall retain the pro-rata portion of the premium. Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

(4) If the Insurer elects not to renew this Policy, the Insurer shall provide the Insured Entity with no less than sixty (60) days advance notice thereof, unless any of the events described in Section VIII.B. occur.

### B. SUBSEQUENT MAJOR EVENTS

If in the event of:

(1) the acquisition by another entity or persons of the Insured Entity, a majority of its voting securities, or substantially all of its assets;

(2) the merger or consolidation of the Insured Entity into or with another entity such that the Insured Entity is not the surviving entity; or

(3) the appointment of a receiver, liquidator, conservator, trustee or similar official with respect to the Insured Entity;

then the Policy will remain in effect until the end of the Policy Period as stated in Item 2 of the Declarations, but only with respect to Wrongful Acts occurring prior to such acquisition, merger, consolidation or appointment. Further, the premium will be considered fully earned upon the occurrence of any of the above events in consideration of the coverage extended.

### C. REPRESENTATIONS

It is agreed that the information and statements contained in the Application for this Policy, a copy of which is attached hereto, and any materials submitted therewith (which are on file with the Insurer and shall be deemed to be attached to and part of the Application as if physically attached hereto), are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy.

By acceptance of this Policy the Directors and Officers and the Company agree:

(1) That the statements in the Application and in any materials submitted therewith are their representations, that they shall be deemed material to the acceptance of the risk or hazard assumed by the Insurer under this Policy, and that this Policy is issued in reliance upon the truth of such representations; and

(2) That in the event that the Application, including materials submitted therewith, contains misrepresentations made with the actual intent to deceive, or contain misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by the Insurer under this Policy, no coverage shall be afforded under this Policy (including under Insuring Agreement Section I.B.) for any Director or Officer who did not sign the Application but who knew on the inception date of this Policy the facts that were so misrepresented, and this Policy in its entirety shall be void and of no effect whatsoever if such misrepresentations were known to be untrue on the inception date of the Policy by one or more of the individuals who signed the Application.

D.  ACTION AGAINST THE INSURER

(1) No action shall be taken against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all terms of this Policy, and until the Directors', Officers' or the Company's obligation to pay shall have been finally determined, either by an adjudication or by written agreement of the Directors, Officers, and/or the Company, and the Insurer.

(2) No persons or entities shall have any right under this Policy to join the Insurer as a party to any Claim, nor shall the Insurer be impleaded by the Directors, Officers, or the Company or their legal representatives in any Claim

E.  SUBROGATION

In the event of any payment under this Policy, the Insurer shall be subrogated to any of the Directors', Officers' and the Company's rights to recovery thereof. The Directors or Officers and the Company shall execute all papers required and shall do everything that may be necessary to secure or transfer such rights, including the execution of such documents as may be necessary to enable the Insurer to effectively bring suit in the name of any Director, Officer or the Company. The Insurer shall not exercise these rights of subrogation against a Director or Officer with respect to Loss excluded by Section IV.B., however, unless such individual has been judicially determined to have committed deliberate fraudulent, dishonest or criminal acts.

F.  ASSIGNMENT

Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed hereon.

G.  CONFORMITY TO STATUTE

Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy, including any endorsement to this Policy which is required by any state Department of Insurance (or equivalent authority) ("State Amendatory Endorsement"), are hereby amended to conform to such laws. Nothing herein shall be construed to restrict the terms of any State Amendatory Endorsement. In addition, to the extent permissible by law, nothing in any State Amendatory Endorsement shall be construed to restrict the terms of this Policy.

H.  ENTIRE AGREEMENT

By acceptance of this Policy, the Directors, Officers and the Company and the Insurer agree that this Policy (including the Application and any materials submitted therewith) and any written endorsements attached hereto constitute the entire agreement between the parties.

I.  CHANGES

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer shall not effect a waiver or a change in any part of this Policy or stop the Insurer from asserting any right under the terms of this Policy. This Policy cannot be waived or changed, except by written endorsement issued to form a part of this Policy.

Form No. CIC-7418 (9/97)
page 8 of 8



**GENESIS** GENESIS INSURANCE COMPANY

ADDITION TO SECTION VIII
GENERAL CONDITIONS

Policy Number: YXB001625A

It is understood and agreed that Section VIII. of the Policy is hereby amended by the addition of the following paragraph J to said Section:

J. EMPLOYMENT PRACTICES EXTENSION

It is hereby understood and agreed that coverage as is afforded by this Policy is extended to Employment Practices Claims against an INSURED (whether such claims are brought by a past, present or prospective employee or employees, whether directly or by class action, or by the Equal Employment Opportunity Commission [EEOC] or any other state or federal governmental authority regulating employment practices, or by any other person or entity) subject to a $5,000,000 sublimit of liability for all Employment Practices Claims made in the aggregate during the Policy Period, the terms, conditions and exclusions of this endorsement and to the other terms, conditions and exclusions of the Policy.

It is further understood and agreed that for the purposes of this endorsement only, the following definitions shall apply:

(1) "Employment Practices Claim" shall mean any Claim relating to a past, present or prospective employee of the Company for or arising out of any actual or alleged wrongful dismissal, discharge or termination, either actual or constructive, of employment, employment-related misrepresentation, wrongful failure to employ or promote, wrongful deprivation of career opportunity, wrongful discipline; failure to grant tenure or negligent employee evaluation, or sexual or workplace harassment of any kind (including the alleged creation of a harassing workplace environment); or unlawful discrimination, whether direct, indirect, intentional or unintentional, or failure to provide adequate employee policies and procedure.

Employment Practices Claims shall include claims brought under state, local or federal law (whether common or statutory) and shall include but not be limited to allegations of violations of the following federal laws (as amended) including regulations promulgated thereunder:

(a) Americans with Disabilities Act of 1992 (ADA),

(b) Civil Rights Act of 1991,

(c) Age Discrimination in Employment Act of 1967 (ADEA), including the Older Workers Benefit Protection Act of 1990,

(d) Title VII of the Civil Rights Law of 1964, as amended (1983), including the Pregnancy Discrimination Act of 1978,

(e) Civil Rights Act of 1866, Section 1981, and

(f) Fifth and Fourteenth Amendments of the U.S. Constitution.

(2) "INSURED" shall include for the purposes of Employment Practices Claims only, any Director, Officer or employee of the Company whether such individual is in a supervisory, co-worker or subordinate position or otherwise. Coverage shall automatically apply to all new Directors, Officers or employees after the inception date of Policy.

It is further understood and agreed that additional coverage is hereby granted for Employment Practices Claims only by amending Exclusions IV. E. and IV. I. of the Policy as follows:

(E)    for bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof;

(I)    which are brought by any Director or Officer or the Company; or which are brought by any security holder of the Company, whether directly or derivatively, unless such Claim (s) is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any Director or Officer or the Company, provided, however, this exclusion shall not apply to Employment Practices Claims;

Exclusions IV. E. and IV. I. of the Policy remain in effect for Claims other than Employment Practices Claims.

It is further understood and agreed that Item 4. of the Declarations Page is amended for Employment Practices Claims only as follows:

ITEM 4.   Retentions Applicable to Insuring Agreements

$   0   Each INSURED for each Employment Practices Claim, but in no event exceeding

$   0   Each Employment Practices Claim for all INSUREDS under Insuring Agreement Section I.A.; and

$ 150,000   Each Employment Practices Claim under Company Reimbursement Insuring Agreement Section I. B.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy other than as above stated.

Date: __January 8, 1999__                    By: *Michael Zyrtman*

                                          Company Officer or Authorized Agent

Form No. GIC-7425.EP (08/93)

# GENESIS   GENESIS INSURANCE COMPANY

### ADDITION TO SECTION VIII
### GENERAL CONDITIONS

Policy Number: YXB001625A

It is understood and agreed that the Policy is amended as follows:

CHANGES TO SECTION II:

Section II is hereby amended as follows:

A.   "Claim" shall mean the following proceedings initiated against a Director or Officer for money damages or other relief, whether brought within or outside of the United States:

    (1)   any civil, arbitration or administrative proceeding commenced by: (a) service of a complaint or similar pleading, or (b) receipt of a notice of charges;

    (2)   any criminal proceeding commenced by the return of an indictment or an information;

    (3)   any administrative or regulatory investigation commenced by a formal order of investigation;

    (4)   any appeal from the above proceedings; or

    (5)   other written or verbal demand for money or services.

"Claim" shall also mean any of the above-listed proceedings initiated against a Director, Officer or the Company which is a Securities Claim.

B.   "Company" shall mean the Insured Entity and its Subsidiaries under Insuring Agreements Sections I.A. and Under Insuring Agreement Section I.C., "Company" shall mean the Insured Entity only. "Company" shall also include the Insured Entity as a debtor-in-possession in the event of bankruptcy.

K.   "Subsidiary" shall mean:

    (1)   any entity in which the Insured Entity owns or at any time owned fifty percent (50%) or more of the issued and outstanding voting securities, directly or indirectly, subject to clauses (2) and (3) below for acquisitions made by the Company during the Policy Period;

    (2)   any entity in which the Insured Entity acquires 50% or more of the issued and outstanding voting securities or substantially all of the assets, directly or indirectly, during the Policy Period, if such entity's total assets represent less than 25% of the Company's total assets prior to the acquisition; and

    (3)   for forty-five (45) days immediately following the acquisition date, any entity in which the Insured Entity acquires 50% or more of the issued and outstanding voting securities or substantially all of the assets, directly or indirectly, during the Policy Period, if such entity's total assets represent more than 25% of the Company's total assets prior to the acquisition; provided, however, such entity will not be considered a Subsidiary or included within the definition of Company beyond such automatic forty-five (45) day period unless the Insurer specifically agrees in writing to provide such coverage, subject to such additional information, coverage terms and premium as the Insurer may require.

The term "Subsidiary" shall also include any subsidiary of a Subsidiary.

**CHANGES TO SECTION VII:**

Section VII is hereby amended as follows:

A. The **Directors, Officers** and/or the **Company** shall give the **Insurer** written notice as soon as practicable of any **Claim** first made during the **Policy** (or Discovery) **Period**, and in no event later than sixty (60) days after the expiration of the **Policy** (or Discovery) **Period**, and, for **Claims** deemed to be first made during the **Policy Period** under Section VII.E., within sixty (60) days from when such **Claims** are made.

**CHANGES TO SECTION VIII:**

Section VIII is hereby amended as follows:

A.(2) This **Policy** shall not be canceled by the **Insurer** except for nonpayment of the premium.

A.(4) If the **Insurer** elects not to renew this **Policy**, the **Insurer** shall provide the **Insured Entity** with no less than sixty (60) days advance notice thereof, unless any of the events described in Section VIII.B. occur.

B. SUBSEQUENT MAJOR EVENTS

If in the event of:

(1) the acquisition by another entity or persons of the **Insured Entity**, a majority of its voting securities, or substantially all of its assets; or

(2) the merger or consolidation of the **Insured Entity** into or with another entity such that the **Insured Entity** is not the surviving entity;

then the **Policy** will remain in effect until the end of the **Policy Period** as stated in Item 2 of the Declarations, but only with respect to **Wrongful Acts** occurring prior to such acquisition, merger, consolidation or appointment. Further, the premium will be considered fully earned upon the occurrence of any of the above events in consideration of the coverage extended. The **Company** will have the right, upon the events described in (1) and (2) above to purchase a six (6) year "run-off" policy to replace this **Policy**, under the same terms and conditions, for no more than 1.1 times the annual premium, less any unearned premium remaining under this **Policy** if it is canceled and so replaced.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

Date: January 6, 1999    By: _Michael Zartman_

Company Officer or Authorized Agent

Form No. GIC-7425  (08/93)

# GENESIS   GENESIS  INSURANCE  COMPANY

### REINSTATEMENT OF EXCESS LIMIT ENDORSEMENT

Policy Number: YXB001625A

It is understood and agreed that Section V. of the Policy is hereby amended by the addition of the following paragraph (H):

H.   In the event a Claim is first made after during the Policy Period and reported to the Insurer pursuant to Section VII. A. of the Policy, then, upon the Company's written request to the Insurer, and upon payment of an additional premium of one hundred percent (120%) of the then unearned Premium, the Limit of Liability as stated in Item 3 of the Declarations shall be amended to consist of both a First Limit and a Reinstated Excess Limit as follows:

(1)   The Limit of Liability shall include a "Reinstated Excess Limit" equal to the Limit of Liability as stated in Item 3 of the Declarations for all Loss in the aggregate arising out of Claims first made during the part of the Policy Period beginning at 12:01 a.m. on the Effective Date of the Reinstated Excess Limit and ending on the expiration of the Policy Period or the Discovery Period (if applicable).  The Reinstated Excess Limit shall be separate from and in addition to the First Limit.

(2)   The Limit of Liability shall also include a "First Limit" equal to the Limit of Liability as stated in Item 3 of the Declarations for all Loss in the aggregate arising out of Claims first made and reported during the Policy Period.

(3)

(a)   The Reinstated Excess Limit shall not apply to Claims made after the Effective Date of the Reinstated Excess Limit which are considered a single Claim (under Section V.C. above) with any Claim first made prior to the Effective Date of the Reinstated Limit, regardless of when or whether the prior Claim is reported to the Insurer.

(b)   The Reinstated Excess Limit shall not apply to Claims based upon or arising out of any Wrongful Acts if any Directors or Officers knew or could have reasonably foreseen, prior to or on the Effective Date of the Reinstated Limit, that such Wrongful Acts might give rise to a Claim.

(c)   The Reinstated Excess Limit shall be excess of (and not available until after full exhaustion of) the First Limit and all limits of liability provided by other insurance policies which are specifically excess of this Policy by reference hereto (including reference to the Policy Number).

(4)   The "Effective Date of the Reinstated Excess Limit" is the date upon which the Insurer is in receipt of both the written request and additional premium as set forth herein.

(5)   Under no circumstances may the covered Loss for any single Claim (under Section V.C.) exceed $25,000,000, whether applied from the First Limit or the Reinstated Excess Limit, or a combination thereof.

(6)  There may be one and only one Reinstated Excess Limit, and one and only one Effective Date of the Reinstated Excess Limit, under this Policy.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy other than as above stated.

Date: _January 8, 1999_                                    By: _Michael Zartman_
                                                                _____
                                                                Company Officer or Authorized Agent

Form No. GIC-7425.RE (08/93)

# GENESIS   GENESIS INSURANCE COMPANY

### DIRECTORS AND OFFICERS LIABILITY INSURANCE
### COLORADO DISCLOSURE FORM CLAIMS MADE POLICY

Policy Number: YXB001625A

## IMPORTANT NOTICE TO POLICYHOLDERS

THIS DISCLOSURE FORM IS NOT YOUR POLICY. IT MERELY DESCRIBES SOME OF THE MAJOR FEATURES OF OUR CLAIMS MADE POLICY FORM. READ YOUR POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES, AND WHAT IS AND IS NOT COVERED. ONLY THE PROVISIONS OF YOUR POLICY DETERMINE THE SCOPE OF YOUR INSURANCE PROTECTION.

Your Policy is a claims made policy. It applies only to **Claims** made against you after the inception date and before the end of the **Policy Period** involving injury or damage that occurs after the Policy's Past Acts Date. Upon termination of your Policy, a Discovery Period may be available.

## OCCURRENCE VS. CLAIMS-MADE

There is no difference in the kinds of injury and damage covered by either an "occurrence" policy or a "claims made" policy. Claims for damages may be assigned to different policy periods, however, depending on which policy you have purchased.

In an "occurrence" policy, coverage is provided for liability because of bodily injury and property damage that occurs during the policy period, no matter when the claim is made.

In your "claims made" policy, coverage is provided for a **Wrongful Act** if the Claim is first made during the **Policy Period**. The Claim must be a demand for damages by an injured party but it does not have to be in writing. Under most circumstances, a **Claim** is considered made when it is received and recorded by you or by us; but sometimes, a Claim may be deemed made at an earlier time. This can happen when another Claim for the same injury or damage has already been made, or when the Claim is received and recorded during the **Discovery Period**.

## PRINCIPAL BENEFITS

This Policy provides coverage for **Loss** resulting from **Claims** first made during the **Policy Period** against **Officers** and **Directors** for a **Wrongful Act** up to the maximum dollar limit specified in the Policy.

The principal benefits and coverage are explained in detail in your claims made policy. Please read it carefully.

## EXCEPTION, REDUCTION AND LIMITATIONS

Your claims made policy contains certain exceptions, reductions and limitations. Please read it carefully.

## RENEWALS, TAILS AND DISCOVERY PERIODS

Your claims made policy has some unique features relating to renewal, Discovery Period, and coverage of occurrences with long periods of exposure. These special claims made provisions are described below:

Special "Claims Made" Provisions

Two concepts relating to continuity of coverage under the "claims made" policy are especially important to understand. These involve the "Past Acts Date" and the "Discovery Period."

Retroactive Date

When you have a "Past Acts Date", there is no coverage for a Wrongful Act that occurred before that Past Acts Date, even if the Claim is first made during the Policy Period.

If there is no Past Acts Date, the Policy will respond only to Claims first made during the Policy Period for covered damage, no matter when the damage occurred. But if previous "occurrence" type insurance also applies to the injury or damage, your "claims made" policy will be excess; that is, it will apply only after that previous insurance is used up.

If there is a Past Acts Date, it cannot be moved ahead in time, except under certain circumstances, e.g., you changed insurers; there is substantial change in your operations that increases your exposure to loss; you failed to provide us with information you knew about the nature of your business or premise, and then only with your written consent. It is important to understand how the "claims made" policy's Discovery Period guarantees continuity of coverage if you are offered a renewal or replacement policy with a later Past Acts Date than the one in your current Policy.

DISCOVERY PERIOD or "Tails"

WARNING

If a Claim is made after the termination of your claims made policy, you may not have coverage for that Claim unless you purchase a Discovery Period or "tail" endorsement, which must be offered to you for at least one year, at a premium not to exceed 200% of your terminated policy premium.

Carefully review the policy provisions regarding the available Discovery Period, especially the length of coverage and price, and the time during which you must purchase or accept any offered Discovery Period.

Date: January 5, 1999                    By: _Michael Zartman_

                                         Company Officer or Authorized Agent

FORM NO. GIC-7473 (08/93) CO



GENESIS INSURANCE COMPANY

DIRECTORS AND OFFICERS LIABILITY INSURANCE
COLORADO FRAUD STATEMENT

IMPORTANT NOTICE TO APPLICANTS

Policy Number: YXB001625A

THE STATE OF COLORADO REQUIRES THAT THIS STATEMENT BE ATTACHED TO EVERY DIRECTORS
AND OFFICERS LIABILITY INSURANCE POLICY APPLICATION. PLEASE READ THE STATEMENT
CAREFULLY.

> IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE,
> OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE
> COMPANY FOR THE PURPOSE OR DEFRAUDING OR ATTEMPTING
> TO DEFRAUD THE COMPANY.   PENALTIES MAY INCLUDE
> IMPRISONMENT, FINES, DENIAL OR INSURANCE, AND CIVIL
> DAMAGES.   ANY INSURANCE COMPANY OR AGENT OF AN
> INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE
> INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A
> POLICY HOLDER OR CLAIMANT FOR THE PURPOSE OF
> DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICY
> HOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR
> AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE
> REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN
> THE DEPARTMENT OF REGULATORY AGENCIES.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions,
agreements or limitations of any policy issued by the Insurer.

Date:  January 8, 1999                    By: _____
                                               Company Officer or Authorized Agent

FORM NO. GIC-7474.CO (06/96)

# GENESIS   GENESIS INSURANCE COMPANY

## DIRECTORS AND OFFICERS LIABILITY INSURANCE
### COLORADO AMENDATORY ENDORSEMENT

Policy Number: YXB001625A

Section III. is hereby amended as follows:

SECTION III. DISCOVERY PERIOD

E.   [additional provision]
In the event of renewal on terms and conditions different from those in effect during the **Policy Period,** the **Company** shall have the right, upon payment of an additional premium to be determined by the **Insurer,** to an extension of the original terms and conditions with respect to any **Claim** first made during the period of one year after the effective date of renewal, but only with respect to any **Wrongful Act** committed prior to the effective date of the renewal. This right of extension shall terminate unless written notice of such election is received by the **Insurer** within thirty (30) days after the effective date of renewal.

B.   [replacement]
The right to purchase the Discovery Period shall terminate unless a written request for the Discovery Period is given to the **Insurer** within sixty (60) days after the effective date of cancellation, or, in the event of a refusal to renew, within sixty (60) days after the **Policy Period** ends, together with payment of the appropriate premium for the Discovery Period. In the event that such written request and premium paid is not so given to the **Insurer,** there shall be no right to purchase the Discovery Period at any later date.

All other provisions of the Policy remain unchanged.

Date: January 8, 1998                         By:  *Michael Zartman*
                                                   Company Officer or Authorized Agent

FORM NO. GIC-7480 (09/97) CO

# GENESIS   GENESIS INSURANCE COMPANY

### DIRECTORS AND OFFICERS LIABILITY INSURANCE
### COLORADO AMENDATORY ENDORSEMENT

Policy Number: YXB001625A

Section VIII. is hereby amended as follows:

    X.    [additional provision]
          LOSS INFORMATION

        The **Insurer** must furnish to the **Insured Entity**, upon its request and within thirty (30) days thereafter, sufficient information about closed or paid **Claims**, **Claims** for which the **Insurer** has established reserves, and claims for which the **Insurer** has received notices of occurrences which could give rise to **Claims**, to allow the **Insured Entity** to determine how much of its aggregate coverage remains available under the **Policy**.

All other provisions of the Policy remain unchanged.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the above-mentioned policy other than as above stated.

Date:  January 8, 1999          By:  _Michael Zartman_
                                    Company Officer or Authorized Agent

FORM No. GIC-7461 (9/97) CO

# GENESIS GENESIS INSURANCE COMPANY

## OUTSIDE DIRECTORSHIP COVERAGE
### (WITH EQUITY INTEREST)

Policy Number: YXB001625A

It is hereby understood and agreed that the insurance provided by this Policy is extended to include coverage for the **Directors** and **Officers** of the **Company** as Directors or Officers of _____ (hereinafter called "Other Entity"), as part of their regularly assigned duties with the **Company** subject to the Policy terms and conditions, provided that coverage shall not apply to any **Loss** in connection with any **Claim** made against such Directors or Officers, unless the Directors or Officers are entitled to indemnification by the **Company** pursuant to applicable laws and regulations. It is further understood and agreed that:

1.   Coverage provided by this Endorsement is available only to the extent that the serving Directors or Officers are not indemnified by the Other Entity; and

2.   This extension of coverage is to be excess of any other insurance, including but not limited to, Directors and Officers Liability Insurance and/or Directors and Officers Reimbursement Insurance provided for, to, or by the Other Entity.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy other than as above stated.

Date:  January 8, 1999                    By:  *Michael Zartman*
                                               Company Officer or Authorized Agent

Form No. GIC-7456 (08/63)

In Witness Whereof, we have caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by our authorized representative.

Secretary                                    President

GIC-12-3J

# EXHIBIT F

[Names and addresses of counsel for
plaintiffs appear on the signature page]

**RECEIVED**

MAR 2 1 2001

AT 9:30_____M
WILLIAM T. WALSH
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALAN FURST, M.D. and MICHAEL S. HARRISON, ESQ., Individually and On behalf of all persons similarly situated, | Hon. Katherine S. Hayden, U.S.D.J. |
| | Civil Action No. 2100cv05509 |
| Plaintiffs, | |
| v. | |
| STEPHEN FEINBERG, DANIEL CROWLEY, DONALD J. AMARAL, CERBERUS PARTNERS, L.P., CERBERUS ASSOCIATES, L.L.C., CERBERUS CAPITAL MANAGEMENT, L.L.C., CRAIG COURT, INC., GOLDMAN SACHS CREDIT PARTNERS, L.P., FOOTHILL CAPITAL CORPORATION, AND JOHN DOES 1-100, | SECOND AMENDED CLASS ACTION COMPLAINT |
| Defendants. | JURY TRIAL DEMANDED |

Plaintiffs, Alan Furst, M.D. and Michael S. Harrison, Esq., individually and on behalf of all others similarly situated, by their attorney, allege the following upon information and belief, based upon the investigation of their counsel which included, among other things, review of the pleadings on file in or pertaining to various existing or prior actions against some or all of the defendants named above, as well as news and

journal articles (except for those allegations which pertain to Plaintiffs, which are based upon personal knowledge):

## I.   NATURE OF THE ACTION

1.   Plaintiffs bring this action as a class action on behalf of themselves and a class (the "Class") consisting of all persons or entities who were holders of common stock of Coram Healthcare Corp. ("Coram") on or before August 8, 2000, and who sold their stock in the said company at any time between August 8, 2000, after defendants announced the Chapter 11 bankruptcy filing of Coram described below, and the filing of this Complaint (the "Class period").

2.   Coram is a health care services corporation whose primary business is a cutting-edge facet of the medical care industry, involving the delivery of infusion therapy and related health care directly to the homes of thousands of patients in need of such therapy ("alternate site infusion therapy").  Coram is a public corporation whose common stock shares are traded "over-the-counter," initially trading under the symbol CRH on the New York Stock Exchange, and currently listed on the NASDAQ bulletin board exchange under the symbol "CRHEQ."

3.   Beginning sometime in 1999, the named defendants identified above, who include the officers and directors of Coram, as well as the officers and directors of the entities who are Coram's principal lenders, and others whose identities are unknown at this time (the "John Doe" defendants), began to implement a scheme designed to perpetrate a fraud upon the market for common stock shares of Coram, in order to artificially depress the trading price of the said shares, and create the false impression that

-2-

the stockholders' equity held by the thousands of public investors who owned Coram common stock shares was steadily decreasing in value, and ultimately, that it was completely worthless. As described in detail below, the ultimate objective of this scheme of fraud was to justify a bankruptcy "reorganization," whose only real purpose was to enable the defendants to assume full ownership and control of Coram, by taking the said company "private," and essentially stealing the stockholders' equity of the Plaintiffs and the class *without* the necessity of compensating them for the millions of dollars representing the actual, true value of the said equity. Defendants' scheme of fraud caused Plaintiffs and the class to incur millions of dollars in trading losses, resulting from the sale of their shares of Coram stock at artificially depressed prices, following the announcement of Coram's bankruptcy filing in August of 2000, and the false statement by defendants that, in connection with such bankruptcy proceeding, there would be "no viable alternative" to Coram's emergence from that proceeding as a "private" corporation.

4.    During the Class Period, Plaintiffs and the Class have sustained total investment losses in an amount which cannot be calculated with certainty, but is believed to be in excess of $50,000,000, by reason of the defendants' fraud on the market for the common stock shares of Coram. Plaintiffs bring this action, individually and on behalf of the Class described herein, for recovery of compensatory damages in the amount of their investment losses, under the applicable federal statutes prohibiting fraud in connection with the purchase and sale of securities.

5.    As part and parcel of the scheme of fraud described herein, defendants Stephen Feinberg ("Feinberg") and Daniel Crowley ("Crowley"), secretly agreed to act

- 3 -

together to operate Coram for the benefit of defendants Cerberus Partners, L.P.
("Cerberus"), Goldman, Sachs Credit Partners, L.P. ("Goldman Sachs"), and Foothill
Capital Corporation ("Foothill"), Coram's principal creditors, and contrary to the interests
of Coram itself. The resulting breach of fiduciary duties owed by Feinberg and Crowley
to Coram benefitted Feinberg, Crowley, Cerberus, Goldman Sachs, and Foothill, and
caused substantial damage to Coram.

6.      This scheme and conspiracy began sometime in 1999, was refined and
implemented during the year 2000, and continues to this day. Feinberg implemented this
scheme by arranging for Crowley to take over the operations of Coram and become its
Chairman and Chief Executive Officer, while concealing the significant and critically
disabling actual conflict of interest that arose from the terms of a secret, undisclosed
employment agreement between Crowley and Cerberus, which provided for Crowley's
loyalties to Cerberus to supersede his legal and ethical obligations to Coram, as well as to
the shareholders of Coram (plaintiffs and the Class), while acting as Chairman of the
Board and CEO of that company.

7.      That secret employment agreement provided for Cerberus to pay Crowley
cash compensation of $960,000 per year and gave Crowley additional significant bonus
opportunities. In return, Crowley agreed to remain a full-time employee of Cerberus and
to cooperate fully with Feinberg in the advancement of the best interests of Cerberus, at
the precise time Crowley held the position of Chairman and Chief Executive Officer of
Coram. Crowley agreed that he would be subject to dismissal and loss of all of these
benefits if he failed to follow Feinberg's directions, in his capacity as the CEO of Coram.

Crowley and Feinberg concealed the terms of the employment arrangement; those terms were not disclosed to the other directors of Coram, nor were they disclosed in any public filings of Coram notwithstanding the fact that such disclosure was mandated by applicable provisions of the Securities and Exchange Act of 1934.

8.    In early 2000, Feinberg increased Crowley's incentive to manage the affairs of Coram for the benefit of Cerberus, rather than for the benefit of plaintiffs and the other shareholders of Coram.  Acting as Chairman of the Compensation Committee of Coram, Feinberg arranged for Coram to bind itself to pay Crowley huge (potentially $13 million or more) incentive bonuses for one year's work.

9.    Consistent with these arrangements, Crowley used his position as Chairman and Chief Executive Officer at Coram to run Coram in a manner that benefitted Cerberus and injured Coram.  The Board of Directors of Coram relied on Crowley for information, judgment and strategic and tactical direction, without knowledge that Crowley was secretly in the pay of, agent for and acting under the direction of Cerberus, and had thereby abandoned the fiduciary duties of care, loyalty and good faith which he owed to Coram.

10.    The actions that Crowley took in breach of his fiduciary duties in order to benefit Cerberus included, but were not limited to: (i) adoption of a business strategy that focused on liquidation of assets and reduction of debt even when such actions were adverse to the interests of Coram and taken solely for the benefit of Cerberus and the other Noteholders (as defined below); (ii) failure to retain and consult independent financial advisors, to explore, inter alia, viable refinancing options; (iii) failure to explore

-8-

opportunities for business combinations, capital infusions and strategies to grow Coram; (iv) payment of interest to Cerberus and other holders of Notes that was not required by the terms of the Notes; (v) failure to use reasonable business judgment in negotiations with Cerberus concerning use of proceeds of asset sales; (vi) failure to use processes that were entirely fair (or in some cases, fair at all) in dealings with Coram's shareholders; (vii) unconscionable delay in implementing steps necessary to comply with government regulations in order to posture Coram's bankruptcy filing as an emergency; and (viii) other steps designed to reduce the real and/or apparent value of Coram, and thereby to facilitate Cerberus' scheme and conspiracy.

11.    As a result, Coram missed attractive business opportunities that would have enhanced its value by increasing its revenues, margins and profits, allowed refinancing of its indebtedness and avoided potentially destructive bankruptcy proceedings.

12.    Plaintiffs now bring this action on their own behalf, and on behalf of all persons similarly situated, to recover damages for the misrepresentations and omissions, in connection with the purchase and sale of securities, and breaches of fiduciary duties described above, and more fully detailed below.

## II.    JURISDICTION AND VENUE

13.    This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5; and under applicable principles of the statutory and common laws of the State of New Jersey.

- 6 -

14.    This Court has jurisdiction over this action under Section 27 of the Exchange Act, 15 U.S.C. § 77v and § 78aa; under 28 U.S.C. §1331 (federal question jurisdiction); under 28 U.S.C. §1337 (interstate commerce); and pursuant to principles of supplemental federal jurisdiction of state law claims.

15.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Many of the acts alleged herein, including the dissemination to the investing public of materially false and misleading statements, and many offers and sales of the securities involved in this action took place in the district.  In addition, upon information and belief, one or more defendants maintain their principal place of business in this district, and some or all of the defendants repeatedly transact business in this District.

## III.    PLAINTIFFS

16.    Plaintiff Alan Furst, M.D. ("Furst") purchased a total of 529,800 shares of Coram common stock between the dates of January of 1996 and October of 1999, at an average price of approximately $2.60 per share, for a total cost of $1,382,792.  Plaintiff Furst sold the said shares between August 8, 2000 and September 13, 2000, as a direct and proximate result of the scheme of fraud complained of herein, at an average price of approximately $.06 per share, for a total of $36,329, thereby suffering net investment losses in excess of $1,500,000.  Plaintiff Michael S. Harrison, Esq. ("Harrison"), purchased a total of 163,097 shares of Coram common stock between the dates of January of 1996 and October of 1999, at an average price of approximately $2.70 per share, for a total cost of $440,031.  Plaintiff Harrison sold the said shares between August 8, 2000

- 7 -

03/23/2001   14:31    SKADDEN ARPS → 95061800PP058470                                    NO.447   P11
SKADDEN                      ID:201-639-6858              MAR 21'01   14:03 No.012 P.12

and September 19, 2000, as a direct and proximate result of the scheme of fraud complained of herein, at an average price of approximately $.18 per share, for a total of $29,900, thereby suffering net investment losses in excess of $400,000.

## IV.    DEFENDANTS

17.    Defendant Cerberus Partners, L.P. ("Cerberus") is a limited partnership organized and existing under the laws of the State of Delaware, with its principal address in New York, New York. Cerberus Partners is a limited partnership whose business includes large investments in high-risk, high-yield debt instruments of troubled companies. Cerberus Partners (and, possibly, other Cerberus entities) is the holder of "Series A" and "Series B" notes ("Notes") issued by Coram. The Notes are far and away Coram's largest obligations. Defendant Cerberus Associates L.L.C. ("Cerberus Associates") is the General Partner of Cerberus Partners. Defendant Cerberus Capital Management L.P. ("Cerberus Capital") is an affiliate of Cerberus Partners. Cerberus Capital acts as the agent of Cerberus Partners and is under its management and control. Defendant Craig Court, Inc. ("Cerberus Craig") is the general partner of Cerberus Capital.

18.    Defendant Goldman Sachs Credit Partners, L.P. ("Goldman Sachs") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Foothill Capital Corporation ("Foothill") is a corporation organized and existing under the laws of the State of California, with its principal place of business in Los Angeles, California,

03/23/2001    14:31    SKADDEN ARPS → 95061800PP058470    NO.447    D12
SKADDEN    ID:201-639-6858    MAR 21'01    14:03 No.012 P.13

Goldman Sachs, and Foothill, along with Cerberus, are principal lenders to Coram, holding indebtedness of Coram in the approximate amount of $260.5 million (hereinafter sometimes collectively referred to as the "Lender Defendants").

19.    Defendant Stephen Feinberg ("Feinberg") is the chief executive officer, and major shareholder of Cerberus Partners, L.P. Feinberg also served as a director on the board of directors of Coram, until his resignation from Coram's board on or about July 24, 2000, shortly after the sale of Coram's most profitable business, its CPS unit.

20.    Defendant Donald J. Amaral ("Amaral") was Chairman of Coram's Board of Directors from September 1997 to November 30, 1999, and has been a Director of Coram since October 1995. Amaral was Chief Executive Officer of Coram from October 1995 through April 23, 1999 and October 22, 1999 through November 30, 1999, and was President and Chief Executive Officer from October 1995 through December 1997. Defendant Daniel D. Crowley ("Crowley"), has been the President, Chief Executive Officer, Chairman of the Board and a Director of Coram, since November 30, 1999. Defendants Amaral and Crowley are sometimes referred to collectively, along with defendant Feinberg and the "John Doe" defendants (one or more members of the Board of Directors who assisted Crowley and Feinberg in connection with the scheme described herein, whose identities are unknown at this time) as the "Officer and Director Defendants".

## V.    CLASS ACTION ALLEGATIONS

21.    Plaintiffs bring this action on their own behalf, and as a class action on behalf of a class of all persons and entities who purchased Coram common stock at any

- 9 -

time before August 8, 2000, and sold their Coram common stock at any time between August 8, 2000 and the filing of this Complaint (the "Class Period"). Excluded from the Class are the defendants herein, any person, firm, trust, corporation, officer, director or other individual in which any of the defendants has a controlling interest or which is related to or affiliated with any of the defendants, and the legal representatives, heirs, successors-in-interest or assigns of such excluded parties.

22.    From the time of Coram's inception, the defendants sold or issued approximately 50 million shares of Coram common stock to thousands of investors located throughout the country, including in New Jersey. As a result, the members of the Class are so numerous that joinder of all members is impracticable. While the exact number of class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believes that the entire Class includes in excess of five thousand persons. It is impractical to bring all members of the Class before this Court.

23.    The claims of Plaintiffs are typical of the claims of the members of the Class, as the Plaintiffs and all members of the Plaintiffs Class sustained damage arising out of defendants' wrongful conduct complained of herein.

24.    Plaintiffs will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in class action litigation.

25.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, the expense and burden of individual litigation makes it impossible for the

-10-

class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

26.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether defendants violated the federal securities laws, by engaging in the activities described herein, designed to induce Plaintiff and the class to effectuate the sale of their Coram common stock at artificially depressed prices, through misrepresentations and/or omission of material facts, in violation of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78t(a);

(b) Whether the defendants committed common law fraud, intentional or reckless misrepresentations, or negligence by directly or indirectly participating in the acts alleged herein;

(c) Whether documents and statements publicly disseminated by defendants relating to the Coram common stock contained materially false and misleading statements and representations, and/or omitted to state material facts necessary to make the statements made not false and misleading;

(d) Whether defendants acted willfully, recklessly or negligently in disseminating materially false or misleading information, or omitting to

-11-

state and/or in misrepresenting material facts, in connection with the purchase and sale of securities; and

(e) Whether Plaintiffs, and the members of the Class have sustained damages by reason of the defendants' misrepresentations and omissions, and the fraudulent behavior complained of herein and, if so, the proper measure of such damages.

## VI.    FACTS COMMON TO ALL CAUSES OF ACTION

27.    Coram is a publicly traded company that provides home infusion services to healthcare patients throughout the United States. Coram was formed in July, 1994, as a result of the merger of several national and regional providers of home infusion therapy and related services. Since that time, Coram has made a number of acquisitions that resulted in Coram becoming the leading provider of alternative site infusion therapy services in the United States based on geographic service area and total revenue.

28.    Infusion therapy involves the intravenous administration of nutrition, anti-infective therapy, HIV therapy, blood factor therapies, pain management, chemotherapy and other therapies. The initiation and duration of these infusion therapies is determined by a physician based upon a patient's diagnosis, treatment plan and response to therapy.

### Cerberus Becomes Interested in Coram

29.    Cerberus invests in high-risk, high-yield debt instruments of troubled companies for itself and others. Its business objectives are based on its belief that such

-12-

debt (often purchased at a severe discount from its face value) may increase in value *if the* formance of the troubled company reverse, or that if bankruptcy ensues, Cerberus can become an owner of the troubled company through debt restructuring at an attractive price.

30.   Cerberus began to acquire Coram's debt in 1995. In April, 1997, Cerberus purchased a significant amount of additional Coram debt. At or about the same time, Cerberus sold or exchanged a portion of Coram's debt instruments to Goldman Sachs Credit Partners LP ("Goldman Sachs") and Foothill Capital Corporation ("Foothill").

31.   In May, 1998, Cerberus, Goldman Sachs and Foothill (collectively, the "Noteholders") executed a Securities Exchange Agreement with Coram whereby the Noteholders agreed to exchange their existing Rollover Notes and Warrants for Series A ("Series A Notes") and Series B Notes ("Series B Notes"). The Series A Notes mature in May, 2001. The Series B Notes mature in 2008 but can be redeemed by the Noteholders at par when the Series A Notes mature.

32.   Feinberg became a director of Coram when the Securities Exchange Agreement was executed, in accordance with a provision that permitted Cerberus and the other Noteholders to designate a director to sit on the Coram Board of Directors.

33.   The Securities Exchange Agreement also provided that a default would result if Coram's then CEO, Donald J. Amaral (who, with Feinberg, arranged the agreement) ceased to be CEO. Feinberg incentivized Amaral to execute the agreement

-13-

03/23/2001    14:31    SKADDEN ARPS → 95061800PP058470                    NO.447    P17
SKADDEN                ID:201-639-6858        MAR 21'01    14:06 No.012 P.18

and to act in the best interests of Cerberus, not Coram, by (as a member of Coram's Board of Directors) approving payment of a $1 million bonus to Amaral. The Securities Exchange Agreement further benefitted Amaral by providing that a default under the Coram debt instruments held by the Noteholders would occur if Amaral ceased to be CEO of Coram.

### The Actual Conflict of Interest— Feinberg Arranges For Crowley to Take Over Coram's Operations While Secretly in the Pay of Cerberus

34.    In April, 1999, despite the job security provided for him under the Securities Exchange Agreement, Amaral resigned as CEO of Coram. He was replaced at that time by Richard M. Smith. Smith's business plan was to prudently build Coram's business and increase the value of the Company.

35.    These actions led Smith into conflict with Feinberg, who had no interest in increasing the value of Coram except to divert all available cash flow to repayment of the Notes held by Cerberus, regardless of whether such repayment was required or was in the best interests of Coram. Feinberg then developed a plan to replace Smith with a CEO who would act under his direction, and in the interests of Cerberus rather than Coram.

36.    To implement this plan, Cerberus, acting through Feinberg, hired Crowley in August, 1989, to be a full-time employee of Cerberus with cash compensation of $1 million per year and opportunities for substantial additional bonuses. As soon as Crowley was hired to work full time for Cerberus, Feinberg recommended that Coram hire Crowley as a "consultant."

37.    Feinberg, a member of the Coram Board of Directors, did not disclose to

-14-

03/23/2001   14:31   SKADDEN ARPS → 95061800PP058470                    NO.447   P18
SKADDEN                    ID:201-639-6858        MAR 21'01   14:06 No.012 P.19

the board the compensation terms of Crowley's employment agreement with Cerberus nor did he disclose that Crowley had agreed to work full time for Cerberus under the direction of Feinberg and that all of Crowley's benefits could be terminated by Feinberg if Crowley did not follow his instructions.

38.    As a result of Feinberg's recommendation, Crowley was in fact hired as a consultant to Coram in approximately September 1999. Crowley's duties as a consultant to Coram were essentially to supervise the CEO, Smith. Not surprisingly - and as intended by Feinberg - Smith was unhappy with having Crowley look over his shoulder while Smith remained responsible for management of the business. Smith protested this relationship and requested that if Crowley were to be retained as a consultant, it be under Smith's direction and that Crowley report to Smith. After Feinberg persuaded the other members of the Coram Board of Directors that Smith must report to Crowley, Smith - again as intended by Feinberg - resigned in October 1999, less than six weeks after Crowley was hired as a consultant.

39.    When Smith resigned, Feinberg was able to persuade the Coram Board of Directors, as he had intended all along, to have Crowley take over management of Coram's operations. However, prior to agreeing to act as Chief Executive Officer of Coram, Crowley demanded more compensation from Cerberus, above the $960,000 annual salary he was already receiving from Cerberus and in addition to his compensation from Coram. Crowley made these demands in a furtive letter, in which he requested that such additional compensation for his success at Coram be disguised by giving him an

-15-

additional share of the upside in an unrelated company partly owned by Cerberus called Winterland. As proposed by Crowley, the compensation would not be measured by the success of Winterland, but rather by the result of Crowley's efforts at Coram. Feinberg in fact agreed to provide Crowley with additional potential compensation from Cerberus' share of Winterland in exchange for Crowley agreeing to act as CEO of Coram under Feinberg's direction.

40.    Within days of these discussions between Feinberg and Crowley, Crowley was hired by Coram for a three-year term, effective November 30, 1999, as Chairman of the Board, President and Chief Executive Officer. His compensation included options to purchase 1 million shares of Coram common stock, a base salary and a potential performance bonus.

41.    On or about the same day that Crowley agreed to employment terms with Coram, Crowley and Cerberus executed a written employment agreement that reflected the earlier terms described in Paragraph 36 and confirmed that Crowley agreed to devote "his entire business time, attention, skill and energy exclusively" to Cerberus by performing duties to be assigned by Feinberg, in exchange for a base salary of $80,000 a month ($960,000 a year) plus the potential for Crowley to receive sizeable bonuses, including by a share in the profits of Winterland. The written agreement also provided that Cerberus could terminate all of Crowley's rights to receive these payments if he did not follow Feinberg's reasonable instructions.

42.    Almost immediately upon hiring Crowley, Feinberg recommended to Coram's Board of Directors, of which Feinberg was then a member, that Coram hire

-16-

Crowley's consulting company, Dynamic Health Care Solutions ("Dynamic") to act as a "consultant" to Coram. Many of the services performed by Dynamic were services for which Crowley was to be compensated as CEO of Coram, so that for the most part the substantial fees paid by Coram to Dynamic were simply so much additional hidden compensation arranged by Feinberg for Crowley. Fees paid to Dynamic for only one month in December, 1999, were approximately $200,000; the amount of fees paid during the first seven months of 2000, prior to the bankruptcy filing, are unknown but are believed to be substantial.

43.    For the duration of the Cerberus employment agreement, continuing to this day, Crowley has cooperated fully with Feinberg in the advancement of the best interests of Cerberus, as required by that agreement.

44.    Neither Crowley nor Feinberg disclosed to Coram and its Board of Directors that Crowley had been engaged as a full-time, exclusive Cerberus employee or that Crowley was being paid nearly $1 million a year, plus expenses, and potential bonuses, by Cerberus. Further, the existence of the employment agreement between Crowley and Cerberus was not disclosed in any public filings of Coram, notwithstanding that such disclosure was mandated by provisions of the Securities and Exchange Act.

**Crowley Manages Coram for the Benefit of Cerberus and the Noteholders**

45.    Once installed as CEO, Crowley immediately made substantial changes in the way Coram was managed and operated. He discarded the efforts of his predecessor, Rick Smith, to grow the business. Instead, Crowley's efforts were designed to enhance

-17-

the value of the Notes held by Cerberus, his employer, and to give Cerberus and the other Noteholders a claim to the equity of Coram. He made strategic decisions designed to provide cash to reduce debt at the expense of future cash flow and without regard to the injury thereby caused to Coram. While some of those decisions were warranted by legitimate business concerns, most of them, and the thrust of his efforts, were designed to decrease future profitability (and hence present value) in the interest of repaying debt.

46. For example, at a time when Coram was seriously short of cash, Crowley made substantial cash interest payments to the Noteholders, including Cerberus, even though Coram was not obligated to make such payments in cash.

47. Another example of the manner in which Crowley acted in the short term interests of Cerberus and against the interests of Coram was his decision to sell one of Coram's operating divisions, Coram Prescription Services ("CPS"), for approximately $30 million, a price far below the $100 million value estimated by Coram's investment banker, Deutsche Bank Alex Brown. At the time this sale was announced, defendants contended in a press release describing the sale that it was designed to "increase shareholders' equity," by providing funds necessary to pay down Coram's long-term debt; that the sale would result in an after-tax gain "of approximately $18 million;" and that the sale would "increase shareholders' equity by that amount." Nevertheless, this "sale" of Coram's most profitable business was designed simply to place approximately $30 million of Coram's assets in the hands of defendant Feinberg, whose affiliates, and the Lender Defendants, received the $30 million in proceeds from the sale of Coram's CPS unit to "pay down" the indebtedness allegedly due to them. Additionally, this sale was

-18-

effectuated to position Coram to justify its Chapter 11 bankruptcy filing, and to achieve its ultimate goal of ridding itself of its public shareholders (i.e., Plaintiffs and the Class), by emerging from the bankruptcy proceeding with Coram existing solely as a private corporation owned by defendants, and thereby effectively robbing Plaintiffs and the Class of their equity without the necessity of any payment to them whatsoever.

48.   This sale of Coram's CPS unit was, in reality, simply one more step in the defendants' scheme to strip Coram of its most valuable assets, to place the proceeds from the sale of those assets into the pockets of defendant Feinberg and the Lender Defendants, and to better position defendants to convince the bankruptcy court into accepting the defendants' false representations that, because there was no real value to Coram's shareholders' equity, defendants would be justified in emerging from bankruptcy as the sole owners of Coram, and with Coram itself as a private corporation, without any compensation whatsoever to the Plaintiffs and the Class. The only constituency that benefitted by that sale was the Noteholders, including Cerberus, who received all of the proceeds of the sale while Coram lost the cash flows that CPS had been generating. Crowley did not attempt to negotiate the amount of this payment to the Noteholders, though prudent business practice required that he do so.

## Compliance With Stark II

49.   In December, 1999, shortly after becoming CEO of Coram, Crowley became aware that the company needed to address its future compliance with federal health care regulations regarding Medicare and Medicaid payments. Under the ownership and referral provisions of the Omnibus Budget Reconciliation Act of 1993 ("Stark II") it

-19-

is unlawful for a physician to refer patients for certain designated health services reimbursable under the Medicare and Medicaid programs to an entity with which the physician (or the physician's immediate family members - broadly defined) has a financial relationship, unless the financial relationship fits within an exception enumerated under Stark II or regulations promulgated thereunder. Coram is subject to the provisions of Stark II.

50.   Stark II includes an exception for a physician's ownership of publicly-traded securities if, among other things, the company has stockholder equity exceeding $75 million. As of December 31, 1999, Coram complied with the stockholder equity exception to Stark II.

51.   In December, 1999, however, Crowley became aware that Coram would not qualify for the equity exception to Stark II as of the end of the year 2000. One way to solve the problem, which was briefly considered, would have been for Cerberus and the other Noteholders to convert some of their Coram debt into equity. Such conversion might dilute existing equity, but would not have destroyed it. This approach initially appealed to Crowley, who owned one million stock options.

### The Scheme to Steal the Equity In Bankruptcy

52.   Nevertheless, in February, 2000, Cerberus and the other Noteholders rejected any proposal that would have retained value for existing equity. Instead, with the assistance of bankruptcy counsel retained for Coram at the urging, if not insistence of Fainberg, Crowley and Fainberg devised a scheme to use Stark II as an excuse to wipe out the interests of the existing common shareholders of Coram and secure the future value of

-20-

Coram for Cerberus and the other Noteholders. The essence of this scheme was to present to the Bankruptcy Court an argument that the solution to the looming Stark II problem was to make Coram a private company by canceling the interests of the public shareholders and transferring the entire equity to Cerberus and the other Noteholders. This would solve the Stark II problem because no referring physicians would be shareholders of Coram and thus no physician referrals would run afoul of Coram's Stark II obligations. However, this solution also deprived equity of its true value, and would completely wipe out the shareholder interests of plaintiffs and the class.

53.    To implement this scheme, Crowley and Feinberg, with the assistance of counsel, decided to delay any bankruptcy filing as long as possible in the year 2000 so that Coram could argue that there were emergency circumstances that required the approval of a bankruptcy plan of reorganization by the end of the year. This approach was intended to stifle shareholder opposition by severely limiting the opportunity to oppose the plan in the Bankruptcy Court. Crowley and Feinberg hoped that a busy bankruptcy judge, faced with an apparent drop dead end of the year deadline for reorganization if Coram was to remain viable, would not allow time for proper scrutiny of the facts pertinent to the plan of reorganization.

54.    To further this scheme, Coram waited until the second week of August, 2000, to file its Chapter 11 petition, this despite the fact that Crowley and Feinberg were aware as early as December, 1999 that the Stark II problem had a drop dead date thirteen months later, and that Crowley and Feinberg had discussed restructuring options at every Board of Directors meeting from November, 1999 to August, 2000. Specifically, the

directors (i) were advised in January, 2000 about bankruptcy options; (ii) made serious preparatory efforts in mid-February, 2000; (iii) engaged bankruptcy counsel at their April 5, 2000 Board meeting; and (iv) engaged a valuation expert on April 12, 2000. After the bankruptcy petition was filed, Coram, through its counsel acting under the direction of Crowley, opposed the formation of an official committee of Coram common stock shareholders, thus resulting in further delay and further squeezing the reorganization proceedings on the basis of a deadline that Crowley had known about a year earlier.

### How the Scheme to Steal Equity Injured Coram

55.    While the scheme devised by Feinberg and Crowley was directed by them towards the elimination of stockholders' equity, they also knew that a direct and inevitable result of their plan would be to cause material injury to Coram and its business - and in fact it did cause such harm in a myriad of ways.

56.    For example, Feinberg caused Crowley to manage Coram so as to avoid all reasonable efforts to explore options other than Chapter 11 Bankruptcy proceedings. Coram never retained an investment banker to explore the manner in which the value of Coram could be increased, and never had a functioning special committee of independent directors to explore strategic options to grow the company. As a result, Coram missed attractive business opportunities that would have enhanced its value by increasing its revenues, margins and profits, allowed refinancing of its indebtedness, and avoided destructive bankruptcy proceedings.

57.    Further, as it became apparent in the healthcare industry and provider community that Coram was being managed towards bankruptcy, healthcare organizations

-22-

that were the driving force in referring customers ceased to refer customers to Coram. Coram's failure to deal with the Stark II problem had a direct, negative effect on revenues. After rising during the first half of 2000, revenues declined once the scheme to have Cerberus and the Noteholders acquire the equity of Coram, without any recompense to the existing stockholders, was put in place in approximately April, 2000, and the inevitable Stark II deadline -- which Coram had failed to deal with for eight months -- quickly approached. What is clear is that Crowley failed to exercise opportunities to grow the business or to explore strategic options but deliberately managed Coram's affairs so that it would appear to have little or no value above the amount owed under the Notes.

### The Crowley Payoff

58.    Crowley demanded more compensation if he was to go along with the scheme to steal the equity for Cerberus and the other Noteholders. The $960,000 annual salary he was receiving from Cerberus and the $650,000 in annual salary (plus a potential bonus capped at less than $2 million) from Coram was not sufficient for Crowley. For example, a significant part of Crowley's original compensation package with Coram was one million options to purchase Coram stock at a price measured by the public price on the day Crowley became CEO. If the scheme to wipe out equity succeeded, these options would become worthless. In addition, Crowley is a high net worth individual who would have potential personal exposure if the scheme was discovered. Crowley did not want to accept such a risk without a significant reward.

59.    In response to Crowley's demand, and to ensure Crowley's cooperation

-23-

with the Cerberus scheme, Feinberg, as Chairman of Coram's Compensation Committee, renegotiated Crowley's employment agreement, even though that agreement had been signed only three or four months earlier, and Crowley had no right to renegotiate his contract at that time.

60.    The renegotiated agreement (the second amendment to Crowley's employment agreement) was finalized in April, 2000. It was signed on behalf of Coram by Feinberg, who was not an officer of Coram. It is probably the only Coram contract that Feinberg ever signed. The second amendment provided that Crowley was to receive a potentially unlimited bonus and one that would almost certainly dwarf the maximum $1.9 million bonus that Crowley could receive under the employment agreement he had agreed to and executed in late 1999. Crowley was virtually guaranteed a bonus of at least $4.5 million under the second amendment negotiated by Feinberg and in fact expected then, and still expects today, to receive a bonus of at least $13 million.

61.    In late July, 2000, about two weeks before the bankruptcy filing, Feinberg attempted to cover his tracks by abruptly resigning from Coram's Board of Directors. However, since Cerberus's employee Crowley remained as Chairman and CEO of Coram and was contractually obligated to act under Feinberg's direction or be fired from his lucrative employment contract with Cerberus, the change was merely cosmetic. Feinberg still retained de facto control over Coram, and he exercised that control to carry out the scheme to bankrupt Coram.

-24-

03/23/2001    14:31    SKADDEN ARPS → 95061800PP058470    NO.447    D28
SKADDEN            ID:201-639-6858        MAR 21'01   13:36 No.011 P.07

### Coram's Bankruptcy Filing. And Fraudulent Bankruptcy Press Releases

62.    Between the time of the formation of Coram, in or around 1994, through the time of the announcement of its Chapter 11 Bankruptcy filing, on or about August 8, 2000, defendants issued and sold approximately 50 million shares of Coram common stock to investors throughout the country, primarily at prices ranging from $1.00 per share to a high of approximately $2.75 per share.  These investments were made by Plaintiffs and the Class on the basis of information supplied to them by the defendants, touting the prospects for growth and profitability of the said company, and the cutting edge features of its core business, the delivery of infusion therapy for administration to patients in the home setting.

63.    As recently as October of 1999, when Coram's annual revenues were already in excess of $100 million on an annual basis, defendants were projecting revenues for Coram, in the coming years, up to the level of $1 billion on an annual basis. Nevertheless, defendants retained financial and legal experts who were selected primarily because of their willingness to support defendants' false and frivolous contention that the stockholders' equity of Coram had zero value, and who advised them that the cheapest and easiest way of achieving their goal would be to engage in activities designed to artificially depress the market value of Coram common stock, and then publicly adopt the position that (1) in fact, there was no shareholders' equity whatsoever in Coram; (2) it was necessary for Coram to seek the protection of the bankruptcy laws, under Chapter 11, so it could "restructure" its long-term debt; and (3) because the shareholders' equity was completely devoid of value anyway, Coram could emerge from these bankruptcy

03/23/2001    14:31    SKADDEN ARPS → 95061800PP058470    NO.447    D29

SKADDEN    ID:201-639-6858    MAR 21'01    13:37 No.011 P.08

proceedings as a "private company," whose ownership would then be solely in the hands of the defendants named herein, and thereby bring Coram automatically into compliance with "Stark II" as well.

64.    Pursuant to this scheme, less than two months after their announcement of the sale of its CPS unit, for the alleged purpose of "increasing shareholders' equity," on or about August 8, 2000 defendants issued another press release to announce the Chapter 11 bankruptcy filing of Coram.  In that same press release, as a means of defrauding the market for Coram stock, positioning themselves to increase their own holdings of the said stock at bargain prices, and buttressing their contention that Coram was entitled to emerge from bankruptcy proceedings as a "private" corporation, owned solely by themselves, defendants asserted that "[t]he Company's [Coram's] plan calls for emergence from bankruptcy as a privately held company," and "provides no recoveries for the holders of Company stock currently outstanding."  Moreover, on September 13, 2000, defendants caused Coram to issue another false and fraudulent press release, which quoted defendant Crowley as asserting that "[I]ndependent financial advisors advised us that there were no viable options for new financing and that the value of the Company is less than the value of the debt..."  In fact, however, defendants knew full well that their statements regarding the worthlessness of the Coram shareholders' equity, the "independence" of financial experts with whom they had consulted; and the contention that there were "no viable options" to Coram's financial problems, other than a bankruptcy filing designed to transform Coram into a privately held company, with no compensation whatsoever to Plaintiffs and the Class, were totally false and that, on the

-26-

contrary, the true value of that shareholders' equity was equal to millions of dollars, and there was at least one, if not several "viable options" to Coram emerging from bankruptcy proceedings as a "private" corporation, without payment of any consideration whatsoever to its common stock shareholders. In fact, shortly before December 31, 2000, after their proposed plan of "reorganization," designed to rid themselves of their shareholders without compensation to them, was *rejected* by the bankruptcy court, defendants quickly found and implemented another means of compliance with "Stark II," which simply involved the conversion of debt to equity, so as to bring Coram into compliance with the requirements of that statute. Defendants always knew that this approach represented a "viable option" in compliance with "Stark II," even as they publicly represented that the *only* viable option was the emergence of Coram from bankruptcy proceedings as a private corporation.

65.    Nevertheless, unaware of the false and fraudulent nature of the statements made in the press releases of August 8 and September 13, 2000, and believing that the artificially depressed prices of Coram stock shares which followed those announcements represented the true value of those shares, and their fair market value, Plaintiffs and the Class proceeded to sell their shares of Coram stock at the artificially deflated prices which followed the announcement of August 8, 2000 believing that, in light of the precipitous drop in the price of Coram common stock following that announcement, and the defendants' stated intention to emerge from bankruptcy proceedings with Coram as a "private" corporation, the sale of their shares of stock at these extremely low prices

represented the *only* prospect for them to salvage some value for their shares of Coram stock.

66.    Plaintiffs have since learned, however, that in fact truly independent financial experts retained by other stockholders, and an Equity Committee for remaining Coram stockholders established in the Coram bankruptcy proceedings, have now established that, in direct contrast to the fraudulent public statements made by defendants in the press releases of August 8 and September 13, 2000, there was and is in fact substantial value to the shareholders' equity of Coram, and that the defendants' fraudulent statements to the contrary were part and parcel of the scheme of fraud described herein. Plaintiffs have also learned that, despite their contention that the common stock of Coram is completely worthless, defendants have engaged in various activities designed to amass additional shares of the said stock at the now substantially deflated prices resulting from their fraudulent statements, as witnessed by numerous 13-D filings of the defendants and their affiliates, reflecting purchases and/or conversions of indebtedness to Coram common stock, in some instances at conversion prices far above the current trading prices of Coram shares.  These Section 13-D SEC filings also establish that, over a period of at least one year, the Lender Defendants have used loan documents to establish their "lending" relationships with Coram, which were in fact designed from the outset to permit them to systematically convert Coram's indebtedness to them to equity, and at the same time dilute the equity of the Plaintiffs and the Class.

## VII.    FRAUDULENT CONCEALMENT.

67.    Up to and including August 8 of 2000, all of the correspondence received by Plaintiffs and the Class from defendants, and each of their press releases, was designed to confirm to Plaintiffs and the Class the appearance of legitimacy and accuracy, and to conceal the scheme of fraud, and breaches of fiduciary duties described above. Then, in late September of 2000, Plaintiffs learned for the first time, through press releases of the Equity Committee established in the bankruptcy proceedings pending in the United States District Court for the District of Delaware, and through related investigation, that the statements made by defendants, representing that there was no value whatsoever to the stockholders' equity in Coram held by Plaintiffs and the Class, and no viable option to compliance with Stark II, other than Coram's emergence from bankruptcy proceedings as a privately held corporation, were false and fraudulent.

68.    Accordingly, Plaintiffs and the Class remained unaware of the fraud described and complained of herein, until shortly before the filing of this Complaint and, despite their exercise of reasonable diligence in keeping informed of all publicly available information regarding Coram, could not have learned earlier of the fraud upon the market for shares of Coram common stock perpetrated by defendants, or of the breaches of fiduciary duties complained of herein.

SKADDEN                    ID:201-639-6858              MAR 21'01    13:39 No.011 P.12

## VIII.  FIRST CLAIM

### Section 10(b) of the Securities Exchange Act of 1934

### (Against All Defendants)

69.     Plaintiffs reallege and specifically incorporate herein by reference the allegations contained in Paragraphs 1 through 68 of this Complaint.

70.     This Claim is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, and is asserted by Plaintiffs and the Class against all defendants.

71.     At all times relevant, the defendants, singly and in concert, engaged in, and aided and abetted a plan, scheme and unlawful conspiracy and course of conduct, pursuant to which they knowingly and recklessly engaged in acts, transactions, practices, and courses of conduct which operated as a fraud upon Plaintiffs and the Class, and made various untrue statements of material facts and failed to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs.  The purpose and effect of said scheme was and is to, among other things, induce Plaintiffs to effectuate the sale of their Coram common stock for consideration far less than the true market value of the said stock, so as to enrich defendants, at the sole expense of and detriment to Plaintiffs and the Class.

72.     At all relevant times, defendants, pursuant to said plan, scheme and unlawful conspiracy and course of conduct, and in violation of their (or the controlled person's) duty to Plaintiffs, knowingly or recklessly issued and/or caused to be issued, and participated in, the issuance of the false and misleading statements, designed to induce Plaintiffs and the

-30-

Class to sell their Coram common stock at artificially deflated prices, and to acquiesce in the emergence of Coram from bankruptcy proceedings as a "private" company owned by defendants. Defendants failed to disclose material facts to the Plaintiffs and the Class which would have resulted in them withholding their consent to the sale of their Coram stock, and opposing defendants' scheme to convert Coram into their own "private" company.

73.    By virtue of the foregoing acts, defendants have violated and/or aided and abetted violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, in that they, or a person whom they controlled: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of conduct which operated as a fraud or deceit upon the investors in the said Coram common stock, and in connection with the solicitation of their consent to the sale, assignment, or surrender of their interests in the said Coram common stock.

74.    In ignorance of the false and misleading nature of the misrepresentations and omissions described above, Plaintiffs and the Class have relied, to their detriment, upon the materially false and misleading statements referred to herein. As a direct and proximate result of defendants' wrongful conduct, the Plaintiffs have suffered substantial damage.

WHEREFORE, Plaintiffs pray for the relief as hereinafter set forth.

03/23/2001    14:31    SKADDEN ARPS → 95061800PP058470    NO.447    D35
SKADDEN    ID:201-639-6858    MAR 21'01    13:40 No.011 P.14

## IX.    SECOND CLAIM

### Section 20(a) of the Securities Exchange Act of 1934

#### (Against the Officer and Director Defendants, and the Lender Defendants)

75.    Plaintiffs reallege and specifically incorporate herein by reference the allegations contained in Paragraphs 1 through 74 of this Complaint.

76.    This Claim is based upon Section 20(a) of the Exchange Act, 15 U.S.C. §78t, and is brought by Plaintiffs and the class against the Officer and Director Defendants, and the Lender Defendants.

77.    By reason of the conduct detailed above, these defendants, and each of them, directly or indirectly, possessed the power to direct or cause the direction of the management and policies of Coram. Moreover, these defendants knowingly and/or recklessly exercised that power, to effectuate the above-referenced violations of Section 10(b) of the Exchange Act, and Rule 10b-5. Accordingly, each such defendant is liable under Section 20(a) of the Exchange Act, in connection with the purchases and sales of the Coram common stock described herein. As a direct and proximate result of the wrongful conduct of these defendants, Plaintiffs suffered substantial damage as a result of the sale of the purchases and sales of their shares of Coram common stock.

WHEREFORE, Plaintiffs pray for the relief as hereinafter set forth.

## XII.  THIRD CLAIM

### Fraud and Deceit

#### (Against all defendants)

78.    Plaintiffs reallege and specifically incorporate herein by reference the allegations contained in Paragraphs 1 through 77 set forth above.

79.    Plaintiffs assert this Claim against all defendants, for activities they engaged in during all relevant time periods referred to herein.

80.    Beginning in or about June 1, 1999, defendants commenced a common scheme, plan and conspiracy that continues to date. The primary purpose and effect of the defendants' conspiracy and scheme was to fraudulently induce Plaintiffs and the Class to sell, assign, and/or surrender their interests in their Coram common stock, at prices far below their true market value, all for the purpose of generating huge and substantial profits for the defendants themselves, at the cost and expense of the Plaintiffs and the Class. Defendants, and each of them, actively participated in and/or aided and abetted acts in furtherance of this conspiracy including, among other things, inducing defendant Coram to breach its fiduciary duties to Plaintiffs and the Class, and using Coram as a vehicle for disseminating false and misleading statements in press releases, designed to misrepresent the value of Coram common stock, perpetrate a fraud upon the market for the said stock, and to induce the consent of Plaintiffs and the Class to the sale, assignment, or surrender of all or substantially all of the rights conferred by the said Coram common stock, at little or no compensation whatsoever.

81.    These defendants, individually and in concert, directly and indirectly engaged in, and aided and abetted a common plan, scheme, and continuing course of conduct and conspiracy. In so doing, defendants knowingly engaged in acts and transactions to misrepresent and/or omit material facts in connection with purchases and sales of the Coram common stock described herein, which operated as a fraud and deceit upon the investors in those Coram common stock, including Plaintiffs and the Class.

82.    The materially false and misleading statements and omissions made to Plaintiffs and the Class at the time of their sales of their Coram common stock were made by defendants, and each of them, with an intent to deceive or defraud Plaintiffs and the Class, or to aid and abet the deception and defrauding of Plaintiffs and the Class. The purpose and effect of defendants' scheme and conspiracy to defraud was to induce Plaintiffs and the Class to effectuate the sale, assignment, or surrender of their existing interests in the said Coram common stock, so that defendants could earn substantial profits by reason of such sales, and consummate their ultimate goal of assuming full and complete ownership and control of Coram for themselves.

83.    Plaintiffs and the Class, at the time of said misrepresentations and omissions, were necessarily ignorant of these omissions and misrepresentations of material facts, which they believed to be true. In reliance upon the superior knowledge of the defendants, Plaintiffs and the Class consented to sale of some or all of their Coram common stock shares, or have been forced to participate in such sales to their detriment. If Plaintiffs and the Class had known the true facts, they would never have consented to the sale, assignment, or surrender of their interests in the said Coram common stock, for

-34-

consideration far below the true market value of the said shares. By reason thereof, Plaintiffs and the Class have suffered, and will continue to suffer, substantial damages.

84.    Defendants had a duty to fully disclose to Plaintiffs and the Class all material facts concerning the Coram common stock held by them, and/or to be sold by them.

85.    In ignorance of the false and misleading nature of the misrepresentations and omissions made to them by the said defendants, Plaintiffs and the Class have relied, to their damage, on the false, misleading and deceitful misrepresentations made to them by the defendants at the time of the sale of their Coram common stock, and on the false, misleading and deceitful misrepresentations made to them by the defendants at the time of their consent to the sale, assignment, or surrender of all, or substantially all of their interests in the said stock.

WHEREFORE, Plaintiffs pray for the relief as hereinafter set forth.

## XIII.    FOURTH CLAIM

### Breach Of Fiduciary Duties

### (Against the Officer and Director Defendants)

86.    Plaintiffs reallege and specifically incorporates herein by reference the allegations contained in Paragraphs 1 through 85 of this Complaint.

87.    The Officer and Director Defendants had a fiduciary duty to act in the best interests of the Plaintiffs and the Class, in connection with all activities relating to Coram common stock, and in connection with the activities of Coram under their supervision and

control. A special relationship of trust and confidence existed between Plaintiffs, the Class, and these defendants, reposing in defendants the obligations of that of a trustee acting on behalf of Plaintiffs and the Class, in all matters relating to the relationship, and to make every reasonable effort to attain the lawful and proper objectives of Coram, and to insure that the statements they made were accurate and truthful, and the actions taken by them designed to enhance the value of the shareholders' equity held by the Plaintiffs and the Class, and the profitability of Coram.

88.    Defendants breached their fiduciary duties to the Plaintiffs and the Class by working instead to orchestrate the scheme of fraud described herein, and to artificially deflate the value of the shares of Coram common stock held by Plaintiffs and the Class. In addition, these defendants breached their fiduciary duties to Plaintiffs and the Class by agreeing to a bankruptcy filing and "restructuring" of Coram, designed to strip Plaintiffs and the Class of any and all of the value represented by the shares of common stock held by them, through the vehicle of permitting Coram to emerge from the said bankruptcy proceedings as a "privately held company," owned and controlled solely by the defendants, including themselves.

89.    Through the foregoing acts, practices and course of conduct, these defendants were grossly negligent in failing to use special care and diligence in the exercise of their fiduciary obligations to the Plaintiffs and the Class. Defendants have violated, and continue to violate, their fiduciary duty of care to the Plaintiffs and the Class.

90.    The acts of the Officer and Director defendants complained of herein were and are in breach of their fiduciary duty of loyalty to Plaintiffs and the Class, in that these

-36-

defendants knew that their actions involved improper self-dealing and other acts in derogation of the fiduciary duties owed by them, as officers and directors of Coram, and/or as the controlling persons of the entities to which the proceeds and assets of Coram were entrusted, and delivered.

91.    As a proximate cause of the Officer and Director Defendants' conduct noted above, Plaintiffs and the Class have been damaged, and are entitled to recover an amount which will compensate them for all the detriment proximately caused thereby, whether it could have been anticipated or not.

92.    The conduct of the Officer and Director Defendants' was undertaken fraudulently, maliciously, willfully and in reckless disregard of the rights of Plaintiffs and the Class, and was intended and directed to harm the Plaintiffs and the Class, and to advance the personal interests of these defendants, entitling Plaintiffs and the Class to an award of punitive damages.

WHEREFORE, Plaintiffs pray for the relief as hereinafter set forth.

## XV.    FIFTH CLAIM

### (For Imposition of A Constructive Trust)

93.    Plaintiffs incorporate by reference paragraphs 1 through 92 set forth above.

94.    This Claim is asserted against all defendants, with respect to any and all of the substantial monies obtained from Plaintiffs by any and all defendants by virtue of securities fraud, common law fraud, breach of fiduciary duties, and/or negligence in connection with the wrongdoing complained of herein, and the perpetration of the fraud

-37-

upon the market for Coram common stock described herein, including the fraudulent implementation of all acts and transactions designed to induce Plaintiffs and the Class to consent to the sale, assignment or surrender of their interests in Coram common stock, at artificially depressed prices, during the Class Period, and any and all acts and transactions designed to transfer valuable assets from Coram to themselves.

95.    Plaintiffs and the Class reposed trust and confidence in some or all of the defendants as fiduciaries in the management of Coram. As a result of their relationship with and control over the assets and funds of Coram, all defendants assumed positions of trust with respect to the Plaintiffs and the Class, as well as to the Coram common stock as well. All proceeds paid, and/or purportedly payable to any of the defendants in connection with transactions engaged in by them through or with Coram, including but not limited to loans made by the Lender Defendants to Coram, and/or the sale, assignment or surrender of interests in the Coram common stock these defendants have received, have been procured in breach of trust.

96.    Plaintiffs and the Class are the true, sole and equitable owners of any and all Coram common stock sold by them during the Class Period, by reason of the misrepresentations and omissions described herein, and the proceeds paid to any and all defendants, and/or the stock interests obtained by defendants by reason of the sale, assignment or surrender of the Coram common stock interests of the Plaintiffs, are the rightful property of the Plaintiffs and the Class. The equitable interests of Plaintiffs and the Class in those proceeds are therefore superior to all others.

97.    Defendants, and each of them, participated in, and aided and abetted, the above-described securities laws violations and other wrongful acts with the express intent to obtain monies and property rightfully belonging to Plaintiffs and the Class. As a direct and proximate result of defendants' wrongful conduct and breaches of trust, defendants wrongfully acquired substantial sums of monies, and interests in Coram common stock rightfully belonging to Plaintiffs and the Class, and of which defendants are now constructive trustees.

98.    The defendants have no legal or equitable right or interest in any funds and stock interests rightfully belonging to the Plaintiffs and the Class, and are constructive trustees of such funds and stock interests, owing a duty to transfer same to Plaintiffs and the Class.

99.    The defendants are, therefore, also constructive trustees of:

a.    All funds received as a result of the sale or purchase of Coram common stock, or as the result of the purchase or sale of any asset of Coram, including its CPS unit;

b.    All other revenue or shares of stock received by the defendants, as a result of the wrongful acts complained of herein.

100.    Plaintiffs and the Class hereby assert their equitable interests, as described above, and demand the imposition of a constructive trust as to all proceeds so described.

WHEREFORE, Plaintiffs pray for the relief as hereinafter set forth.

## XVI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief against defendants and each of them, jointly, severally, or in the alternative, as follows:

A.    Certifying this action to proceed as a class action, pursuant to the provisions of Rule 23(b)(3), Fed. R. Civ. P.;

B.    Awarding Plaintiffs and the Class compensatory damages, in such amount as may be proved at trial, together with pre-judgment and post-judgment interest, representing the difference between the value received by Plaintiffs and the Class for the sale of their Coram common stock, and its true market value, at the time of their said sales.

C.    Awarding Plaintiffs and the Class compensatory damages, in such amount as may be proved at trial, together with pre-judgment and post-judgment interest, representing the difference between the value received by Plaintiffs and the Class for the sale of their Coram common stock, and the value that stock would have attained, in the absence of the breaches of fiduciary duties described herein, at the time of their said sales.

D.    Awarding Plaintiffs and the Class punitive damages, by reason of the wanton, malicious, intentional and/or reckless nature of the wrongs perpetrated against them.

Case 1:06-cv-00364-SLR    Document 1-9    Filed 05/31/2006    Page 21 of 22
03/23/2001    14:31    SKADDEN ARPS → 95061800PP05B470    NO.447    P44

SKADDEN                ID:201-639-6858        MAR 21'01    13:44 No.011 P.23

E.    Declaring a constructive trust upon all funds paid or payable to any and all of the defendants in connection with the purchase and/or sale of any of the Coram common stock, or the assets of Coram described herein;

F.    Requiring an immediate and full accounting of all transactions consummated by any of the defendants, with respect to the Coram common stock referred to herein, or any of the Coram assets transferred to them, during the Class Period;

G.    Awarding to Plaintiffs and the Class their attorneys' fees, together with the costs of this suit.

H.    Awarding to Plaintiffs and the Class such other and further relief as this Court may deem proper and just.

G. Martin Meyers, Esq.
LAW OFFICES OF G. MARTIN MEYERS, P.C.
35 West Main Street, Suite 106
Denville, New Jersey 07834
Telephone: (973) 625-0838
Telefax:    (973) 625-5350
Attorney for Plaintiffs and the Class

Susan S. Singer, Esq.
LAW OFFICES OF SINGER & GOGER
Renaissance Towers
111 Mulberry Street
Newark, New Jersey 07102

Attorneys for Plaintiffs and the Class

Dated: March 20, 2001        By: _____
                                    G. MARTIN MEYERS, ESQ.

-41-

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury of all issues as allowed by law.

G. Martin Meyers, Esq.
LAW OFFICES OF G. MARTIN MEYERS, P.C.
35 West Main Street, Suite 106
Denville, New Jersey 07834
Telephone: (973) 625-0838
Telefax:    (973) 625-5350
Attorney for Plaintiffs and the Class

Susan S. Singer, Esq.
LAW OFFICES OF SINGER & GOGER
Renaissance Towers
111 Mulberry Street
Newark, New Jersey 07102

Attorneys for Plaintiffs and the Class

Dated: March 20, 2001            By: _____
                                     G. MARTIN MEYERS, ESQ. (#5833)

-42-

# EXHIBIT G



CORAM HEALTHCARE

January 24, 2001

Total of 8 pages

<u>Via Priority Federal Express</u>

**Genesis Insurance Company**
Attention:  Manager, D&O Claims Department.
25550 Chagrin Boulevard, Suite 300
Beachwood, Ohio  44122

Re:     **Coram Healthcare Corporation**
        **Directors & Officers Liability Insurance**
        **Policy Numbers:**        **Genesis – YXB001625A**
                                   **Chubb – 752-152504-99**
                                   **RLI – EPG-0001054**
                                   **Zurich – DOC3636937-00**
                                   **Hartford – NDA-0160273-00**
                                   **Gulf – GA0491129**
                                   **Royal – PSF001588**

Dear Sir/Madam:

        This letter constitutes written notice furnished pursuant to Clause [7(c)] of the Policy No. YXB001625A (the "Policy") issued by Genesis Insurance Company Genesis to Coram Healthcare Corporation ("Coram" or the "Company") [1] of which you are either primary or follow form excess.  The Clause provides that if during the policy period the Insureds become aware of any occurrence which may subsequently give rise to a Claim being made against the Insureds in respect of any actual or alleged Wrongful Act(s), and the Insureds give written notice to you of such occurrence during the policy period, then any Claim which may subsequently be made against the Insureds arising out of such Wrongful Act(s) shall, for the purposes of the Policy, be treated as a Claim made during the currency of the Policy.

You are hereby notified of the following occurrences any or all of which may subsequently give rise to a Claim being made against the Insureds for Wrongful Acts which may be alleged to have been committed by such Insureds during the policy period:

        1.      On August 8, 2000 the Company and its subsidiary, Coram, Inc. (collectively the "Debtors"), filed voluntary petitions with the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") based upon their inability to repay $251 million in debt due or redeemable in May, 2001, and upon the need to remain in compliance with the physician ownership and referral provisions of the Omnibus Budget Reconciliation Act of 1993 ("Stark II").  Under the Bankruptcy Code, certain claims against the Debtors are stayed while the Debtors continue their operations as debtors-in-possession.  Additional Chapter 11 claims have

---

[1] Terms defined in the Policy are used herein with the same respective meanings unless otherwise defined herein.

arisen and may continue to arise resulting from the rejection of executory contracts, from the Bankruptcy Court's permitting the Debtors to access debtor-in-possession financing and from the determination by the Bankruptcy Court of allowed claims for disputed amounts. Additional Claims related to the stayed claims and the additional Chapter 11 claims and/or alleging, arising out of or based upon one or more Interrelated Wrongful Acts may be filed or otherwise brought against one or more of the Insureds. In addition, the filing of such petitions, the failure of the Debtors to pay or redeem such $251 million in debt or to comply with Stark II, the claims subject to the bankruptcy stay and the other Chapter 11 claims could give rise to Claims of fraud, neglect or breach of duty or other Wrongful Acts against one or more of the Insureds. (See Attachment 1 for further information regarding this Disclosure Notification)

2.    On December 28, 2000, the Debtor announced that the Bankruptcy Court approved its emergency request to allow its noteholders to convert approximately $122 Million of debt to equity (in the form of preferred stock) in order to maintain Debtor's compliance with Stark II. The terms, the making and the granting of such request, the conditions that led to the making of such request and the disclosures made in connection with such request could give rise to Claims by holders of Coram common stock arising out of the dilution of their ownership interests as a result of the debt to equity conversion and/or other claims of fraud, neglect or breach of duty or other Wrongful Acts against one or more of the Insureds. (See Attachment 2 for further information regarding this Disclosure Notification)

3.    On the same day that the Debtors' Chapter 11 cases were filed, they filed their joint Plan of Reorganization (the "Initial Plan") with the Bankruptcy Court. The Initial Plan was subsequently amended and restated (the "Restated Plan"). The Restated Plan was subsequently approved for distribution by the Bankruptcy Court. Confirmation and consummation of the Restated Plan would have resulted in the complete elimination of Coram's equity interests. On December 28, 2000, the Debtor announced that the Bankruptcy Court did not approve the Restated Plan. The Debtor is formulating and is expected shortly to submit a further revised Plan of Reorganization (the "Revised Plan") to the Bankruptcy Court. The Company expects that confirmation and consummation of the Revised Plan will also result in the complete elimination of Coram's equity interests. The terms and the submissions of the Initial Plan, the Restated Plan and the Revised Plan, the disapproval of the Restated Plan and the approval, if any, of the Revised Plan and of any revisions, amendments or other modifications of the Revised Plan, the conditions that led to the submissions of the Initial Plan, the Restated Plan and the Revised Plan and the disclosures made in connection with the Initial Plan, the Restated Plan and the Revised Plan could give rise to Claims of fraud, neglect or breach of duty or other Wrongful Acts against one or more of the Insureds. (See Attachment 3 for further information regarding this Disclosure Notification)

4.    In December 1999 Coram announced it was repositioning its business to focus on its core alternate site infusion therapy business and the clinical research and medical informatics business operated by one of its Subsidiaries. The Company implemented various programs and changes to its practices and continues to assess systems support and concentration of its resources. The Company has also liquidated or divested or is considering the liquidation or divestiture of certain of its operations. In particular, certain disputes have arisen regarding the relationship between Coram and CuraScript Pharmacy, Inc. ("CuraScript") arising out of the sale

of the Coram Prescription Services business (the "CPS business") to CuraScript on July 31, 2000. A number of matters remain unresolved at this time arising out of each party's performance of its obligations under the Marketing Services Agreement, the Transition Services Agreement and the Asset Purchase Agreement regarding the transaction. Furthermore, as a result of this reorganization of the Company's operating structure, branches have been closed or scaled back and personnel have been eliminated. The Company also incurred a restructuring charge that was recorded in the fourth quarter of 1999. The elements of the repositioning and restructuring of the Company's business and/or divestiture of operations, as they have continued and will continue and as they have changed and may further change, the creation of the financial conditions that led to the repositioning and restructuring and the disclosures made in connection with the repositioning, divestiture and restructuring could give rise to Claims of fraud, neglect or breach of duty or other Wrongful Acts against one or more of the Insureds. (See Attachment 4 for further information regarding this Disclosure Notification)

5.  In August 1999 an involuntary bankruptcy petition was filed against Coram Resource Network, Inc. in the Bankruptcy Court. On November 12, 1999 Coram Resource Network, Inc. and Coram Independent Practice Association, Inc. (together "RNET") filed voluntary bankruptcy petitions with the Bankruptcy Court and RNET have been and/or are being liquidated. In the summer of 2000, the Company received a draft complaint prepared by Young, Conaway, Stargatt & Taylor, counsel to RNET. In the complaint, RNET asserted claims of more than $41 million in damages against Coram and certain of its current and former officers and directors. The principal theories included piercing-the-corporate-veils to reach Coram and breaches by the directors of their fiduciary duties. No such complaint has actually been filed, but RNET filed a motion for substantive consolidation in the bankruptcy proceedings involving the Debtors. Subsequently, a settlement was reached regarding the substantive consolidation motion. There was not a release of claims in the settlement. RNET maintains a claim for $41 million against the Debtors in the bankruptcy proceedings. Furthermore. confirmation of the joint plan of reorganization filed in the Chapter 11 proceedings may not be approved with a full release of all potential Claims against the Insureds in the Debtors' Chapter 11 proceeding and in the RNET liquidation proceedings. The filing of those conditions leading up to the filing of the petitions, the petitions, the liquidation of R-NET, the motion for substantive consolidation, the creation of the financial conditions which resulted in those developments, and the Bankrupcy Court's potential non-release of all potential Claims against the Insureds could give rise to Claims of fraud, neglect or breach of duty or other Wrongful Acts against one or more of the Insureds. (See Attachment 5 for further information regarding this Disclosure Notification)

6.  In 1998, Coram restructured its credit facilities through the repayment of its former senior credit facility, exchanged its former subordinated debt for the issuance of Series A Notes and Series B Notes and established a new senior credit facility. The terms of the foregoing credit transactions, the disclosure made in connection with them and the creation of the financial conditions which resulted in them could give rise to Claims of fraud, neglect or breach of duty or other Wrongful Acts against one or more of the Insureds. (See Attachment 6 for further information regarding this Disclosure Notification)

7.  On November 6, 2000 Alan Furst, M.D. and Michael S. Harrison, Esq. filed a Complaint in the U.S. District Court for the District of New Jersey (the "New Jersey Action").

The Complaint in the New Jersey Action seeks class action status on behalf of those who sold Coram stock between August 8, 2000 and November 8, 2000. It is possible that additional class action suits may be filed relating to disclosures made by the Company regarding its financial condition, business, operations and relationships with the Insureds and lenders at times other than the class period set forth in the Furst v. Feinberg complaint. Furthermore, the Equity Committee in the Chapter 11 alleged that the Debtors failed to disclose fully to the creditors in the Disclosure Statement all of financial relationships that existed between Mr. Crowley and Cerberus Partners. In addition, certain portions of the transcript from the December 21, 2000 hearing in the Bankruptcy Court raise the implication that the officers and directors of the Debtors may have been negligent in failing to obtain such information from Mr. Crowley upon his employment with the organization and later in connection with their consideration of filing of the bankruptcy petitions. With this information, a stockholder or creditor of the Debtors may attempt to assert some sort of securities fraud, breach of fiduciary duty, negligence or other claim directly or derivatively against the Insureds for the failure to disclose this relationship, inquire about it, limit it or otherwise take notice of these facts in the operation of the organization or the filing of the bankruptcy petitions and the formulation and negotiation of the plan of reorganization that was proposed in the bankruptcy proceedings.

Additional class actions, Claims by the Equity Committee, Claims based on the conditions and circumstances set forth in the transcript from the December 21, 2000 hearing in the Bankruptcy Court, or other Claims related to the New Jersey Action, and/or alleging, arising out of or based upon one or more Interrelated Wrongful Acts may be filed or otherwise brought against one or more of the Insureds. (See Attachment 7 for further information regarding this Disclosure Notification)

8.      Coram was engaged in litigation (the "Aetna Litigation") with Aetna U.S. Healthcare, Inc. ("Aetna") over a five-year capitated agreement (the "Master Agreement") between the companies. In that litigation, Aetna sought damages of $133 Million or more. Although the Aetna Litigation has been resolved, other Claims related to the Aetna Litigation and/or alleging, arising out of or based upon one or more Interrelated Wrongful Acts may be filed or otherwise brought against one or more of the Insureds. (See Attachment 8 for further information regarding this Disclosure Notification)

9.      At various times the Company has had difficulty in obtaining and has failed to obtain pharmaceutical and other products needed to service its patients. The Company has been subjected to pressure from vendors to tighten payment terms and to increases in the time it takes to receive payment for its services. As a result, the Company has to an extent, shifted its services to persons covered under benefit plans funded by governmental or managed care payers (which reimburse at a lower rate and provide a narrower range of benefits than private indemnity payers) and has faced demands by care payers that it assume all or a portion of the financial risk of providing care. Furthermore, the Department of Justice and OIG have conducted surveys of acquisition costs of prescription drugs during the course of a national review of prices paid by government funded health programs for prescription drugs. Armed with initial findings, certain state Medicaid programs have implemented changes to the reimbursement rates applicable to such prescription drugs. The Debtors have information which indicates that such surveys will be ongoing. In connection with these surveys, the OIG or the Department of Justice or state

Medicaid programs may modify their reimbursement rates and may attempt to uncover overpayments made to suppliers such as CHC and its subsidiaries for prescription drugs. These factors have adversely affected the Company's results of operations and could provide for Claims for fraud, neglect or breach of duty, overpayment, improper billing or other Wrongful Acts against one or more of the Insureds. (See Attachment 9 for further information regarding this Disclosure Notification)

10.    There has historically been and may continue to be significant volatility in the market price for Coram's common stock and broad market fluctuations have affected and may in the future adversely affect that market price. In the past, following periods of volatility in the market price of Coram's stock, securities class actions have been brought against Coram and other Insureds. One or more further periods of volatility could give rise to Claims of fraud, neglect or breach of duty or other Wrongful Acts against one or more of the Insureds. (See Attachment 10 for further information regarding this Disclosure Notification)

11.    Coram's business is subject to extensive and frequently changing state and federal regulations and changes in the law or new interpretations of existing law(s). In August 2000, one of the Durable Medical Equipment Regional Carriers ("DMERC") of the Healthcare Financing Administration ("HCFA") conducted an audit of certain reimbursement claims submitted by the Lenexa, Kansas branch operated by Coram Alternate Site Services, Inc. ("CASS"). When preparing the documents requested by the DMERC in connection with the audit, certain company personnel recognized that certain claims may have been submitted without all of the required supporting documentation. The Company is reviewing the organization's billing practices with counsel to determine what exposure, if any is present. In connection with the audit, the DMERC may audit other company operations in other locations and may attempt to hold CASS and/or its parent and affiliated corporations or their respective officers and directors responsible for the repayment of claims submitted improperly and for penalties and interest associated with such improper claims. Any such claims may also be asserted by the OIG, Department of Justice or a qui tam relator. Coram's failure to comply with such regulation(s), law(s) and/or as a result of or related to the Lenexa, Kansas audit (including, but not limited to, further audits of other Company operations in other locations) could have an adverse effect on its ability to continue to provide, or receive reimbursement for, its equipment, products and services and could give rise to Claims of fraud, neglect or breach of duty or other Wrongful Acts against one or more of the Insureds and subject them to civil and criminal penalties. (See Attachment 11 for further information regarding this Disclosure Notification)

12.    Apria Healthcare, Inc. and one of its affiliates (collectively "Apria") filed a lawsuit in the Superior Court of Orange County, California (the "Apria Action"). The claims in the Apria Action relate to services provided as part of certain home health provider networks managed by RNET and alleges that RNET operated as the alter ego of Coram and that, accordingly, Coram should be declared responsible for the alleged breaches of the contracts RNET and with Apria. Additional actions or other Claims related to the Apria Action and/or alleging, arising out of or based upon one or more other contracts to which RNET was a party or Interrelated Wrongful Acts may be filed or otherwise brought against one or more of the Insureds. (See Attachment 12 for further information regarding this Disclosure Notification)

13.    On July 17, 2000 TBOB Enterprises, Inc. ("TBOB") filed an arbitration demand against Coram (the "TBOB Arbitration") arising out of the acquisition by a Coram subsidiary, Curaflex Health Services, Inc. ("Curaflex"), of the claimant's prescription services business. The demand in the TBOB Arbitration claims that Coram has impaired earn-out payments due TBOB (basis through March 2001) by improperly charging certain expenses to the acquired business and failing to enhance the value of that business.  TBOB has indicated that it believes that Coram and Curaflex have not upheld their duties under this arrangement.  The final earn-out payment is due in March 2001, and the arbitration matter has been withdrawn due to the Chapter 11 proceedings.  Additional Claims related to the TBOB Arbitration and/or alleging, arising out of or based upon one or more Interrelated Wrongful Acts may be filed or otherwise brought against one or more of the Insureds by persons whose businesses have been acquired by the Company.  (See Attachment 13 for further information regarding this Disclosure Notification)

14.    In May 1999, Coram received a statutory notice of deficiency from the Internal Revenue Service (the "IRS") with respect to proposed adjustments regarding the deduction of warrants, write-off of goodwill and the specified liability portion of Coram's loss for the year ended September 30, 1995 which may affect prior years' tax liabilities.  Additional Claims by the IRS alleging, arising out of or based upon one or more Interrelated Wrongful Acts and Claims of fraud, neglect or breach of duty or other Wrongful Acts alleging, arising out of or based upon the disclosure or failure to disclose such proposed adjustments or Interrelated Wrongful Acts may be filed or otherwise brought against one or more of the Insureds.  (See Attachment 14 for further information regarding this Disclosure Notification)

15.    Insureds have historically made statements to securities analysts and others, issued press releases and filed (and deferred filing) reports with the Securities and Exchange Commission reporting financial results for respective prior periods and characterizing Coram's operations, financial condition and prospects.  In light of subsequent developments (including, without limitation, the Debtors' bankruptcy) creditors, shareholders, and/or purchasers of Coram's common stock may bring Claims against one or more of the Insureds alleging that such statements, releases and reports failed to disclose sufficiently the Company's deteriorating financial condition on a timely basis and were otherwise false and misleading, concealed material adverse information, contained untrue statement of material facts and/or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading and that such statements, releases and reports constituted Wrongful Acts.   (See Attachment 15 for further information regarding this Disclosure Notification)

16.    Further in light of such subsequent developments, creditors, shareholders and purchasers of Coram's common stock may bring Claims against one or more of the Insureds alleging that they failed to take timely and appropriate action to address the deteriorating financial condition of the Company by not instituting policies, procedures and controls to avoid the financial losses and other deterioration in the Company's condition and operation which have led to the Debtors' bankruptcy.  (See Attachment 16 for further information regarding this Disclosure Notification)

17.    A person who was formerly employed by the Mount Prospect, Illinois branch filed a charge with the EEOC alleging sexual harassment and unlawful discrimination in connection with the termination of her employment in 1998.  In 1999, the EEOC made a finding that discrimination may have occurred with respect to Ms. Alcala and perhaps others.  However, we have received no notice that the EEOC has issued a right to sue letter.  Additionally, we have received no notice that a lawsuit has been filed by Ms. Alcala even though her attorney has made inquiries about resolving the matter and about the pending bankruptcy proceedings. It is possible that Ms. Alcala could raise a claim against Coram Healthcare Corporation ("CHC"), Coram Alternate Site Services, Inc. and/or their officers and directors relating to the unlawful discrimination or the sexual harassment of which Ms. Alcala has already complained.  (See Attachment 17 for further information regarding this Disclosure Notification)

18.    The former Chief Executive Officer and President, Richard M. Smith, signed an agreement with Coram and Coram, Inc. ("CI") in November 1999 that contemplated that he would be paid two years of salary continuation plus certain other benefits in connection with his departure from the organization.    These obligations were guaranteed by the operating subsidiaries of CI. The organization discontinued making the severance payments (as it did with all severance payments) when the Chapter 11 petitions were filed by the Debtors on August 8, 2000.  Mr. Smith may attempt to raise a claim against the Insureds for bad faith discontinuation of the payments.  (See Attachment 18 for further information regarding this Disclosure Notification)

19.    Certain lower tier subsidiaries of Coram operate home nursing agencies in the state of New York.  As such, they are regulated by the New York Department of Health.  The New York Department of Health requires the submission of extensive background information on the officers and directors of each regulated entity and the entities that control them.  In prior acquisition transactions, Coram has not strictly followed the requirements of the Department and has been forced to pay fines of more than $25,000.  The New York Department of Health may take the position that the exchange of debt for preferred stock of Coram, Inc. that occurred on or about December 31, 2000 was a change of control that required their prior approval.  The Department may then try to enforce some sort of penalty or injunction against one or more of the Insureds. . (See Attachment 19 for further information regarding this Disclosure Notification)

20.    Based on exit paperwork, the Company has learned that three former employees from its Omaha, Nebraska, branch, Lauri Galloway, Carol Nelson, and Misty Griffin, believe that the Company improperly permitted a hostile work environment to persist in such branch.  It is possible that any of these former employees may attempt to hold the Insureds responsible for any such action or inaction.  (See Attachment 20 for further information regarding this Disclosure Notification)

For the purpose of this notice, a Claim shall allege an "Interrelated Wrongful Act" if such Claim alleges, arises out of, is based upon or in any way related to, directly or indirectly, in part or in whole (i) any fact, circumstances, act or omission alleged in any of items (1), (7), (8), (12), (13), (14), and (17) above and/or (ii) any Wrongful Act which is the same as, similar or related to or a repetition of any Wrongful Act alleged in any of items (1), (7), (8), (12), (13), (14) and (17) above, regardless of whether such claim involves the same or different Insureds, the same or

different legal causes or actions or the same or different claimants or is brought in the same or different venue or resolved in the same or different forum.

In providing this notice, the Insureds do not admit that they committed any Wrongful Act(s) and do not concede liability with respect to any of the Claims and/or potential Claims referred to above or waive any defenses with respect to any of such Claims and/or potential Claims. This notice is provided solely for the purpose of preserving the Insureds' rights to coverage under the Policy with respect to those Claims and potential Claims. This communication is privileged and otherwise protected from disclosure in litigation under a joint defense or common interest privilege as attorney work product or otherwise. The Attachments to this letter shall be provided in a separate mailing.

Please promptly acknowledge your receipt of this notice and acceptance of it as a notice of occurrences which may subsequently give rise to a Claim and/or Claims being made against the Insureds and that this notice satisfies the requirements of Clause [7(c)] of the Policy. If you have any questions or require additional information, please do not hesitate to contact us immediately.

Very truly yours,
CORAM HEALTHCARE CORPORATION
David Schwab
General Counsel

# EXHIBIT H

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Settlement Agreement") is made and entered into this fifth

day of April, 2006, by and between ARLIN M. ADAMS (the "Trustee"), in his capacity as

CHAPTER 11 TRUSTEE TO THE BANKRUPTCY ESTATES OF CORAM HEALTHCARE

CORPORATION ("CHC") and CORAM, INC. ("CI" and together with CHC, collectively

"Coram") and the following former members of the Coram Board of Directors:  DONALD J.

AMARAL, a citizen of the State of Nevada, WILLIAM J. CASEY, a citizen of the State of

California, L. PETER SMITH, a citizen of the State of Illinois, and SANDRA L. SMOLEY, a

citizen of the State of California (collectively the "Outside Directors").

WHEREAS, on December 29, 2004, the Trustee commenced an action against

defendant Daniel J. Crowley, Coram's former Chairman, President and CEO, and the Outside

Directors, in the United States District Court for the District of Delaware at Case No. 04-1565-

SLR (the "Delaware Action");

WHEREAS, the Delaware Action alleges that Crowley and the Outside Directors

breached their fiduciary duties to Coram;

WHEREAS, the Outside Directors notified Genesis Insurance Company

("Genesis") of the Delaware Action but Genesis has refused to defend them;

WHEREAS, the Trustee and the Outside Directors, without any admission of

liability, desire to avoid the expense and uncertainty of further litigation and to resolve any and

all disputes that have been raised or could be raised in the Delaware Action by entering into this

Settlement Agreement; and

1

**WHEREAS**, this Settlement Agreement is subject to approval by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

**NOW, THEREFORE**, in consideration of the promises set forth in this Settlement Agreement, which the parties agree constitute good and sufficient consideration, and subject to the terms and conditions set forth below, and intending to be legally bound, the Trustee and the Outside Directors agree as follows:

1.      The Outside Directors consent to the entry of judgment in the Delaware Action against them in favor of the Trustee in the amount of $9,550,000 (the "Judgment").

2.      Within five business days of the execution of this Settlement Agreement and receipt by the Trustee of the financial information from the Outside Directors as set forth below, the Trustee will file a motion with the Bankruptcy Court to approve this Settlement Agreement.

3.      The Outside Directors hereby assign to the Trustee all of their rights and any and all causes of action any or all of them may have arising out of, or under, any of the directors' and officers' liability insurance policies obtained by Coram for their benefit, including but not limited to the primary policy issued by Genesis (Policy No. YXB001625A), for the period January 8, 1999 through January 27, 2001 (the "D&O Policy"), and any further causes of action based on the handling of the Outside Directors' claims under such policies.

4.      The Trustee agrees that he will not seek to execute on the Judgment on any assets of the Outside Directors other than the claims assigned in paragraph 3 above and the directors' and officers' liability insurance policies, including the D&O Policy.

2

PHDATA 1354393_2

5.     This settlement is contingent upon the Outside Directors providing the Trustee in writing with accurate and complete information substantiating their representations regarding the Outside Directors' executable assets, which the Trustee has reasonably relied upon in negotiating this Settlement Agreement.

6.     Any financial information provided by the Outside Directors that is marked "Confidential" by the Outside Directors shall not be disclosed by the Trustee or his attorneys to any third party without the consent of the Outside Directors except that:  (a) the Trustee may, if necessary, submit such financial information to the Bankruptcy Court in support of his motion to approve this Settlement Agreement, but shall request that he be permitted to do so under seal; and (b) the Trustee may comply with any order or direction of the Bankruptcy Court regarding such information.

7.     The Outside Directors shall continue to defend the action for a declaratory judgment filed against them by Genesis in the U.S. District Court for the District of Colorado (Civil Action No. 05-cv-335) (the "Coverage Action") and to prosecute their counterclaim for breach of the D&O Policy in the Coverage Action until this Settlement Agreement is approved by the Bankruptcy Court. Thereafter, the parties shall use their best efforts to have the Trustee substituted as a party-in-interest for the Outside Directors in the Coverage Action.

8.     The Trustee shall make reasonable efforts to prosecute in the Coverage Action the Outside Directors' claims under the D&O Policy for attorneys' fees and costs incurred in the Delaware Action and the Coverage Action. The Trustee shall not be required to appeal any ruling of the trial court in the Coverage Action relating to the Outside Directors' claim for attorneys'

3

fees and costs and the Trustee shall be permitted to compromise such claim with the approval of the Outside Directors, which shall not be unreasonably withheld.

9.      Within ten (10) days of the Bankruptcy Court's approval of this Settlement Agreement, the parties shall cause the consent judgment to be entered in the Delaware Action.  If the Bankruptcy Court does not grant the Motion to Approve Settlement, this Settlement Agreement is null, void and of no effect.  If the Bankruptcy Court grants the Motion to Approve Settlement but only with modifications, the parties agree to negotiate in good faith in an effort to reach agreement to satisfy any concerns the Bankruptcy Court might express.  Failing such agreement, the Settlement Agreement will be null and void and the parties will return to their prior positions.

10.     Upon approval of this Settlement Agreement by the Bankruptcy Court, each of the Outside Directors agrees to cooperate with the Trustee in connection with the Coverage Action and the continuing Delaware Action against defendant Daniel Crowley and shall comply with all reasonable requests of the Trustee.

11.     The Trustee and the Outside Directors represent that they enter into this settlement freely and voluntarily and with and upon the advice of counsel.

12.     No covenants, agreements, representations or warranties of any kind have been made by any party hereto, except as expressly set forth herein.  This Settlement Agreement constitutes the entire agreement between the parties relating to the subject matter hereof, and all prior negotiations and discussions with respect to the subject matter of this Settlement

4

Agreement have been and are merged and integrated into, and superseded by this Settlement Agreement.

13.    This Settlement Agreement may not be altered, amended, modified, terminated or otherwise changed in any respect whatsoever except by a writing signed by the Trustee and the Outside Directors.

14.    This Settlement Agreement shall be binding upon and inure to the benefit of the Trustee (in his capacity as Trustee only and not personally) and the Outside Directors, and their respective agents, representatives, attorneys, partners, employees, predecessors, successors, heirs, assigns, executors, administrators, and any other persons who may in any fashion claim an interest in the subject matter hereof through any of the parties.

15.    This Settlement Agreement shall be construed and enforced under the law of the State of Delaware.

16.    This Settlement Agreement may be signed in counterpart copies, each of which shall be deemed to be an original document, and all of which shall together be deemed to constitute a single document.  Facsimile copies shall be deemed to be originals.

**[balance of page intentionally left blank]**

PHDATA 1354393_2

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the date stated at the outset.

WITNESS:

_____

**ARLIN M. ADAMS**

_____
Arlin M. Adams, as Chapter 11 Trustee of
Coram Healthcare Corp. and Coram, Inc.

WITNESS:

_____

**DONALD J. AMARAL**

_____
Donald J. Amaral

WITNESS:

_____

**WILLIAM J. CASEY**

_____
William J. Casey

WITNESS:

_____

**L. PETER SMITH**

_____
L. Peter Smith

WITNESS:

_____

**SANDRA L. SMOLEY**

_____
Sandra L. Smoley

6

IN WITNESS WHEREOF, the parties hereto have executed this Settlement

Agreement as of the date stated at the outset.

WITNESS:                                  **ARLIN M. ADAMS**

_____      _____

Arlin M. Adams, as Chapter 11 Trustee of
Coram Healthcare Corp. and Coram, Inc.

WITNESS:                                  **DONALD J. AMARAL**

_____      _____

                                                Donald J. Amaral

WITNESS:                                  **WILLIAM J. CASEY**

_____      _____

                                                William J. Casey

WITNESS:                                  **L. PETER SMITH**

_____      _____

                                                L. Peter Smith

WITNESS:                                  **SANDRA L. SMOLEY**

_____      _____

                                                Sandra L. Smoley

PHDATA 1354393_2

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the date stated at the outset.

WITNESS:                              **ARLIN M. ADAMS**

_____              _____
                                     Arlin M. Adams, as Chapter 11 Trustee of
                                     Coram Healthcare Corp. and Coram, Inc.

WITNESS:                              **DONALD J. AMARAL**

_____              _____
                                     Donald J. Amaral

WITNESS:                              **WILLIAM J. CASEY**

_____              _____
                                     William J. Casey

WITNESS:                              **L. PETER SMITH**

_____              _____
                                     L. Peter Smith

WITNESS:                              **SANDRA L. SMOLEY**

_____              _____
                                     Sandra L. Smoley

6

To: Boris Feldman

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the date stated at the outset.

WITNESS:                              ARLIN M. ADAMS

_____              _____
                                     Arlin M. Adams, as Chapter 11 Trustee of
                                     Coram Healthcare Corp. and Coram, Inc.

WITNESS:                             DONALD J. AMARAL

_____              _____
                                     Donald J. Amaral

WITNESS:                             WILLIAM J. CASEY

_____              _____
                                     William J. Casey

WITNESS:                             L. PETER SMITH

_____              _____
                                     L. Peter Smith

WITNESS:                             SANDRA L. SMOLEY

_____              _____
                                     Sandra L. Smoley

6

PHDATA 1354393_2

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the date stated at the outset.

WITNESS:                                    **ARLIN M. ADAMS**

_____            _____
                                           Arlin M. Adams, as Chapter 11 Trustee of
                                           Coram Healthcare Corp. and Coram, Inc.

WITNESS:                                    **DONALD J. AMARAL**

_____            _____
                                           Donald J. Amaral

WITNESS:                                    **WILLIAM J. CASEY**

_____            _____
                                           William J. Casey

WITNESS:                                    **L. PETER SMITH**

_____            _____
                                           L. Peter Smith

WITNESS:                                    **SANDRA L. SMOLEY**

_____            _____
                                           Sandra L. Smoley

6

PHDATA 1354393_2

# EXHIBIT I

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                          :    Chapter 11
                                                :
CORAM HEALTHCARE CORP. and                      :    Case No. 00-3299 (MFW)
CORAM, INC.,                                     :    (Jointly Administered)
                                                :
            Debtors.                            :    **Docket Ref. No: 4646**
                                                :

---

## ORDER GRANTING MOTION OF THE CHAPTER 11 TRUSTEE
## FOR APPROVAL OF SETTLEMENT WITH OUTSIDE DIRECTORS

---

AND NOW, this 24th day of _____April_____, 2006, upon

consideration of the Motion of the Chapter 11 Trustee for Approval of Settlement With

Outside Directors (the "Motion"); and upon further consideration of any objection to the

Motion; and the Court finding that: (a) it has jurisdiction over this matter pursuant to 28

U.S.C. §§ 157 and 1334; (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (c)

notice of the Motion was sufficient under the circumstances and no other further notice need

be provided; (d) a reasonable opportunity to object or to be heard regarding the relief

requested in the Motion has been afforded to all interested persons and entities; (e) the relief

requested in the Motion in the best interests of the Debtors'[1] estates; (f) good and sufficient

grounds for entering into the Settlement Agreement annexed to the Motion as Exhibit F (the

"Settlement Agreement") have been established; and (g) the terms and conditions of the

Settlement Agreement are fair, reasonable and in the best interest of the Debtors' estates; and

after due deliberation thereon and sufficient cause appearing therefore, it is

---

[1] Unless otherwise defined herein, all capitalized terms shall have the same meanings ascribed to them in the Motion.

**ORDERED**, that, pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019, the

Motion be and hereby is **GRANTED**, and it is further

**ORDERED**, that the Trustee be and hereby is **AUTHORIZED** to enter into the

Settlement Agreement, the terms and conditions of which are **APPROVED**; and it is further

**ORDERED**, that the Trustee be and hereby is **AUTHORIZED** to take such

further actions as may be necessary to implement the terms and conditions of the Settlement

Agreement.

Mary F. Walrath, C.U.S.B.J.

2

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Arlin M. Adams, as Chapter 11 Trustee of the Bankruptcy Estates of Coram Healthcare Corporation and Coram, Inc.

## DEFENDANTS
Genesis Insurance Company

**(b)** County of Residence of First Listed Plaintiff ___New Castle County,___ Delaware
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Schnader Harrison Segal & Lewis LLP
824 North Market St., Suite 1001
Wilmington, DE 19801  (302) 888-4554

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☒☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Trustee for Incorporated or Principal Place of Business In This State | ☒☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☒☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | **PERSONAL INJURY** | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | ☐ 362 Personal Injury - Med. Malpractice | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 365 Personal Injury - Product Liability | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 368 Asbestos Personal Injury Product Liability | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | **PERSONAL PROPERTY** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 370 Other Fraud | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 371 Truth in Lending | | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 380 Other Personal Property Damage | | | ☐ 950 Constitutionality of State Statutes |
| **CIVIL RIGHTS** | ☐ 385 Property Damage Product Liability | | | |
| ☐ 441 Voting | **PRISONER PETITIONS** | | | |
| ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 443 Housing/ Accommodations | **Habeas Corpus:** | | | |
| ☐ 444 Welfare | ☐ 530 General | | | |
| ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | | |
| ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other | | | |
| ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | |
| | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332
Brief description of cause:
Breach of insurance contract

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 9,550,000+

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE Robinson Miller Walrath
DOCKET NUMBER 04-1565 (D. Del.) 05-335 (D. Colo.) 06-50639 (Bankr. D. Del.)

DATE 05/31/06

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ 0 6 - 3 6 4

# ACKNOWLEDGMENT
## OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ___1___ COPIES OF AO FORM 85.

5·31-06
(Date forms issued)

(Signature of Party or their Representative)

(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action